UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| INTERMED SERVICES MANAGEMENT COMPANY, LP, | § § § | |
| Plaintiff | § § | |
| V. | § § | Civil Action No. 3:22-cv-00191-L |
| HORSESHOE, LLC AND HALTER COMPANIES, LLC, | § § § | |
| Defendants. | § § | |

## AMENDED NOTICE OF REMOVAL

Defendants, Horseshoe, LLC and Halter Companies, LLC ("Defendants"), pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, file their Amended Notice of Removal of this action from the 382nd Judicial District Court of Rockwall County, Texas, Cause No. 1-22-0060, to the United States District Court for the Northern District of Texas. As grounds for removal, Defendants state as follows:

1.      In support of this Amended Notice of Removal Defendants attach and incorporate herein the Affidavit of Benjamin Efraim that was filed in connection with the Notice of Removal. Plaintiff Intermed Services Management Company, LP ("Plaintiff" or "Intermed") filed this action in the 382nd Judicial Court of Rockwall County, Texas seeking declaratory relief pertaining to a sale of real property that is located in that county.

2.      Plaintiff Intermed is a limited partnership. The citizenship of a limited partnership is determined by the citizenship of its limited partners. *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008).

3.      The limited partners of Plaintiff are:

a.      Dr. Scott M. Pierce, a citizen of the State of Texas;

b.      Dr. Evan Evans, a citizen of the State of Texas;

c.      Dr. Joseph T. Bleier, a citizen of the State of Texas;

d.      Dr. Asim Usman, a citizen of the State of Texas;

e.      Dr. Steven P. Brancheau, a citizen of the State of Texas;

f.      Dr. Syed Adnan Hamid, a citizen of the State of Texas;

g.      Dr. Mohan Philip, a citizen of the State of Texas;

h.      Dr. Robert M. Lenington, a citizen of the State of Texas; and

i.      Dr. David Minchey, a citizen of the State of Alabama.

4.      The general partner of Plaintiff is Intermed Services, Inc. Intermed Services, Inc. is a Texas corporation with its principal place of business in Greenville, Texas. Intermed Services, Inc. is a citizen of the State of Texas.

5.      None of the Plaintiff's partners is a citizen of the State of California. Plaintiff Intermed Services Management, L.P. is a citizen of the State of Texas

6.      Defendants are limited liability companies organized and existing under the laws of the State of California. The citizenship of a limited liability company is based on the citizenship of its members. *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008). All of Defendants' members are citizens of the State of California, as shown below.

7.      Defendant Halter Companies, LLC has two members: Black Equine Holdings Corp. and Fortune Equities, LLC. Black Equine Holdings Corp. is a corporation organized under the laws of the State of California with its principal place of business located in the State of California. As such, Black Equine Holdings Corp. is a citizen of the State of California.

8.      Fortune Equities, LLC is a limited liability company organized under the laws of the State of California. Its members are all California trusts. The citizenship of these trusts is

based on the citizenship of the trusts' trustees. *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 297 n.6 (5th Cir. 2009); *Dillard Family Trust v. Chase Home Fin., LLC*, 2011 U.S. Dist. LEXIS 147869 (N.D. Tex. 2011).

  9.  The Fortune Equities, LLC's member trusts are:

  a.  The B.E. 2006 Trust, a California Trust. The Trustee of The B.E. 2006 Trust is Kena Chin Efraim, who is a resident of the State of California.

  b.  The BEE-BER Trust. The Trustee of the BEE-BER Trust is Kena Chin Efraim, who is a resident of the State of California.

  c.  The BEE-MCE Trust 1. The Trustee of the BEE-MCE Trust 1 is Kena Chin Efraim, who is a resident of the State of California.

  d.  The BEE-MCE Trust 2. The Trustee of the BEE-MCE Trust 2 is Roy Newman, who is a resident of the State of California.

  e.  The MBE-BER Trust.  The Trustee of the MBE-BER Trust is Kena Chin Efraim, who is a resident of the State of California.

  f.  The MBE-MCE Trust 1. The Trustee of the MBE-MCE Trust 1 is Kena Chin Efraim, who is a resident of the State of California.

  g.  The MBE-MCE Trust 2. The Trustee of the MBE-MCE Trust 2 is Roy Newman, who is a resident of the State of California.

  h.  The TCE-BER Trust. The Trustee of the TCE-BER trust is Kena Chin Efraim, who is a resident of the State of California.

  i.  The TCE-MCE Trust 1. The Trustee of the TCE-MCE Trust 1 is Kena Chin Efraim, who is a resident of the State of California.

  j.  The TCE-MCE Trust 2. The Trustee of the TCE-MCE Trust 2 is Roy Newman, who is a resident of the State of California.

10.     Because all of Fortune Equities, LLC's members are citizens of the State of California, Fortune Equities, LLC is also a citizen of the State of California.

11.     Therefore, since both members of Plaintiff Halter Companies, LLC are citizens of the State of California, Halter Companies, LLC is a citizen of the State of California.

12.     Defendant Horseshoe, LLC has two members: The B.E. 2006 Trust and Black Equine Holdings Corp. Black Equine Holdings Corp. is a corporation organized under the laws of the State of California with its principal place of business located in the State of California. As such, Black Equine Holdings Corp. is a citizen of the State of California.

13.     The B.E. 2006 Trust is a California Trust. The Trustee of the B.E. 2006 Trust is Kena Chin Efraim, who is a resident of the State of California.

14.     Because all of Horseshoe, LLC's members are citizens of the State of California, Horseshoe, LLC is a citizen of the State of California.

15.     Therefore, since Halter Companies, LLC and Horseshoe, LLC are citizens of the State of California, and Plaintiff is a citizen of the State of Texas, there is complete diversity between the parties. Diversity jurisdiction over Plaintiff's action exists in this Court under 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs (as shown below), and this matter is between citizens of different states.

16.     Defendant Horseshoe, LLC contracted to purchase a commercial property in Rockwall County, Texas from Plaintiff for the sum of $6,826,000.00. After many months of negotiations and amendments to the contract for the purchase of that property, Plaintiff repudiated and/or terminated the contract.

17.     On January 21, 2022, Defendant Halter Companies, LLC filed an Original Complaint and Demand for Arbitration against Plaintiff Intermed Services Management, L.P., in the United States District Court for the Northern District of Texas, in Cause No. 3:22-cv-00145-

N (the "First Federal Case") concerning title to the same real property that is at issue in this case. Defendants intend to move the District Court to consolidate the instant action with the First Federal Case and to compel arbitration in the consolidated cases, as the parties' contract mandates arbitration.

18.    Because Plaintiff's Original Petition for Declaratory Relief does not state an amount in controversy, Defendants are entitled to do so and show that the amount in controversy is in excess of $75,000. *De Aguilar v. Boeing Co.*, 11 F.3d 55, 58 (5th Cir. 1993). "[T]he amount in controversy, in an action for declaratory or injunctive relief, is the value of the right to be protected or the extent of the injury to be prevented." *Leininger v. Leininger*, 705 F.2d 727, 729 (5th Cir. 1983). Defendants would show the Court that the amount in controversy in this action is in excess of $75,000, exclusive of interest and costs, because the value of the real property, the title to which is at issue herein, is at least $6,150,000, as shown below.

19.    Plaintiff is the owner of that certain building and real property located generally at 810 E. Ralph Hall Parkway, Rockwall, Rockwall County, Texas (the "Property"). The Property consists generally of an office building in which several of Plaintiff's limited partners operate medical practices.

20.    On or about December 16, 2020, Plaintiff and Horseshoe, LLC ("Horseshoe") entered into that certain North Texas Commercial Association of Realtors Commercial Contract of Sale (the "Contract"). Robert Lenington, one of Plaintiff's limited partners, signed the Contract for Plaintiff as its "managing partner". At the time, Dr. Lenington was the President of Plaintiff, as reported by Plaintiff to the Texas Secretary of State.

21.    Under the terms of the Contract, Plaintiff agreed to sell the Property to Horseshoe for the sum of $6,826,000.00. Horseshoe ultimately assigned the Contract to Halter

Companies, LLC ("Halter") as allowed in the Contract. References to Defendant herein shall include Horseshoe prior to the assignment.

22.     Defendant performed all of its obligations under the Contract and began its due diligence as provided therein.

23.     Between March 22, 2021, and November 4, 2021, the parties amended the Contract five times. In the Fourth Amendment the parties reduced the purchase price to $6,150,000. Each of the amendments extended the closing date. Plaintiff signed each of the amendments through its purported manager and president, Robert Lenington.

24.     Unbeknownst to Defendant, Plaintiff purportedly had replaced Robert Lenington as the manager of Plaintiff in or about April 2021. Yet, Plaintiff continued to have Dr. Lenington sign the amendments to the Contract through November 2021, without verifying that Dr. Lenington was no longer the general partner, manager or president of Plaintiff.

25.     In or about October of 2021, for reasons that were never explained to Defendant, Plaintiff began to undertake a systematic course of conduct to stall, delay, and obstruct many actions required by the Contract in order to inhibit Defendant's ability to take necessary actions to close the transaction.  Plaintiff's actions were deliberately designed to create a situation in which it would become difficult, if not impossible, for Defendant to close.  The chain of events that were to lead to the closing were like a line of dominoes that needed to fall for Defendant to complete its due diligence and obtain financing in order to comply with the Contract and close the sale.

26.     On information and belief, Plaintiff concocted a scheme to delay, stall, obstruct and prevent the closing of the Contract so that it could attempt to sell the Property to another purchaser at a higher price than that at which it had agreed to sell the Property to Defendant. Plaintiff attempted to rely on the delays and alleged issues Plaintiff itself created to justify an

alleged repudiation and/or termination of the Contract. By letter dated January 18, 2022, Plaintiff advised Defendant that it repudiated or terminated the Contract. Defendant had complied with the Contract and was ready, willing and able to close the sale, but Plaintiff refused to close. Therefore, this action concerns the sale of real property valued under the Contract at $6,150,000.

27.    This action involves a dispute as to the ownership of real property that exceeds $6,000,000 in value. Therefore, because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship, this Court has diversity jurisdiction over this matter.

28.    The United States District Court for the Northern District of Texas, Dallas Division, is the appropriate court for removal of this action from the 382nd Judicial Court of Rockwall County, Texas.

29.    This Amended Notice of Removal is allowed pursuant to 28 U.S.C. §1653.

30.    Pursuant to 28 U.S.C. §1446(d), Defendants have served a copy of the Amended Notice of Removal on Plaintiff and has filed a copy of the Amended Notice of Removal with the Clerk of the District Court of Rockwall, Texas.

WHEREFORE, having fulfilled all statutory requirements, Defendants remove the above-described action pending in the 382nd Judicial Court of Rockwall County, Texas to the United States District Court.

Respectfully submitted,

/s/ Phillip J. Conley
Phillip J. Conley
State Bar No. 04666200
E-mail: pjc@crm-lawfirm.com
Attorney-in-charge
Jay M. Rosenberg
State Bar No. 17269450
E-mail: jmr@crm-lawfirm.com

CONLEY ROSENBERG & MENDEZ PC

14160 Dallas Parkway
Suite 800
Dallas, Texas 75254
(972) 364-9700
(972) 713-6480 (facsimile)

ATTORNEYS FOR DEFENDANTS
HORSESHOE, LLC AND HALTER
COMPANIES, LLC

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing pleading was served upon Plaintiff's counsel on this 15th day of February, 2022.

/s/ Phillip J. Conley
Phillip J. Conley

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| INTERMED SERVICES MANAGEMENT COMPANY, LP, | § § § | |
| Plaintiff | § § | |
| V. | § | Civil Action No. _____ |
| | § | |
| HORSESHOE, LLC AND HALTER COMPANIES, LLC, | § § | |
| | § | |
| Defendants. | § | |

### AFFIDAVIT OF BENJAMIN EFRAIM

| | |
|---|---|
| STATE OF CALIFORNIA | § |
| | § |
| COUNTY OF VENTURA | § |

BEFORE ME, the undersigned Notary Public, on this day personally appeared Benjamin Efraim, who, being by me duly sworn upon his oath, deposed and stated the following:

"My name is Benjamin Efraim. I am over the age of 18, have never been convicted of a felony or a crime involving moral turpitude, and am fully competent to testify in all respects. I have personal knowledge of all facts set forth herein, and they are all true and correct.

I am the Manager of Fortune Realty, LLC, which is the manager of Halter Companies, LLC ("Halter") and Horseshoe, LLC ("Horseshoe").

In these management positions I am familiar with the formation, ownership and operations of Halter and Horseshoe.

I have read the Notice of Removal of Halter and Horseshoe in the referenced matter, and each statement therein is based on my personal knowledge or obtained from the companies' documents that are in my custody, and based thereon each such statement is true and correct.

Affidavit of Benjamin Efraim                                                                    Page 1

Attached hereto and incorporated herein is a true and correct copy of the North Texas Commercial Association of Realtors Commercial Contract of Sale between Horseshoe, LLC (later assigned to Halter Companies, LLC) and Intermed Services Management Co., LP, for the purchase of the commercial premises located at 810 e. Ralph Hall Parkway, Rockwall, Rockwall County, Texas."

Further Affiant sayeth not.



Benjamin Efraim

SUBSCRIBED AND SWORN TO ME, the undersigned notary public, on this 26th day of January, 2022.

Notary Public
State of California

NICHOLAS PATRICK AVALLONE
Commission # 2253763
Notary Public - California
Ventura County
My Comm. Expires August 12, 2022

Affidavit of Benjamin Efraim                                                                 Page 2



**North Texas Commercial Association of Realtors®**

COMMERCIAL CONTRACT OF SALE

*[Check all boxes applicable to this Contract – Boxes not checked do not apply to this Contract]*

In consideration of the agreements contained in this Commercial Contract of Sale (the **"Contract"**), Seller shall sell and convey to Purchaser, and Purchaser shall buy and pay for, the Property (defined below) pursuant to the provisions, and subject to the conditions, of this Contract.

1. **PARTIES.** The parties to this Contract are:

   **Seller:** Intermed Services Management Co. LP
   Address:

   Phone:                           Fax:
   Email:

   **Purchaser:** Horseshoe, LLC, a California limited liability company
   Address:

   Phone:                           Fax:
   Email:

2. **PROPERTY.** The address of the Property is:
   810 E. Ralph Hall Parkway
   Rockwall                    , Texas 75032-6878
   The Property is located in        Rockwall            County, Texas, the land portion
   of which is further described as:

   ~~or~~ as described in **Exhibit "A", LEGAL DESCRIPTION** ~~and/or shown on Exhibit "B", SITE PLAN~~. The Property includes, all and singular, all improvements and fixtures situated thereon, and all rights and appurtenances pertaining thereto, including any right, title and interest of Seller in and to adjacent streets, alleys, or rights-of-way (such land, improvements, fixtures, rights and appurtenances being collectively herein referred to as the **"Property"**).

3. **PURCHASE PRICE.**

   A. **Amount and Payable.** The purchase price for the Property is $ 6,826,000.00 (the **"Purchase Price"**), payable at the Closing as follows (with the Earnest Money to be applied to the Purchase Price) *[Check only one]:*

Seller's Initials ___RL___        Purchaser's Initials _____

©Copyright 2010 NTCAR - Form No. 1 (1/10)                                    Page 1

ATTACHMENT – REDACTED AS TO PERSONAL INFORMATION

☑ (1)  All in cash (meaning Good Funds, as defined in Section 4F below). If this Contract is subject to approval for Purchaser to obtain financing from a third party, then **Addendum B-1, THIRD PARTY FINANCING** is attached.

~~☐ (2)  Part in cash (Good Funds), in the following amount or percentage *[Check only one]*:~~

~~☑ (a)  $_____~~

~~☐ (b)  _____ percent (_____%) of the Purchase Price.~~

~~If only part of the Purchase Price is to be paid in cash, then the balance of the Purchase Price will be paid according to the provisions in **Addendum B-2, SELLER FINANCING**. If part of the Purchase Price is to be paid by Purchaser assuming an existing promissory note secured by the Property, or taking the Property subject to an existing promissory note secured by the Property, then **Addendum B-3, EXISTING LOAN**, is attached.~~

~~☐ B.  Adjustment. The Purchase Price will be adjusted up or down based upon the land area of the Property as determined by the Survey. The land area will be multiplied by the following amount per acre or square foot, as applicable, and the product will become the Purchase Price at the Closing *[Check only one]*: ☐ $_____ per acre; or ☐ $_____ per square foot. The land area for purposes of determining the Purchase Price will be the gross land area of the Property unless this box ☐ is checked, in which case the land area for purposes of determining the Purchase Price will be the Net Land Area [as defined in Section 5A (Survey)] of the Property. Notwithstanding the foregoing, the Purchase Price will not be reduced under this Section 3B to less than $_____.~~

4.    **EARNEST MONEY AND TITLE COMPANY ESCROW.**

        **A.    Title Company.** The Title Company to serve as escrow agent for this Contract is (the **"Title Company"**):
Lawyers Title. ⸱_____

_____

        **B.    Effective Date.** The **"Effective Date"** is the date the Title Company acknowledges receipt of this fully executed Contract as indicated by the signature block for the Title Company.

        **C.    Earnest Money.** Within two (2) Business Days after the Effective Date, Purchaser shall deliver an earnest money deposit in the amount of $ _____ 65,000.00 _____ _____ (the **"Earnest Money"**) payable to the Title Company, in its capacity as escrow agent, to be held in escrow pursuant to the terms of this Contract. Seller's acceptance of this Contract is expressly conditioned upon Purchaser's timely deposit of the Earnest Money with the Title Company. If Purchaser fails to timely deposit the Earnest Money with the Title Company, then Seller may, at Seller's option, terminate this Contract by delivering a written termination notice to Purchaser at any time until Purchaser deposits the Earnest Money with the Title Company.

        The Title Company shall deposit the Earnest Money in one or more fully insured accounts in one or more federally insured banking or savings institutions. Purchaser hereby instructs the Title Company to promptly deposit the check upon receipt (which instruction may not be retracted without Seller's written consent). After receipt of necessary tax forms from Purchaser, the Title Company

Seller's Initials _____ *RL* _____        Purchaser's Initials _____ *[initials]* ___

will deposit the Earnest Money in an interest bearing account unless this box ☑ is checked, in which case the Title Company will not be required to deposit the Earnest Money in an interest bearing account. Any interest earned on the Earnest Money will become a part of the Earnest Money. At the Closing, the Earnest Money will be applied to the Purchase Price or, at Purchaser's option, will be returned to Purchaser upon full payment of the Purchase Price.

        **D.**    **Independent Consideration.**  Notwithstanding anything in this Contract to the contrary, a portion of the Earnest Money in the amount of $100.00 will be non-refundable and will be distributed to Seller upon any termination of this Contract as independent consideration for Seller's performance under this Contract. If this Contract is properly terminated by Purchaser pursuant to a right of termination granted to Purchaser by any provision of this Contract, the Earnest Money will be promptly returned to Purchaser. Any provision of this Contract that states that the Earnest Money is to be returned to Purchaser means that the Earnest Money, less the non-refundable portion, is to be returned to Purchaser.

        **E.**    **Escrow.**  The Earnest Money is deposited with the Title Company with the understanding that the Title Company is not: (1) responsible for the performance or non-performance of any party to this Contract; or (2) liable for interest on the funds except to the extent interest has been earned after the funds have been deposited in an interest bearing account.

        **F.**    **Definition of Good Funds.**  "Good Funds" means currently available funds, in United States dollars, paid in the form of a certified check, cashier's check, official bank check or wire transfer acceptable to the Title Company, such that the payment may not be stopped by the paying party. Any reference in this Contract to "cash" means Good Funds.

    **5.**    **SURVEY AND TITLE.**

        **A.**    **Survey.**  Within ~~twenty (20)~~ five (5) days after the Effective Date *[Check only one]:*

        ☐  ~~Seller shall deliver to Purchaser a new survey (the "Survey") of the Property prepared at Seller's expense.~~

        ☐  ~~Seller shall deliver to Purchaser a new survey (the "Survey") of the Property prepared at Purchaser's expense.~~

        ☐  ~~Seller shall deliver to Purchaser a new survey (the "Survey") of the Property prepared at Purchaser's expense, and Seller will give a credit to Purchaser against the Purchase Price at the Closing for the cost of the Survey in an amount not to exceed $_____.~~

        ☑  Seller shall deliver to Purchaser a copy of the most recent existing survey (the **"Survey"**) of the Property in Seller's possession. Seller shall also deliver an Affidavit to the Title Company, in form and substance reasonably satisfactory to the Title Company, stating that none of the improvements on the Property and other matters shown by the existing Survey have changed since the existing Survey was prepared. If Purchaser, Purchaser's lender or the Title Company requires a new survey for any reason, then Purchaser shall pay for the cost of the new Survey, and *[check only one]:* ☑ Seller will not be required to pay for any portion of the cost of the new Survey; ~~or ☐ Seller will give a credit to Purchaser against the Purchase Price at the Closing for the cost of the new Survey in an amount not to exceed $_____.~~

Seller's Initials _____ KL _____    Purchaser's Initials _____

Any new Survey must:

(1) be prepared by a Registered Professional Land Surveyor;
(2) be in a form reasonably acceptable to Purchaser and the Title Company;
(3) set forth a legal description of the Property by metes and bounds or by reference to a platted lot or lots;
(4) show that the Survey was made on the ground with corners marked with monuments either found or placed;
(5) show any discrepancies or conflicts in boundaries, and any visible encroachments;
(6) contain the surveyor's certificate that the Survey is true and correct; and
(7) show the location and size of all of the following on or immediately adjacent to the Property, if any, if recorded or visible and apparent:
   (a) buildings,
   (b) building set back lines (as shown on any recorded plat, but not as may be described in any restrictive covenants or zoning ordinances),
   (c) streets and roads,
   (d) 100-year flood plain (approximate location),
   (e) improvements,
   (f) encroachments,
   (g) easements,
   (h) recording information of recorded easements,
   (i) pavements,
   (j) protrusions,
   (k) fences,
   (l) rights-of-way, and
   (m) any markers or other visible evidence of utilities.

Any area of the Property within the 100-year flood plain will be shown on the Survey as the approximate location of the 100-year flood plain as defined by the Federal Emergency Management Agency or other applicable governmental authority. If the area within any 100-year flood plain is to be deducted for the purpose of determining Net Land Area (defined below), then the Survey must show the area of the Property covered by the 100-year flood plain, and that area, as reasonably determined by the surveyor, will be conclusive for purposes of this Contract, even though the surveyor may qualify that determination as approximate.

After the delivery of the Survey, the legal description of the Property set forth in the Survey will be incorporated in this Contract as the legal description of the Property, and will be used in the deed and any other documents requiring a legal description of the Property.

The Survey must show the gross land area of the Property, and if the Purchase Price is based upon the Net Land Area then the Survey must also show the Net Land Area, expressed in both acres and square feet. The term "Net Land Area" means the gross land area of the Property less the area within any of the following (if recorded or visible and apparent, but excluding those within set back areas) [Check all that apply]:

   ☐ utility easements;
   ☐ drainage easements;
   ☐ access easements;
   ☐ rights-of-way;
   ☐ 100-year flood plain; and
   ☐ any encroachments on the Property.

Seller's Initials _____     Purchaser's Initials _____

**B.**    **Title Commitment**. Within ~~twenty (20)~~ ten (10) days after the Effective Date, Seller shall deliver or cause to be delivered to Purchaser:

(1)    A title commitment (the **"Title Commitment"**) covering the Property binding the Title Company to issue a Texas Owner Policy of Title Insurance (the **"Title Policy"**) on the standard form prescribed by the Texas Department of Insurance at the Closing, in the full amount of the Purchase Price, insuring Purchaser's fee simple title to the Property to be good and indefeasible, subject only to the Permitted Exceptions (defined below); and

(2)    the following (collectively, the **"Title Documents"**):

(a)    true and legible copies of all recorded instruments affecting the Property and recited as exceptions in the Title Commitment;

(b)    a current tax certificate;

(c)    any written notices required by applicable statutes, including those referenced in Section 17; and

(d)    if the Property includes any personal property, UCC search reports pertaining to the Seller.

6.    **REVIEW OF SURVEY AND TITLE.**

**A.**    **Title Review Period**. Purchaser will have until the expiration of the "Inspection Period" (defined below) to review ~~days (the "Title Review Period")~~ ~~after receipt of the last of~~ the Survey, Title Commitment and Title Documents ~~to review them~~ and to deliver a written notice to Seller stating any objections Purchaser may have to them or any item disclosed by them or to approve them. Purchaser's failure to approve them ~~object~~ within the time provided will be deemed a rejection of them by the Purchaser ~~a waiver of the right to object~~. Any item to which Purchaser does not object will be deemed a **"Permitted Exception."** The items set forth on Schedule C of the Title Commitment, and any other items the Title Company identifies to be released upon the Closing, will be deemed objections by Purchaser. Zoning ordinances and the lien for current taxes are deemed to be Permitted Exceptions.

**B.**    **Cure Period**. If Purchaser delivers any written objections to Seller within the Title Review Period, then Seller shall make a good faith attempt to cure the objections within ~~ten (10)~~ five (5) days (the **"Cure Period"**) after receipt of the objections. ~~However, Seller is not required to incur any cost to do so.~~ If Seller cannot cure the objections within the Cure Period, Seller may deliver a written notice to Purchaser, before expiration of the Cure Period, stating whether Seller is committed to cure the objections at or before the Closing. If Seller does not cure the objections within the Cure Period, or does not timely deliver the notice, or does not commit in the notice to fully cure all of the objections at or before the Closing, then Purchaser may terminate this Contract by delivering a written notice to Seller on or before the earlier to occur of: (1) the date that is ~~seven (7)~~ five (5) days after the expiration of the Cure Period; or (2) the scheduled Closing Date.

**C.**    **New Items**. If any new items are disclosed by any updated Survey, updated Title Commitment, or any new Title Documents, that were not disclosed to Purchaser when the Survey, Title Commitment, and Title Documents were first delivered to Purchaser, then Purchaser will have ~~fifteen (15)~~ ten (10) days to review the new items and to deliver a written acceptance of such new items ~~notice~~ to Seller ~~stating any objections Purchaser may have to the new items~~. Unless Purchaser delivers such written acceptance to Seller, then in accordance with Section 6.A above, Purchaser shall be deemed to have objected to each such new item, and ~~If Purchaser timely delivers any written objections as to the new items to Seller,~~ then Seller shall make a good faith attempt to cure the objections to the new items within ~~ten (10)~~ five (5) days (the **"Additional Cure Period"**) after receipt of the objections as to the new items. ~~However, Seller is not required to incur any cost to do so.~~ If Seller does not cure the objections as to the new items within the Additional Cure Period, or does not deliver a written notice to Purchaser before the expiration of the Additional Cure Period stating whether Seller is committed to cure the

Seller's Initials _____    Purchaser's Initials _____

objections as to the new items at or before the Closing, then Purchaser may terminate this Contract by delivering a written notice to Seller on or before the earlier to occur of: (1) that date that is ~~seven (7)~~ five (5) days after the expiration of the Additional Cure Period; or (2) the scheduled Closing Date.

      **D.**    **Return of Earnest Money or Waiver.**  If Purchaser properly and timely terminates this Contract <u>or is deemed to have terminated this Contract due to Purchaser's failure to approve the Survey, Title Commitment, or Title Documents, then</u>, the Earnest Money will be returned to Purchaser.  ~~If Purchaser does not properly and timely terminate this Contract, then Purchaser will be deemed to have waived any uncured objections and must accept title at the Closing subject to the uncured objections and other Permitted Exceptions.~~  Seller's failure to cure Purchaser's objections under this Section 6 does not constitute a default by Seller.

7.    **SELLER'S REPRESENTATIONS.**

      **A.**    **Statements.**  Seller represents to Purchaser, to the best of Seller's knowledge, as follows:

      **(1)**    **Title.**  At the Closing, Seller will convey to Purchaser good and indefeasible fee simple title to the Property free and clear of any and all liens, assessments, easements, security interests and other encumbrances except the Permitted Exceptions.  Delivery of the Title Policy pursuant to Section 15 (the Closing) will be deemed to satisfy the obligation of Seller as to the sufficiency of title required under this Contract.  However, delivery of the Title Policy will not release Seller from the warranties of title set forth in the warranty deed.

      **(2)**    **Leases.**  There are no parties in possession of any portion of the Property as lessees, tenants at sufferance or trespassers except tenants under written leases delivered to Purchaser pursuant to this Contract.

      **(3)**    **Liens and Debts.**  There are no mechanic's liens, Uniform Commercial Code liens or unrecorded liens against the Property, and Seller shall not allow any such liens to attach to the Property before the Closing that will not be satisfied out of the Closing proceeds.  All obligations of Seller arising from the ownership and operation of the Property and any business operated on the Property, including, but not limited to, taxes, leasing commissions, salaries, contracts, and similar agreements, have been paid or will be paid before the Closing. Except for obligations for which provisions are made in this Contract for prorating at the Closing and any indebtedness taken subject to or assumed, there will be no obligations of Seller with respect to the Property outstanding as of the Closing.

      **(4)**    **Litigation.**  There is no pending or threatened litigation, condemnation, or assessment affecting the Property.  Seller shall promptly advise Purchaser of any litigation, condemnation or assessment affecting the Property that is instituted after the Effective Date.

      **(5)**    **Material Defects.**  Seller has disclosed to Purchaser any and all known conditions of a material nature with respect to the Property which may affect the health or safety of any occupant of the Property, <u>as well as deferred maintenance issues and items requiring repair</u>.  Except as disclosed in writing by Seller to Purchaser, the Property has no known latent structural defects or construction defects of a material nature, and none of the improvements have been constructed with materials known to be a potential health hazard to occupants of the Property.

      **(6)**    **Hazardous Materials.**  Except as otherwise disclosed in writing by Seller to Purchaser, the Property (including any improvements) does not contain any Hazardous Materials (defined below) other than lawful quantities properly stored in containers in compliance with applicable laws.

Seller's Initials    *RL*        Purchaser's Initials

**B.    Remedies.** If Purchaser discovers, before the Closing, that any of Seller's representations has been misrepresented in a material respect, Purchaser may notify Seller of the misrepresentation in writing, and Seller shall attempt to correct the misrepresentation. If the misrepresentation is not corrected by Seller before the Closing, Purchaser may: (1) proceed to Closing, without waiving any claim for misrepresentation; or (2) terminate this Contract by delivering a written termination notice to Seller, in which case the Earnest Money will be returned to Purchaser.

8.    **OPERATION OF THE PROPERTY.** After the Effective Date until the Closing Date, Seller shall: (1) operate the Property in the same manner as the Property has been operated by Seller; and (2) maintain the Property in the same condition as existed on the Effective Date, except for ordinary wear and any casualty loss. After the Effective Date, Seller shall not, without Purchaser's prior written approval: (1) further encumber the Property or allow an encumbrance upon the title to the Property, or modify the terms of any existing encumbrance, if the encumbrance would still be in effect after Closing; or (2) enter into any lease or contract affecting the Property, if the lease or contract would still be in effect after Closing. However, Seller may enter into a lease or contract with an independent third party, in the ordinary course of business, without Purchaser's consent, if Purchaser will be entitled to terminate the lease or contract after Closing, without incurring any termination charge, by delivering a termination notice 30 days in advance of the termination date. If Seller enters into any lease or contract affecting the Property after the Effective Date, then Seller shall immediately deliver a photocopy of the signed document to Purchaser.

9.    **NONCONFORMANCE.** Purchaser has or will independently investigate and verify to Purchaser's satisfaction the extent of any limitations of uses of the Property. Purchaser acknowledges that the current use of the Property or the improvements located on the Property (or both) may not conform to applicable Federal, State or municipal laws, ordinances, codes or regulations. Zoning, permitted uses, height limitations, setback requirements, minimum parking requirements, limitations on coverage of improvements to total area of land, Americans with Disabilities Act requirements, wetlands restrictions and other matters may have a significant economic impact upon the intended use of the Property by Purchaser. However, if Seller is aware of pending zoning changes and/or current nonconformance with any Federal, State or local laws, ordinances, codes or regulations, Seller shall disclose same to Purchaser.

10.    **INSPECTION.** *[Check only one]*

☐    **A.    Inspection Not Necessary.** Purchaser acknowledges that Purchaser has inspected the Property, including all buildings and improvements, and is thoroughly familiar with their condition. Purchaser accepts the Property in its present "AS IS" condition, and any changes caused by normal wear and tear before the Closing, but without waiving Purchaser's rights by virtue of Seller's representations expressed in this Contract.

☑    **B.    Inspection Desired.** Purchaser desires to inspect the Property and Seller grants to Purchaser the right to inspect the Property as described below.

(1)    **Inspection Period.** Purchaser will have a period of 45 days after the Effective Date delivery to Purchaser of the last document specified in Section 11.A. (the **"Inspection Period"**) to inspect the Property and conduct studies regarding the Property. Purchaser's studies may include, without limitation: (a) permitted use and zoning of the Property; (b) core borings; (c) environmental and architectural tests and investigations; (d) property measurements, roof inspections, permitting and licensing review, ADA and architectural barriers review, physical inspections of improvements, fixtures, equipment, subsurface soils, structural members, and personal property; and (e) examination of agreements, manuals, plans, specifications and other documents relating to the construction and condition of the Property. Purchaser and Purchaser's agents, employees, consultants and contractors will have the right of reasonable entry onto the

Seller's Initials [ RL ]        Purchaser's Initials _____

Property during normal business hours, and upon reasonable advance notice to Seller and any tenants on the Property, for purposes of inspections, studies, tests and examinations deemed necessary by Purchaser. Purchaser also shall be allowed access to the Property after expiration of the Inspection Period to continue such studies, inspections, and assessments. The inspections, studies, tests and examinations will be at Purchaser's expense and risk. Purchaser may also use the Inspection Period to perform feasibility studies, obtain equity funding, seek financing, and satisfy other conditions unrelated to the condition of the Property. Purchaser shall defend and indemnify Seller against any claims that arise due to any actions by Purchaser or Purchaser's agents, employees, consultants and contractors. Purchaser's obligation to defend and indemnify Seller will survive the Closing or termination of this Contract.

(2)    ~~Extension of Inspection Period. Purchaser may extend the Inspection Period for~~ up to _____ ~~days by delivering an additional earnest money deposit in the amount of~~ $_____ ~~to the Title Company. The additional deposit will become part of the Earnest~~ ~~Money.~~

(3)    **Termination.** If Purchaser determines, in Purchaser's sole discretion, no matter how arbitrary, that Purchaser chooses not to purchase the Property for any reason, then Purchaser may terminate this Contract by delivering a written notice to Seller on or before the last day of the Inspection Period, or if Purchaser is deemed to have terminated this Contract due to Purchaser's failure to issue the waiver notice provided in section 10.B.(4), in which (either) case the Earnest Money will be returned to Purchaser. Purchaser's reason for choosing to terminate this Contract does not need to be related to the condition of the Property, and Purchaser is not required to justify Purchaser's decision to terminate this Contract.

(4)    **Acceptance.** Unless Purchaser expressly waives its inspection rights under this Section 10 before the expiration of the Inspection Period, then Purchaser will be deemed to have objected to the Property and terminated this Contract. ~~If Purchaser does not properly and timely~~ ~~terminate this Contract before the expiration of the Inspection Period (or if Purchaser accepts the~~ ~~Property in writing) then Purchaser will be deemed to have waived all objections to the Property.~~ Nothing in this Section 10.B(4) shall affect ~~except for~~ any title objections that may be outstanding pursuant to Section 6 (Review of Survey and Title) of this Contract. If Purchase waives its inspection rights as set forth above, then ~~In that event,~~ except as may be expressly stated otherwise in this Contract, Purchaser accepts the Property in its current **"AS IS"** condition, with any changes caused by normal wear and tear before the Closing, and this Contract will continue in full force and effect. This provision does not, however, limit or invalidate any express representations and agreements Seller has made in this Contract.

(5)    **Restoration.** If the transaction described in this Contract does not close through no fault of Seller, and the condition of the Property was altered due to inspections, studies, tests or examinations performed by Purchaser or on Purchaser's behalf, then Purchaser must restore the Property to its original condition at Purchaser's expense. Purchaser's obligation to restore the Property will survive the termination of this Contract.

C.    **Reports.** *[Check all that apply]*

~~a    (a)    Within __ days after the Effective Date, Seller shall deliver to Purchaser a written~~ ~~"Phase I" report of an environmental assessment of the Property. The report will be prepared, at~~ ~~Seller's expense, by an environmental consultant reasonably acceptable to Purchaser. The~~ ~~environmental assessment must include an investigation into the existence of Hazardous Materials~~ ~~(as defined in Section 19.A. of this Contract) in, on or around the Property. The environmental~~ ~~assessment must also include a land use history search, engineering inspections, research and~~ ~~studies that may be necessary to discover the existence of Hazardous Materials.~~



Seller's Initials [ _RL_ ]          Purchaser's Initials _____

☑ **(b)** Within ~~10~~ two (2) business days after the Effective Date, Seller shall deliver to Purchaser copies of all reports in Seller's possession or control of engineering investigations, tests and environmental studies that have been made with respect to the Property within the three year period before the Effective Date.

~~☐ (c) If Purchaser terminates this Contract, Purchaser shall return to Seller, at Purchaser's expense and contemporaneously with the termination, the original, hard copies of any documents Seller delivered to Purchaser. Also, Purchaser shall return, destroy, or delete any other copies of such documents, electronic or otherwise, in Purchaser's possession. This provision will survive the termination of this Contract.~~

~~☐ (d) If Purchaser terminates this Contract, Purchaser shall deliver to Seller, at Purchaser's expense and contemporaneously with the termination, copies of all written reports, inspections, plats, drawings and studies that relate to the condition of the Property made by Purchaser's agents, consultants and contractors. This provision will survive the termination of this Contract.~~

## 11. DELIVERY AND REVIEW OF DOCUMENTS.

**A.**      **Delivery**. Seller agrees to deliver to Purchaser, within ~~10~~ two (2) business days after the Effective Date, complete and legible copies of the following pertaining to the Property~~, to the extent in Seller's possession or readily available to Seller~~:

**(1)** All current leases, including all modifications, amendments, supplements and extensions thereof (including written descriptions of any oral agreements);

**(2)** A current rent roll certified by Seller to be true, complete and accurate as of the date of delivery, including names of tenants, annual or monthly rents, expenses paid by tenants and by Seller, commencement dates, terms of leases, and renewal options;

**(3)** A current inventory of all tangible personal property and fixtures owned by Seller and located on, attached to, or used in connection with the Property, to be sold with the Property, certified by Seller to be true and correct as of the date of delivery;

**(4)** ~~Any Notes, Deeds of Trust and other loan documents pertaining to loans assumed or taken subject to;~~

**(5)** All service, maintenance, management, or other contracts relating to the ownership and operation of the Property;

**(6)** All warranties and guaranties;

**(7)** All fire, hazard, liability, and other insurance policies;

**(8)** The real estate and personal property tax statements for the previous two calendar years;

**(9)** All leasing and commission agreements;

**(10)** To the extent in Seller's possession or readily available to Seller, the ~~The~~ "as built" or other plans and specifications;



Seller's Initials  RL          Purchaser's Initials _____

(11)  A statement of utility charges, repair costs and other expenses incurred by Seller for the operation and maintenance of the Property for each month for the two years preceding the Effective Date;

(12)  A true and correct statement of income and expenses from January 1, 2017 to Year-to-Date 2020.

(13)  Any certificate of mold remediation that has been issued for the Property under Section 1958.154 of the Occupations Code within the preceding five years; and

(14)  Other See Addendum E.

**B. Review of Documents.** Purchaser will have a period of time (the **"Document Review Period"**) to review the information identified above, ending ~~the later to occur of:~~

~~(1)    days after the Effective Date; or~~
~~(2)~~ the end of the Inspection Period ~~(if any)~~.

Unless Purchaser expressly waives its document review under this Section 11 before the expiration of the Inspection Period, then Purchaser, ~~If Purchaser objects to any information disclosed to or discovered by Purchaser,~~ in Purchaser's sole discretion, no matter how arbitrary, will be deemed to have objected to any or all of the information disclosed to or discovered by Purchaser and Purchaser shall be deemed to have ~~may: (i)~~ terminated this Contract ~~by delivery of a written notice to Seller before the expiration of the Document Review Period,~~ in which case the Earnest Money will be returned to Purchaser and Purchaser shall return all documents Seller delivered to Purchaser. If Purchaser delivers written notice to Seller during the Inspection Period waiving any ~~; or (ii) waive the~~ objections to or approves the information disclosed to or discovered by Purchaser, then Purchaser and Seller shall proceed to ~~and~~ close the transaction, subject to Purchaser's and Seller's other rights, duties and obligations set forth elsewhere in this Contract. ~~If Purchaser does not deliver a written termination notice to Seller before expiration of the Document Review Period, then any objections as to the information provided by Seller pursuant to this Section will be deemed to be waived by Purchaser.~~

**12. ESTOPPEL CERTIFICATES.** Seller agrees to deliver to Purchaser, at least 10 but not more than 30 days before the Closing Date, estoppel certificates executed by each of the tenants under the leases of the Property stating:

(1)    whether the tenant is an assignee or subtenant;

(2)    the expiration date of the lease;

(3)    the number of renewal options under the lease, if any, and the total period of time covered by the renewal options;

(4)    that none of the terms or provisions of the lease have been changed since the original execution of the lease, except as shown on any attached amendments or modifications;

(5)    that no default exists under the terms of the lease by either landlord or tenant;

(6)    that the tenant has no claim against the landlord under the lease and has no defense or right of offset against collection of rent or other charges accruing under the lease;

(7)    the amount and payment date of the last payment of rent, the period of time covered by that payment, and the amount of any rental payments made in advance;

Seller's Initials _____    Purchaser's Initials _____

©Copyright 2010 NTCAR - Form No. 1 (1/10)

(8)    the amount of any security deposits and other deposits, if any; ~~and~~

(9)    the identity and address of any guarantor of the lease.~~;~~ and

(10) any additional information that may be reasonably requested by Purchaser and / or Purchaser's Lender, provided Seller shall request all information provided under each tenant's lease(s).

If any estoppel certificate is not timely delivered, or is unacceptable to Purchaser, then Purchaser may immediately notify Seller in writing of Purchaser's objections. Seller shall promptly attempt to cure the unacceptable matters ~~without any obligation to incur any cost in connection with the attempt~~. If Seller is unable to cure the unacceptable matters before the Closing Date, Purchaser may: (i) terminate this Contract by delivering a written termination notice to Seller, in which case the Earnest Money will be returned to Purchaser; or (ii) close the transaction and retain a claim for damages against Seller for the cost of curing the unacceptable matter~~, in which case Purchaser will be deemed to have waived any objections to the unacceptable matters~~.

13.    **CASUALTY LOSS AND CONDEMNATION.**

   A.    **Damage or Destruction.** All risk of loss to the Property will remain upon Seller before the Closing. If the Property is damaged or destroyed by fire or other casualty to a Material Extent (defined below), then Purchaser may terminate this Contract by delivering a written termination notice to Seller within ten (10) days after ~~the date~~ Purchaser's receipt of written notice that the casualty occurred (and in any event before the Closing), in which case the Earnest Money will be returned to Purchaser. If the Property is damaged by fire or other casualty to less than a Material Extent, the parties shall proceed to the Closing as provided in this Contract. If the transaction is to proceed to the Closing, despite any damage or destruction, there will be no reduction in the Purchase Price and Seller shall either: (1) fully repair the damage before the Closing, at Seller's expense; or (2) give a credit to Purchaser at the Closing for the entire cost of repairing the Property. The term **"Material Extent"** means damage or destruction where the cost of repair exceeds ten percent (10%) of the Purchase Price. If the repairs cannot be completed before the Closing Date, or the cost of repairing the Property cannot be determined before the Closing Date, then either party may postpone the Closing Date by delivering a written notice to the other party specifying an extended Closing Date that is not more than thirty (30) days after the previously scheduled Closing Date, unless such extension will interfere with Purchaser's timely completion of its 1031 exchange.

   B.    **Condemnation.** If condemnation proceedings are commenced before the Closing against any portion of the Property, then Seller shall immediately notify Purchaser in writing of the condemnation proceedings, and Purchaser may terminate this Contract by delivering a written notice to Seller within ten (10) days after Purchaser receives the notice (and in any event before the Closing), in which case the Earnest Money will be returned to Purchaser. If this Contract is not terminated, then any condemnation award will ~~(a) if known on the Closing Date, belong to Seller and the Purchase Price will be reduced by the same amount, or (b) if not known on the Closing Date,~~ belong to Purchaser and the Purchase Price will not be reduced.

14.    **ASSIGNMENT.** *[Check only one]*

   ☐    **A.**    **Assignment Permitted.** ~~Purchaser may assign this Contract provided the assignee assumes in writing all obligations and liabilities of Purchaser under this Contract, in which event Purchaser will be relieved of any further liability under this Contract.~~

Seller's Initials _____RL_____    Purchaser's Initials _____

☑    **B.    Limited Assignment Permitted.** Purchaser may assign this Contract only to a related party, defined as: (1) an entity in which Purchaser is an owner, partner or corporate officer; (2) an entity which is owned or controlled by the same person or persons that own or control Purchaser; or (3) a member or members of the immediate family of Purchaser, or a trust in which the beneficiary or beneficiaries is or are a member or members of the immediate family of Purchaser. Purchaser will remain liable under this Contract after any assignment.

☐    ~~C.    Assignment Prohibited.  Purchaser may not assign this Contract without Seller's prior written consent.~~

15.    **CLOSING.**

**A.    Closing Date.** The closing of the transaction described in this Contract (the "Closing") will be held at the offices of the Title Company at its address stated below, on the date (the "**Closing Date**") that is *[complete only one]:*

45_____ days after the expiration of the Inspection Period;
~~_____ days after the Effective Date; or~~
_____

However, if any objections that were timely made by Purchaser in writing pursuant to Section 6 (Review of Survey and Title) have not been cured, then either party may postpone the Closing Date by delivering a written notice to the other party specifying an extended Closing Date that is not more than thirty (30) days after the previously scheduled Closing Date, unless such extension will interfere with Purchaser's timely completion of its 1031 exchange.

**B.    Seller's Closing Obligations.** At the Closing, Seller shall deliver to Purchaser, at Seller's expense:

(1)    A duly executed *[check only one]* ☐ ~~General Warranty Deed~~ ☑ Special Warranty Deed (with vendor's lien retained if financing is given by Seller or obtained from a third party) conveying the Property in fee simple according to the legal description prepared by the surveyor as shown on the Survey, subject only to the Permitted Exceptions;

(2)    An updated Title Commitment committing the underwriter for the Title Company to issue promptly after the Closing, at Seller's expense, the Title Policy pursuant to the Title Commitment, subject only to the Permitted Exceptions, in the full amount of the Purchase Price, dated as of the date of the Closing, and (at an additional premium cost) *[check only one if applicable]* ☐ ~~with the survey exception modified at Seller's expense to read "any shortages in area,"~~ or ☑ with the survey exception modified at Purchaser's expense to read "any shortages in area;"

(3)    A Bill of Sale conveying the personal property, described in this Contract, free and clear of liens, security interests and encumbrances, subject only to the Permitted Exceptions (to the extent applicable);

(4)    Possession of the Property, subject to valid existing leases disclosed by Seller to Purchaser and other applicable Permitted Exceptions;

(5)    An executed assignment of all leases, if there are any leases affecting the Property;

Seller's Initials _____    Purchaser's Initials _____

(6)    A current rent roll certified by Seller to be complete and accurate, if there are any leases affecting the Property;

(7)    Evidence of Seller's authority and capacity to close this transaction; and

(8)    All other documents reasonably required by the Title Company to close this transaction.

C.    **Purchaser's Closing Obligations**. At the Closing, Purchaser shall deliver to Seller, at Purchaser's expense:

(1)    The ~~cash portion of the~~ Purchase Price (with the Earnest Money being applied to the Purchase Price);

(2)    ~~The Note and the Deed of Trust, if~~ **Addendum B-2, SELLER FINANCING,** ~~is attached;~~

(3)    ~~An Assumption Agreement in recordable form agreeing to pay all commissions payable under any lease affecting the Property;~~

(4)    Evidence of Purchaser's authority and capacity to close this transaction; and

(5)    All other documents reasonably required by the Title Company to close this transaction.

D.    **Closing Costs**. Each party shall pay its share of the closing costs which are customarily paid by a seller or purchaser in a transaction of this character in the county where the Property is located, or as otherwise agreed.

E.    **Prorations**. Rents (including any additional rental or reimbursement amounts to be reconciled), ~~lease commissions, interest on any assumed loan, insurance premiums on any transferred insurance policies, maintenance expenses,~~ operating expenses, ~~standby fees,~~ and ad valorem taxes for the year of the Closing will be prorated at the Closing effective as of the date of the Closing (with the Purchaser being considered the owner of the Property for the entire day of the Closing). Seller shall give a credit to Purchaser at the Closing in the aggregate amount of any security deposits deposited by tenants under leases affecting the Property. If the Closing occurs before the tax rate is fixed for the year of the Closing, the apportionment of the taxes will be upon the basis of the tax rate for the preceding year applied to the latest assessed valuation~~, but any difference between actual and estimated taxes for the year of the Closing actually paid by Purchaser will be adjusted equitably between the parties upon receipt of a written statement of the actual amount of the taxes~~. This provision will survive the Closing.

F.    **Rollback Taxes**. If any Rollback Taxes are due before the Closing due to a change in use of the Property by Seller or a denial of any special use valuation of the Property before the Closing, then Seller shall pay those Rollback Taxes (including any interest and penalties) at or before the Closing. If this sale or a change in use of the Property or denial of any special use valuation of the Property after the Closing would result in the assessment after the Closing of additional taxes and interest applicable to the period of time before the Closing ("**Rollback Taxes**"), then: (1) Purchaser shall pay the Rollback Taxes (including any interest and penalties) if and when they are assessed, without receiving any credit from Seller; unless (2) this box ☑ is checked, in which case Seller shall give a credit to Purchaser at the Closing for the amount of the Rollback Taxes (including interest and penalties) that may be assessed after the Closing as reasonably estimated by the Title Company, and Purchaser shall pay the Rollback Taxes (including any interest and penalties) if and when they are assessed after the Closing. If

Seller's Initials _RL_____    Purchaser's Initials _____

Seller gives a credit to Purchaser for the estimated amount of Rollback Taxes, and the actual Rollback Taxes assessed after the Closing are different from the estimate used at the Closing, then there will be no subsequent adjustment between Seller and Purchaser.

~~G.      Loan Assumption. If Purchaser assumes an existing mortgage loan, or takes the Property subject to an existing lien, at the Closing, Purchaser shall pay: (1) to the lender, any assumption fee charged by the lender; (2) to the lender, reasonable attorney's fees charged by the lenders' attorney; and (3) to Seller, a sum equal to the amount of any reserve accounts held by the lender for the payment of taxes, insurance and any other expenses applicable to the Property for which reserve accounts are held by the lender, and Seller shall transfer the reserve accounts to Purchaser. Purchaser shall execute, at the option and expense of Seller, a Deed of Trust to Secure Assumption with a trustee named by Seller. If consent to the assumption is required by the lender, Seller shall obtain the lender's consent in writing and deliver the consent to Purchaser at the Closing. If Seller does not obtain the lender's written consent (if required) and deliver it to Purchaser at or before the Closing, Purchaser may terminate this Contract by delivering a written termination notice to Seller, and the Earnest Money will be returned to Purchaser.~~

**H.      Foreign Person Notification**. If Seller is a Foreign Person, as defined by the Internal Revenue Code, or if Seller fails to deliver to Purchaser a non-foreign affidavit pursuant to §1445 of the Internal Revenue Code, then Purchaser may withhold from the sales proceeds an amount sufficient to comply with applicable tax law and deliver the withheld proceeds to the Internal Revenue Service, together with appropriate tax forms. A non-foreign affidavit from Seller must include: (1) a statement that Seller is not a foreign person; (2) the U. S. taxpayer identification number of Seller; and (3) any other information required by §1445 of the Internal Revenue Code.

16.    **DEFAULT.**

**A.      Purchaser's Remedies**. If Seller fails to close this Contract for any reason except Purchaser's default or the termination of this Contract pursuant to a right to terminate set forth in this Contract, Seller will be in default and Purchaser may elect to either: (1) enforce specific performance of this Contract (force Seller to sell the Property to Purchaser pursuant to this Contract); or (2) terminate this Contract by delivering a written notice to Seller. If Purchaser elects to terminate this Contract due to Seller's default, then Purchaser will be deemed to have waived any other remedies available to Purchaser and the Earnest Money will be returned to Purchaser.

The following sentence applies only if this box ☑ is checked If Seller defaults and Purchaser does not elect to enforce specific performance of this Contract, or the remedy of specific performance is not available, then Seller shall reimburse Purchaser for Purchaser's actual expenses paid by Purchaser to independent third parties in connection with this Contract including, but not limited to, reasonable fees and expenses for engineering assessments, environmental assessments, architectural plans, surveys and legal work (but excluding any indirect, punitive or consequential damages, such as a claim for lost profits) in an amount not to exceed $26,000.00.

The foregoing will be Purchaser's sole and exclusive remedies for Seller's default unless this box ☑ is checked, in which case Purchaser may sue Seller for damages. If the box is checked to allow Purchaser to sue Seller for damages, then Purchaser must elect to pursue either specific performance or a claim for damages at the beginning of any legal action initiated by Purchaser.

**B.      Seller's Remedies**. If Purchaser fails to close this Contract for any reason except Seller's default or the termination of this Contract pursuant to a right to terminate set forth in this Contract, Purchaser will be in default and Seller may terminate this Contract and receive the Earnest Money as liquidated damages for Purchaser's breach of this Contract, thereby releasing Purchaser from this Contract. If Seller terminates this Contract due to Purchaser's default, then the Earnest Money will be paid to Seller.

Seller's Initials _____   Purchaser's Initials _____

The right to receive the Earnest Money will be Seller's sole and exclusive remedy ~~for Purchaser's default unless one of the following remedies is selected, in which case Seller may sue Purchaser: ☐ to enforce specific performance (force Purchaser to purchase the Property pursuant to this Contract); or ☐ for damages. If one or both of the boxes is checked to allow Seller to sue Purchaser to enforce specific performance or for damages, then Seller must elect to either receive the Earnest Money as liquidated damages or pursue one of the other selected remedies at the beginning of any legal action initiated by Seller.~~

17. **AGENCY DISCLOSURE.**

    **A.**    **Agency Relationships**. The term **"Brokers"** refers to the Principal Broker and the Cooperating Broker, if applicable, as set forth on the signature page. Each Broker has duties only to the party the Broker represents as identified below. If either Broker is acting as an intermediary, then that Broker will have only the duties of an intermediary, and the intermediary disclosure and consent provisions apply as set forth below. *[Each broker check only one]*

        **(1)**    The Principal Broker is: ☑ agent for Seller only~~; or ☐ agent for Purchaser only; or ☐ an intermediary.~~

        ~~**(2)**    The Cooperating Broker is: ☐ agent for Seller only; ☐ agent for Purchaser only; or ☐ an intermediary.~~

    **B.**    **Other Brokers**. Seller and Purchaser each represent to the other that they have had no dealings with any person, firm, agent or finder in connection with the negotiation of this Contract or the consummation of the purchase and sale contemplated by this Contract, other than the Brokers named in this Contract, and no real estate broker, agent, attorney, person, firm or entity, other than the Brokers, is entitled to any commission or finder's fee in connection with this transaction as the result of any dealings or acts of the representing party. Each party agrees to indemnify, defend, and hold the other party harmless from and against any costs, expenses or liability for any compensation, commission, fee, or charges that may be claimed by any agent, finder or other similar party, other than the Brokers, by reason of any dealings or acts of the indemnifying party.

    **C.**    **Fee Sharing**. Seller and Purchaser agree that the Brokers may share the Fee (defined below) among themselves, their sales associates, and any other licensed brokers involved in the sale of the Property. The parties authorize the Title Company to pay the Fee directly to the Principal Broker and, if applicable, the Cooperating Broker, in accordance with <u>Section 18</u> (Professional Service Fee) or any other agreement pertaining to the Fee. Payment of the Fee will not alter the fiduciary relationships between the parties and the Brokers.

    **D.**    ~~**Intermediary Relationship**. If either of the Brokers has indicated in Section 17A (Agency Relationships) that the Broker is acting as an intermediary in this transaction, then Purchaser and Seller hereby consent to the intermediary relationship, authorize such Broker or Brokers to act as an intermediary in this transaction, and acknowledge that the source of any expected compensation to the Brokers will be Seller, and the Brokers may also be paid a fee by Purchaser.~~ **A broker is required to treat each party honestly and fairly and to comply with the Texas Real Estate License Act. A broker who acts as an intermediary in a transaction:**

Seller's Initials   <u>RL</u>      Purchaser's Initials          

~~(1)        shall treat all parties honestly;~~

~~(2)        may not disclose that the owner will accept a price less than the asking price unless authorized in writing to do so by the owner;~~

~~(3)        may not disclose that the buyer will pay a price greater than the price submitted in a written offer unless authorized in writing to do so by the buyer; and~~

~~(4)        may not disclose any confidential information or any information that a party specifically instructs the broker in writing not to disclose unless authorized in writing to disclose the information or required to do so by the Texas Real Estate License Act or a court order or if the information materially relates to the condition of the property.~~

~~Broker is authorized to appoint, by providing written notice to the parties, one or more licensees associated with Broker to communicate with and carry out instructions of one party, and one or more other licensees associated with Broker to communicate with and carry out instructions of the other party or parties. During negotiations, an appointed licensee may provide opinions and advice to the party to whom the licensee is appointed.~~

## 18.   PROFESSIONAL SERVICE FEE.

**A.      Payment of Fee**. Seller agrees to pay the Brokers a professional service fee (the "**Fee**") for procuring the Purchaser and for assisting in the negotiation of this Contract as follows: At the closing of this sale and through escrow, Seller shall pay the agents a professional service fee of 6% of the Purchase Price split evenly between the parties (50% Buyer and 50% Seller). Buyer's portion of the professional service fee (3% of the Purchase Price) shall be credited to Buyer through escrow, but shall not reduce the Purchase Price.

The Fee will be earned upon the execution of this Contract and will be paid at the Closing of a sale of the Property by Seller pursuant to this Contract (as may be amended or assigned). The Fee will be paid by Seller to the Brokers in the county in which the Property is located. Seller shall pay any applicable sales taxes on the Fee. The Title Company or other escrow agent is authorized and directed to pay the Fee to the Brokers out of the Closing proceeds. A legal description of the Property, as set forth in this Contract and any Survey delivered pursuant to this Contract, is incorporated by reference in the agreement pertaining to the Fee set forth or referenced in this Section.

The Fee is earned notwithstanding: (1) any subsequent termination of this Contract (except a termination by Seller or Purchaser pursuant to a right of termination in this Contract); or (2) any default by Seller. If the Closing does not occur due to Purchaser's default, and Seller does not elect to enforce specific performance, the Fee will not exceed one-half of the Earnest Money. If either party defaults under this Contract, then the Fee will be paid within ten (10) days after the scheduled Closing Date, and the Title Company is authorized to pay the fee out of the Earnest Money or any other escrow deposit made pursuant to this Contract. If Seller defaults, then Seller's obligation to pay the Fee will not be affected if Purchaser chooses the remedy of terminating this Contract, and the amount of the Fee will not be limited to the amount of the Earnest Money or any other escrow deposit made pursuant to this Contract.

**B.      Consent Required**. Purchaser, Seller and Title Company agree that the Brokers are third party beneficiaries of this Contract with respect to the Fee, and that no change may be made by Purchaser, Seller or Title Company as to the time of payment, amount of payment or the conditions for payment of the Fee without the written consent of the Brokers.

Seller's Initials ___ Ki ___        Purchaser's Initials _____

~~C.      Right to Claim a Lien. Pursuant to Chapter 62 of the Texas Property Code, the Brokers hereby disclose their right to claim a lien based on the commission agreement set forth in this Contract and any other commission agreements applicable to the transaction contemplated by this Contract. This disclosure is hereby incorporated in any such commission agreements.~~

19.    **MISCELLANEOUS PROVISIONS.**

A.      **Definition of Hazardous Materials.** **"Hazardous Materials"** means any pollutants, toxic substances, oils, hazardous wastes, hazardous materials or hazardous substances as defined in or pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, as amended, the Clean Water Act, as amended, or any other Federal, State or local environmental law, ordinance, rule, or regulation, whether existing as of the Effective Date or subsequently enacted.

B.      **Notices.** All notices and other communications required or permitted under this Contract must be in writing and will be deemed delivered on the earlier of: (1) actual receipt, if delivered in person or by courier, with evidence of delivery; ~~(2) receipt of an electronic facsimile ("Fax") transmission with confirmation of delivery to the Fax numbers specified in this Contract, if any;~~ or (3) upon deposit with the United States Postal Service, certified mail, return receipt requested, postage prepaid, and properly addressed to the intended recipient at the address set forth in this Contract. Any party may change its address for notice purposes by delivering written notice of its new address to all other parties in the manner set forth above. Copies of all written notices should also be delivered to the Brokers and to the Title Company, but failure to notify the Brokers or the Title Company will not cause an otherwise properly delivered notice to be ineffective.

☑ **1.**    Seller also consents to receive any notices by email.
☑ **2.**    Purchaser also consents to receive any notices by email.

C.      **Termination.** If this Contract is terminated for any reason, the parties will have no further rights or obligations under this Contract, except that: (1) Purchaser shall pay the costs to repair any damage to the Property caused by Purchaser or Purchaser's agents; (2) Purchaser shall return to Seller any reports or documents delivered to Purchaser by Seller; and (3) each party shall perform and remain liable for any other obligations that, by the explicit provisions of this Contract, expressly survive the termination of this Contract. The obligations of this Section 19C will survive the termination of this Contract. The terms of any mutual termination agreement will supersede and control over the provisions of this Section 19C to the extent of any conflict.

D.      **Forms.** In case of a dispute as to the form of any document required under this Contract, the most recent form prepared by the State Bar of Texas will be used, modified as necessary to conform to the terms of this Contract.

E.      **Attorneys' Fees.** The prevailing party in any proceeding brought to enforce this Contract, or brought relating to the transaction contemplated by this Contract, will be entitled to recover, from the non-prevailing party, court costs, reasonable attorneys' fees and all other reasonable related expenses.

F.      **Integration.** This Contract contains the complete agreement between the parties with respect to the Property and cannot be varied except by written agreement. The parties agree that there are no oral agreements, understandings, representations or warranties made by the parties that are not expressly set forth in this Contract. Any prior written agreements, understandings, representations or warranties between the parties will be deemed merged into and superceded by this Contract, unless it is clear from the written document that the intent of the parties is for the previous written agreement, understanding, representation or warranty to survive the execution of this Contract.

Seller's Initials _____    Purchaser's Initials _____

**G.** **Survival**. Any representation or covenant contained in this Contract not otherwise discharged at the Closing will survive the Closing.

**H.** **Binding Effect**. This Contract will inure to the benefit of, and will be binding upon, the parties to this Contract and their respective heirs, legal representatives, successors and assigns.

**I.** **Time for Performance**. Time is of the essence under each provision of this Contract. Strict compliance with the times for performance is required.

**J.** **Business Day**. If any date of performance under this Contract falls on a Saturday, Sunday or Texas legal holiday, such date of performance will be deferred to the next day that is not a Saturday, Sunday or Texas legal holiday. References to "business days" mean calendar days, excluding Saturdays, Sundays, and days in which federal banks in Dallas, Texas are closed.

**K.** **Right of Entry**. After reasonable advance notice and during normal business hours, Purchaser, Purchaser's representatives and the Brokers have the right to enter upon the Property before the Closing for purposes of viewing, inspecting and conducting studies of the Property, so long as they do not unreasonably interfere with the use of the Property by Seller or any tenants, or cause damage to the Property.

**L.** **Governing Law**. This Contract will be construed under and governed by the laws of the State of Texas, and unless otherwise provided in this Contract, all obligations of the parties created under this Contract are to be performed in the county where the Property is located.

**M.** **Severability**. If any provision of this Contract is held to be invalid, illegal, or unenforceable by a court of competent jurisdiction, the invalid, illegal, or unenforceable provision will not affect any other provisions, and this Contract will be construed as if the invalid, illegal, or unenforceable provision is severed and deleted from this Contract.

**N.** **Broker Disclaimer**. The Brokers will disclose to Purchaser any material factual knowledge the Brokers may possess about the condition of the Property. Purchaser understands that a real estate broker is not an expert in matters of law, tax, financing, surveying, hazardous materials, engineering, construction, safety, zoning, land planning, architecture, or the Americans with Disabilities Act. Purchaser should seek expert assistance on such matters. The Brokers do not investigate a property's compliance with building codes, governmental ordinances, statutes and laws that relate to the use or condition of the Property or its construction, or that relate to its acquisition. Purchaser is not relying upon any representations of the Brokers concerning permitted uses of the Property or with respect to any nonconformance of the Property. If the Brokers provide names of consultants or sources for advice or assistance, the Brokers do not warrant the services of the advisors or their products. The Brokers cannot warrant the suitability of property to be acquired. Purchaser acknowledges that current and future federal, state and local laws and regulations may require any Hazardous Materials to be removed at the expense of those persons who may have had or continue to have any interest in the Property. The expense of such removal may be substantial. Purchaser agrees to look solely to experts and professionals selected or approved by Purchaser to advise Purchaser with respect to the condition of the Property and will not hold the Brokers responsible for any condition relating to the Property. The Brokers do not warrant that Seller will disclose any or all property defects or other matters pertaining to the Property or its condition. Seller and Purchaser agree to hold the Brokers harmless from any damages, claims, costs and expenses including, but not limited to, reasonable attorneys' fees and court costs, resulting from or related to any person furnishing any false, incorrect or inaccurate information with respect to the Property, Seller's concealing any material information with respect to the condition of the Property, or matters that should be analyzed by experts. To the extent permitted by applicable law, the Brokers' liability for errors or omissions, negligence, or otherwise, is limited to the return of the Fee, if any, paid to the responsible Broker pursuant to this Contract. The parties agree that they are not relying upon any oral statements that the Brokers may have made. Purchaser is relying solely upon Purchaser's own investigations and the

Seller's Initials ___ *RL* _____     Purchaser's Initials _____

representations of Seller, if any, and Purchaser acknowledges that the Brokers have not made any warranty or representation with respect to the condition of the Property or otherwise.

**O.     Counterparts.**  This Contract may be executed in a number of identical counterparts. Each counterpart is deemed an original and all counterparts will, collectively, constitute one agreement.

**P.     Patriot Act Representation.**  Seller and Purchaser each represent to the other that: (1) its property interests are not blocked by Executive Order No. 13224, 66 Fed. Reg. 49079; (2) it is not a person listed on the Specially Designated Nationals and Blocked Persons list of the Office of Foreign Assets Control of the United States Department of the Treasury; and (3) it is not acting for or on behalf of any person on that list.

**Q.     Exchange.**  Seller and Purchaser shall cooperate with each other in connection with any tax deferred exchange that either party may be initiating or completing in connection with Section 1031 of the Internal Revenue Code, so long as neither party will be required to pay any expenses related to the other party's exchange and the Closing is not delayed. Notwithstanding any other provision that may prohibit the assignment of this Contract, either party may assign this Contract to a qualified intermediary or exchange accommodation title holder, if the assignment is required in connection with the exchange. The parties agree to cooperate with each other, and sign any reasonable documentation that may be required, to effectuate any such exchange.

## 20.     STATUTORY NOTICES.

**A.     Abstract or Title Policy.**  At the time of the execution of this Contract, Purchaser acknowledges that the Brokers have advised and hereby advise Purchaser, by this writing, that Purchaser should have the abstract covering the Property examined by an attorney of Purchaser's own selection or that Purchaser should be furnished with or obtain a policy of title insurance.

**B.     Notice Regarding Unimproved Property Located in a Certificated Service Area.**  If the Property is unimproved and is located in a certificated service area of a utility service, then Seller shall give to Purchaser a written notice in compliance with §13.257 of the Texas Water Code, and Purchaser agrees to acknowledge receipt of the notice in writing. The notice must set forth the correct name of utility service provider authorized by law to provide water or sewer service to the Property, and must comply with all other applicable requirements of the Texas Water Code.

**C.     Special Assessment Districts.**  If the Property is situated within a utility district or flood control district subject to the provisions of §49.452 of the Texas Water Code, then Seller shall give to Purchaser the required written notice and Purchaser agrees to acknowledge receipt of the notice in writing. The notice must set forth the current tax rate, the current bonded indebtedness and the authorized indebtedness of the district, and must comply with all other applicable requirements of the Texas Water Code.

**D.     Property Owners' Association.**  If the Property is subject to mandatory membership in a property owners' association, Seller shall notify Purchaser of the current annual budget of the property owners' association, and the current authorized fees, dues and/or assessments relating to the Property. In addition, Seller shall give to Purchaser the written notice required under §5.012 of the Texas Property Code, if applicable, and Purchaser agrees to acknowledge receipt of the notice in writing. Also, Seller shall give to Purchaser the resale certificate required under Chapter 207 of the Texas Property Code, if applicable, and Purchaser agrees to acknowledge receipt of the resale certificate in writing.

**E.     Notice Regarding Possible Annexation.**  If the Property that is the subject of this Contract is located outside the limits of a municipality, the Property may now or later be included in the extraterritorial jurisdiction of the municipality and may now or later be subject to annexation by the

Seller's Initials  **Rℓ**                         Purchaser's Initials

municipality. Each municipality maintains a map that depicts its boundaries and extraterritorial jurisdiction. To determine if the Property is located within a municipality's extraterritorial jurisdiction or is likely to be located within a municipality's extraterritorial jurisdiction, contact all municipalities located in the general proximity of the Property for further information.

     F.    **Notice Regarding Coastal Area Property.** If the Property adjoins or shares a common boundary with the tidally influenced submerged lands of the state, then Seller shall give to Purchaser a written notice regarding coastal area property, in compliance with §33.135 of the Texas Natural Resources Code, and Purchaser agrees to acknowledge receipt of the notice in writing.

     G.    **Gulf Intracoastal Waterway Notice.** If the Property is located seaward of the Gulf Intracoastal Waterway, then Seller shall give to Purchaser a written notice regarding the seaward location of the Property, in compliance with §61.025 of the Texas Natural Resources Code, and Purchaser agrees to acknowledge receipt of the notice in writing.

     H.    **Notice for Property Located in an Agricultural Development District.** If the Property is located in an agricultural development district, then in accordance with §60.063 of the Texas Agricultural Code: (1) Seller shall give to Purchaser a written notice that the Property is located in such a district; (2) Purchaser agrees to acknowledge receipt of the notice in writing; and (3) at the Closing, a separate copy of the notice with current information about the district will be executed by Seller and Purchaser and recorded in the deed records of the county in which the Property is located.

     I.    **Certificate of Mold Remediation.** If a certificate of mold remediation has been issued for the Property under Section 1958.154 of the Occupations Code within the preceding five years, Seller is required to provide a copy of the certificate to Purchaser.

     J.    **Notice of Water Level Fluctuations.** If the Property adjoins a lake, reservoir, or other impoundment of water that has storage capacity of at least 5,000 acre-feet at the impoundment's normal operating level, then the following notice applies.

            NOTICE OF WATER LEVEL FLUCTUATIONS: The water level of the impoundment of water adjoining the Property fluctuates for various reasons, including as a result of: (1) an entity lawfully exercising its right to use the water stored in the impoundment; or (2) drought or flood conditions.

     L.    **Disclosure of Dual Capacity as Broker and Principal.**    **[Complete if applicable].**

Benjamin B. Efraim   is a licensed ~~Texas~~ California real estate broker and is acting in a dual capacity as broker for the Purchaser and as a principal in this transaction, as he or she may be the Purchaser <u>or affiliated with the Purchaser</u> (or one of the owners of the Purchaser after any assignment of this Contract).

_____ ~~is a licensed Texas real estate broker and is acting in a dual capacity as broker for the Seller and as a principal in this transaction, as he or she may be the Seller (or one of the owners of the Seller).~~

**21.    DISPUTE RESOLUTION.**

     A.    **Mediation.** If any dispute (the **"Dispute"**) arises between any of the parties to this Contract including, but not limited to, payment of the Fee, then any party (including any Broker) may give written notice to the other parties requiring all involved parties to attempt to resolve the Dispute by mediation. Except in those circumstances where a party reasonably believes that an applicable statute of limitations period is about to expire, or a party requires injunctive or equitable relief, the parties are

Seller's Initials ___*RL*___      Purchaser's Initials _____

obligated to use this mediation procedure before initiating arbitration or any other action. Within seven (7) days after receipt of the mediation notice, each party must deliver a written designation to all other parties stating the names of one or more individuals with authority to resolve the Dispute on such party's behalf. Within fourteen (14) days after receipt of the mediation notice, the parties shall make a good faith effort to select a qualified mediator to mediate the Dispute. If the parties are unable to timely agree upon a mutually acceptable mediator, any party may request any state or federal judge to appoint a mediator. In consultation with the mediator, the parties shall promptly designate a mutually convenient time and place for the mediation that is no later than thirty (30) days after the date the mediator is selected. In the mediation, each party must be represented by persons with authority and discretion to negotiate a resolution of the Dispute, and may be represented by counsel. The mediation will be governed by applicable provisions of Chapter 154 of the Texas Civil Practice and Remedies Code, and such other rules as the mediator may prescribe. The fees and expenses of the mediator will be shared equally by all parties included in the Dispute.

          **B.**    **Arbitration.** If the parties are unable to resolve any Dispute by mediation, then the parties (including the Brokers) shall submit the Dispute to binding arbitration before a single arbitrator. The Dispute will be decided by arbitration in accordance with the applicable arbitration statute and any rules selected by the arbitrator. After an unsuccessful mediation, any party may initiate the arbitration procedure by delivering a written notice of demand for arbitration to the other parties. Within fourteen (14) days after the receipt of the written notice of demand for arbitration, the parties shall make a good faith effort to select a qualified arbitrator acceptable to all parties. If the parties are unable to agree upon the selection of an arbitrator, then any party may request any state or federal judge to appoint an arbitrator. This agreement to arbitrate will be specifically enforceable under the prevailing arbitration law.

    **22.**    **CONSULT AN ATTORNEY.** This Contract is a legally binding agreement. The Brokers cannot give legal advice. The parties to this Contract acknowledge that they have been advised to have this Contract reviewed by legal counsel before signing this Contract.

| Purchaser's attorney: | Seller's attorney: |
|---|---|
| Name: Stuart A. Lautin, Esq. | Name: _____ |
| Address: | Address: _____ |
| | _____ |
| Phone: | Phone: _____ |
| Email: | Email: _____ |

    **23.**    **EXHIBITS AND ADDENDA.** All Exhibits and Addenda attached to this Contract are incorporated herein by reference and made a part of this Contract for all purposes *[check all that apply]*:

| | | |
|---|---|---|
| ☑ | Exhibit "A" | Legal Description |
| ☐ | Exhibit "B" | Site Plan |
| ☑ | Exhibit "C" | Information About Brokerage Services |
| ☐ | Exhibit "D" | _____ |
| | | |
| ☐ | Addendum A | Schedule of Personal Property |
| ☑ | Addendum B-1 | Third Party Financing |
| ☐ | Addendum B-2 | Seller Financing |
| ☐ | Addendum B-3 | Existing Loan |
| ☑ | Addendum C | Disclosure Notice |
| ☐ | Addendum D | Lead Based Paint |
| ☑ | Addendum E | Additional Provisions |

Seller's Initials ___RL___    Purchaser's Initials _____

24.    ~~CONTRACT AS OFFER. The execution of this Contract by the first party to do so~~
~~constitutes an offer to purchase or sell the Property. If the other party does not accept that offer by~~
~~signing this Contract and delivering a fully executed copy to the first party within_____~~
~~_____days after the date this Contract is executed by the first party, then the first party may withdraw~~
~~that offer by delivering a written notice to the other party at any time before the other party accepts that~~
~~offer, in which case the Earnest Money, if any, will be returned to Purchaser.~~

25.    **ADDITIONAL PROVISIONS.** *[Additional provisions may be set forth below or on any attached Addendum].*

See Addendum E. attached hereto._____

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Seller's Initials _____    Purchaser's Initials _____

This Contract is executed to be effective as of the date the Title Company acknowledges receipt of this fully executed Contract as indicated by the signature block for the Title Company (the Effective Date).

**SELLER:**

**Intermed Services Management Co, LP,**
a Texas limited partnership

By: (Signature _____ robert lenington
Name: Robert Lenington 51B7F7B1D09549C...
Title: _____ managing partner

By: (Signature)_____
Name: _____
Title: _____

Tax I.D. No: _____
Date of Execution: _____ 12/16/2020

**PRINCIPAL BROKER:**

Ridge Pointe Commercial Real Estate, LTD

By: (Signature)_____ robert lenington
Name: _
Title: _____

Address: _

Telephone: _____
Email: deng
TREC License No.. _____

**PURCHASER:**

**Horseshoe, LLC,**
a California limited liability company

By:    **Fortune Realty, LLC,**
        its Manager

By: (Signature)_____
Name: Benjamin B. Efraim, Esq.
Title: Manager

By: (Signature)_____
Name: _____
Title: _____

Tax I.D. No: _____
Date of Execution: _____ 12 14 2020

~~**COOPERATING BROKER:**~~

~~By: (Signature)_____~~
~~Name:_____~~
~~Title:_____~~

~~Address:_____~~

~~Telephone:_____~~
~~Email:_____~~
~~TREC License No.:_____~~

**TITLE COMPANY RECEIPT:** The Title Company acknowledges receipt of this Contract on _____
_December 16, 2020_ (the **Effective Date**). Upon receipt of the Earnest Money, the Title
Company accepts the Earnest Money subject to the terms and conditions set forth in this Contract.

## TITLE COMPANY:

By: (Signature) _____

Name: _Lindsey Busbee_

Title: _Commercial Escrow Officer_

Address: _

Telephone:

Email:_____

*PERMISSION TO USE: This form is provided for use by members of the North Texas Commercial Association of
Realtors\*, Inc. ("NTCAR") and members of the North Texas Commercial Association of Real Estate Professionals,
Inc. Permission is given to make limited copies of the current version of this form for use in a particular Texas real
estate transaction. Please contact the NTCAR office to confirm you are using the current version of this form. Mass
production, or reproduction for resale, is not allowed without express permission. Any changes to this form must be
made in a manner that is obvious. If any words are deleted, they must be left in the form with a line drawn through
them. If changes are made that are not obvious, they are not enforceable.*

Seller's Initials [ RL ]          Purchaser's Initials [ _signature_ ]

## EXHIBIT "A"

### Legal Description

[To be provided by Title]

©Copyright 2010 NTCAR - Form No. 1 (1/10)

## EXHIBIT "C"

### Information About Brokerage Services

©Copyright 2010 NTCAR – Form No. 1 (1/10)

# Information About Brokerage Services

*Texas law requires all real estate license holders to give the following information about brokerage services to prospective buyers, tenants, sellers and landlords.*



**TYPES OF REAL ESTATE LICENSE HOLDERS:**
- **A BROKER** is responsible for all brokerage activities, including acts performed by sales agents sponsored by the broker.
- **A SALES AGENT** must be sponsored by a broker and works with clients on behalf of the broker.

**A BROKER'S MINIMUM DUTIES REQUIRED BY LAW (A client is the person or party that the broker represents):**
- Put the interests of the client above all others, including the broker's own interests;
- Inform the client of any material information about the property or transaction received by the broker;
- Answer the client's questions and present any offer to or counter-offer from the client; and
- Treat all parties to a real estate transaction honestly and fairly.

**A LICENSE HOLDER CAN REPRESENT A PARTY IN A REAL ESTATE TRANSACTION:**

**AS AGENT FOR OWNER (SELLER/LANDLORD):** The broker becomes the property owner's agent through an agreement with the owner, usually in a written listing to sell or property management agreement. An owner's agent must perform the broker's minimum duties above and must inform the owner of any material information about the property or transaction known by the agent, including information disclosed to the agent or subagent by the buyer or buyer's agent.

**AS AGENT FOR BUYER/TENANT:** The broker becomes the buyer/tenant's agent by agreeing to represent the buyer, usually through a written representation agreement. A buyer's agent must perform the broker's minimum duties above and must inform the buyer of any material information about the property or transaction known by the agent, including information disclosed to the agent by the seller or seller's agent.

**AS AGENT FOR BOTH – INTERMEDIARY:** To act as an intermediary between the parties the broker must first obtain the written agreement of *each party* to the transaction. The written agreement must state who will pay the broker and, in conspicuous bold or underlined print, set forth the broker's obligations as an intermediary. A broker who acts as an intermediary:
- Must treat all parties to the transaction impartially and fairly;
- May, with the parties' written consent, appoint a different license holder associated with the broker to each party (owner and buyer) to communicate with, provide opinions and advice to, and carry out the instructions of each party to the transaction.
- Must not, unless specifically authorized in writing to do so by the party, disclose:
  - o that the owner will accept a price less than the written asking price;
  - o that the buyer/tenant will pay a price greater than the price submitted in a written offer; and
  - o any confidential information or any other information that a party specifically instructs the broker in writing not to disclose, unless required to do so by law.

**AS SUBAGENT:** A license holder acts as a subagent when aiding a buyer in a transaction without an agreement to represent the buyer. A subagent can assist the buyer but does not represent the buyer and must place the interests of the owner first.

**TO AVOID DISPUTES, ALL AGREEMENTS BETWEEN YOU AND A BROKER SHOULD BE IN WRITING AND CLEARLY ESTABLISH:**
- The broker's duties and responsibilities to you, and your obligations under the representation agreement.
- Who will pay the broker for services provided to you, when payment will be made and how the payment will be calculated.

**LICENSE HOLDER CONTACT INFORMATION:** This notice is being provided for information purposes. It does not create an obligation for you to use the broker's services. Please acknowledge receipt of this notice below and retain a copy for your records.

David English/Ridge Pointe
Commercial Real Estate, LTD

| Licensed Broker /Broker Firm Name or Primary Assumed Business Name | License No. | Email | Phone |
|---|---|---|---|
| Designated Broker of Firm | License No. | Email | Phone |
| Licensed Supervisor of Sales Agent/ Associate | License No. | Email | Phone |
| Sales Agent/Associate's Name | License No. | Email | Phone |

12/16/2020

Buyer/Tenant/Seller/Landlord Initials        Date

**Regulated by the Texas Real Estate Commission**        Information available at www.trec.texas.gov

IABS 1-0

# NORTH TEXAS COMMERCIAL ASSOCIATION OF REALTORS®

## ADDENDUM B-1 TO COMMERCIAL CONTRACT OF SALE

### THIRD PARTY FINANCING

**Property address or description:** 810 E. Ralph Hall Parkway, Rockwall, TX 75032-6878, Rockwall County, Texas

1.    **THIRD PARTY FINANCING.** *[Chose one]:*

☐    This Contract is subject to Purchaser obtaining approval from a third party lender of financing in the amount of $_____, payable at _____ _____ intervals based on an amortization of not less than _____ years, with a payment term of not less than _____ years, and with the initial interest rate not to exceed _____ % per annum for the first _____ years of the loan.

☑    This Contract is subject to Purchaser obtaining approval from a third party lender of financing upon terms acceptable to Purchaser.

~~2.    APPLICATION.  Purchaser shall apply for the desired third party financing approval within seven (7) days after the Effective Date and shall use reasonable efforts to obtain the financing approval.~~

3.    **FINANCING CONTINGENCY.** ~~If~~ Unless Purchaser notifies Seller in writing that it has obtained ~~does not obtain~~ the financing approval by the date that is thirty (30)  days  (the  **"Financing Contingency Period"**) after the Effective Date, then ~~Purchaser may  terminate~~ this Contract shall terminate ~~by delivering a written notice to Seller~~ within five (5) days after the end of the Financing Contingency Period (but in any event before the Closing). ~~Purchaser shall deliver a written notice to Seller confirming Purchaser has obtained the financing approval promptly after Purchaser receives the approval.  If Seller does not receive that notice on or before the date that is two (2) business days after the end of the Financing Contingency Period, then Seller may terminate this Contract by delivering a written notice to Purchaser at any time thereafter until Seller receives that notice (but in any event before the Closing).~~  If ~~either party terminates~~ this Contract is terminated pursuant to this Section, the Earnest Money will be returned to Purchaser.

**Seller's Initials** [KL]    **Purchaser's Initials** [signature] ⁰

©Copyright 2010 NTCAR - Form No. 1 (1/10)

ADDENDUM B-1

# NORTH TEXAS COMMERCIAL ASSOCIATION OF REALTORS®

## ADDENDUM C TO COMMERCIAL CONTRACT OF SALE

### DISCLOSURE NOTICE

**Property address or description**: 810 E. Ralph Hall Parkway, Rockwall, TX 75032-6878, Rockwall County, Texas

This Disclosure Notice (this **"Notice"**) is a statement by Seller of the condition of the Property made as of the date of this Contract. This is not a substitute for any inspections Purchaser may make or for warranties that may be made by others. **To best of Seller's knowledge**, other than disclosed by Seller in this Notice: (1) the Property does not have any material latent, structural, or construction defects; (2) the Property is not contaminated with Hazardous Materials in violation of applicable laws and regulations; (3) none of the improvements on the Property has been constructed of materials known to be a potential health hazard to occupants of the Property; and (4) the following information is true and correct in all material respects, and Seller has included any material fact concerning the Property of which Seller is aware. **These representations are not warranties or guarantees by Seller.** Seller hereby authorizes the Brokers to disclose to Purchaser all information about the condition of the Property whether disclosed to the Brokers by Seller orally or in writing (by this Notice or otherwise), or otherwise discovered. Seller shall advise Purchaser and the Brokers of any other material fact or condition, not reported here, that may arise or become known to Seller before the Closing. These representations are made by Seller only and are not representations of the Brokers. Seller acknowledges that Purchaser and the Brokers will be relying upon the accuracy and completeness of this information.

*Please answer all questions.* If the answer to any question is "Yes," explain on a separate sheet.

**1. Buildings and Improvements.** Are there any defects or repairs needed to the following?

| | N/A | YES | NO | UNKNOWN |
|---|---|---|---|---|
| a. Roof, parapets, flashing, penetrations, chimneys, skylights | | | | |
| b. Air conditioning, refrigeration, heating, ventilating systems, air ducting, fans | | | | |
| c. Foundation piers, slabs, grade beams, footings, retaining walls | | | | |
| d. Floors, interiors, floor coverings, ceilings, millwork, partitions | | | | |
| e. Exterior walls, curtain walls, weather proofing, caulking | | | | |
| f. Structural components, columns, trusses, beams, bracing | | | | |
| g. Electrical systems, wiring, lighting, fixtures and equipment | | | | |
| h. Plumbing systems, piping, drains, valves, fixtures and equipment | | | | |
| i. Elevators, escalators, overhead doors, other built-in mechanical equipment | | | | |
| j. Windows, doors, plate glass, canopies, other architectural features | | | | |
| k. Parking areas, driveways, steps, walks, curbs and other pavements | | | | |
| l. Landscaping, irrigation systems, embankments, fences, signs | | | | |

**2. Hazardous Materials.** Have there been any Hazardous Materials:

| | | | | |
|---|---|---|---|---|
| a. Released or deposited on or under or about the Property, or leaking on or from the Property? | | | | |
| b. Used in the construction of the improvements or in finishing materials? | | | | |
| c. Released or deposited on or leaking from other properties contiguous to the Property? | | | | |

Seller's Initials _RL_  Purchaser's Initials _____

©Copyright 2010 NTCAR - Form No. 1 (1/10)

ADDENDUM C

|  | N/A | YES | NO | UNKNOWN |
|---|---|---|---|---|

**3. Subsurface Conditions.**

a. Are there any material soil, geological, groundwater, or foundation problems?

b. Are there underground storage tanks or leaking pipes on the Property?

c. Is the Property situated in a wetland or over a garbage dump or waste landfill?

**4. Special Conditions.**

a. Are there any public or private easements or agreements for utilities or access?

b. Is the Property flood prone or located in a 100-year flood plain?

c. Are there any violations of building codes, zoning ordinances, EPA regulations, OSHA regulations, or Texas Commission on Environmental Quality rules?

d. Are there any violations of Deed Restrictions covering the Property?

e. Are there any threatened condemnations by public authorities or utility companies, including planned streets, highways, railroads, utilities, or development projects?

f. Is the Property located in a historical district or planned development district?

g. Is the Property in any special zoning district or under a specific use permit?

h. Are there any pending changes in zoning or in the physical condition of the Property?

i. Is the Property subject to membership in a property owners' association or dues?

**5. Utilities Present.** *(Strike those not on the Property):* City Water; Sanitary Sewer; Storm Drainage; Natural Gas; Electricity

Seller's Initials ⌐DS KL    Purchaser's Initials 

©Copyright 2010 NTCAR - Form No. 1 (1/10)    **ADDENDUM C**

## ADDENDUM E TO
## COMMERCIAL CONTRACT OF SALE

This Addendum E to Commercial Contract of Sale ("Addendum") modifies the provisions of the Commercial Contract of Sale ("Contract") executed between **Intermed Services Management Co, LP,** as Seller, and **Horseshoe, LLC,** as Purchaser. Terms commencing with a capital letter that are undefined in this Addendum share the same definition as provided in the Contract. References to section numbers refer to their counterparts in the Contract. In the event of conflicts, the provisions of this Addendum govern such conflicts.

1. Loan Balance. The amount of the Purchase Price to be financed can only be approximated at this time; Purchaser shall not incur an event of default if Purchaser seeks a loan for an amount different than that disclosed to Seller at the time of contracting.

2. Additional Earnest Money. Section 4.C. of the Contract is amended to provide that Purchaser shall cause the additional sum of $130,000 to be paid to Title Company within two business days following expiration of the Inspection Period. Such additional sum shall be considered as Earnest Money and applied or disbursed in accordance with the Contract.

3. Due Diligence Documents. In addition to the documents to be delivered to Purchaser identified in Sections 10.C.(b) and 11.A. of the Contract, Seller shall also cause the following documents to be delivered to Purchaser within two business days after the Effective Date:

    (15)    Schedule and reconciliation of all operating expenses from Jan 2017 to year-to-date 2020.
    (16)    Schedule and reconciliation of all "triple net" expenses from Jan 2017 to year-to-date 2020.
    (17)    Schedule and reconciliation of all common area expenses from Jan 2017 to year-to-date 2020.
    (18)    Seller's current owner policy of title insurance, and all endorsements.
    (19)    Copies of all title exceptions described in Seller's current owner title policy.
    (20)    All financial statements, gross sales reports, and income statements furnished by Seller's tenants and such tenants' guarantors.
    (21)    2020 Property budget.
    (22)    2021 Property budget, if it has been developed by Seller or Seller's property manager.
    (23)    All warranties and guaranties pertaining to Seller's equipment, furnishings, and fixtures.
    (24)    Full copies of all pleadings and relevant correspondence for pending litigation, mediation, and arbitration against or in any manner involving Seller, Seller's affiliates or owners, Seller's tenants, and such tenants' guarantors; full copies of all claims asserted by or against any of the foregoing.

JocuSign Envelope ID: F04717A0-B240-4122-B97B-FC042E25DB11

      (25)     All certificates of occupancy, licenses, and permits issued to Seller and Seller's tenants.

      (26)     All brokerage and leasing contracts and agreements, and all amendments.

      (27)     All insurance loss run schedules, casualty reports, and liability claims from Jan 2017 to year-to-date 2020.

      (28)     All prior notices of municipal code and environmental violations.

      (29)     All communications with tenants and tenants' guarantors regarding allegations of default or breach asserted against any of Seller, any affiliate or owner of Seller, Seller's property manager, tenants, tenants' assignees, tenants' sublessees, and tenants' guarantors.

      (30)     All ADA, Texas Architectural Barriers, and Texas Accessibility Standards reports, assessments, repairs, demands, claims, invoices, bills, and statements.

      (31)     All other information material to the Property.

4.   Estoppels. All Estoppel Certificates described in Section 12 of the Contract must be in form and content reasonably acceptable to Purchaser and /or Purchaser's lender.

5.   Closing Docs. Each of the Deed, Bill of Sale, Assignment of Leases, and Certified Rent Roll described in Section 15.B of the Contract must be in form and content reasonably acceptable to Purchaser and /or Purchaser's lender.

6.   Obligation Discharge. Section 15.D of the Contract is modified to provide that Seller shall cause all service contracts, leasing agreements, brokerage contracts, commission agreements, and similar to be paid and fully discharged at Closing, at Seller's expense, and furnish Purchaser with evidence thereof reasonably satisfactory to Purchaser. Further, Seller shall also cause to be fully paid to Purchaser at Closing all unpaid tenant improvement allowances, future rent abatements and credits, all lease option extension credits, and all future tenant-inducements.


[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, this Addendum has been executed as of the Effective Date.

**Intermed Services Management Co, LP** ("Seller")

By: _____

Name: Robert Lemington

Title: managing partner

**Horseshoe, LLC** ("Buyer")

By: Fortune Realty, LLC, its Manager

By: _____

Name: Benjamin B. Efraim

Title: Manager of Fortune Realty, LLC

12|14|2020.

Page 3

43

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| INTERMED SERVICES MANAGEMENT COMPANY, LP, | § | |
| | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| V. | § | Civil Action No. 3:22-CV-00191-L |
| | § | |
| HORSESHOE, LLC AND HALTER COMPANIES, LLC, | § | |
| | § | |
| | § | |
| Defendants. | § | |

INDEX OF STATE COURT DOCUMENTS

1. Plaintiffs' Original Petition For Declaratory Judgment filed January 18, 2022

2. Notice of Removal filed January 27, 2022

3. Amended Notice of Removal filed February 15, 2022

1

1

Filed: 1/18/2022 4:10 PM
Kayla Carson
District Clerk
Rockwall County, Texas

Jeni Holt

1-22-0060

CAUSE NO. _____

| | | |
|---|---|---|
| INTERMED SERVICES MANAGEMENT COMPANY, LP, | § § § | IN THE |
| Plaintiff, | § § § § | |
| v. | § § § | _____ |
| HORSESHOE, LLC AND HALTER COMPANIES, LLC | § | Rockwall County - 382nd District Court |
| Defendants. | § § | ROCKWALL COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION FOR DECLARATORY JUDGMENT

Plaintiff Intermed Services Management Company, LP ("Intermed LP" or "Plaintiff") files its *Original Petition for Declaratory Judgment* as follows:

### I.
### DISCOVERY CONTROL PLAN

1.    Plaintiff intends to conduct discovery under Level 3 of Texas Rule of Civil Procedure 190.

### II.
### PARTIES

2.    Plaintiff is a Texas Limited Partnership.

3.    Defendant Horseshoe, LLC ("Horseshoe") is a foreign limited liability company that may be served with process by serving its registered agent Fortune Companies Management Corp., 265 Sunset Drive, Suite 260, Thousand Oaks, CA 91361.

4.    Defendant Halter Companies, LLC ("Halter") is a foreign limited liability company that may be served with process by serving its registered agent Benjamin B. Efraim, 265 Sunset Drive, Suite 260, Westlake Village, CA 91361.

### III.
### JURISDICTION AND VENUE

5.    Venue is proper in Rockwall County pursuant to Texas Civil Practice and Remedies Code Section 15.002(a)(1) because all or a substantial part of the acts or omissions

giving rise to this claim occurred there, and it is the county in which Plaintiff's building, the property at issue in this lawsuit, is situated.

## IV.
### COMPLIANCE WITH RULE 47

6.    Rule 47(a): This action requests a declaratory judgment that a contract is invalid and unenforceable.

7.    Rule 47(b). The damages sought are within the jurisdictional limits of the court.

8.    Rule 47(c). Plaintiff seeks non-monetary relief and attorney's fees.

## V.
### FACTUAL BACKGROUND

9.    Whenever in this Petition it is alleged that any Defendant did any act or thing, it is meant that Defendants' officers, agents, servants, employees, or representatives did such act or thing, and that at the time such act or thing was done, it was done with the full authorization or ratification of Defendants or was done in the normal and routine course and scope of employment of Defendants' officers, agents, servants, employees, or representatives.

10.    Intermed LP owns real property located at 810 E. Ralph Hall Parkway, Rockwall, Texas 75032 (the "Property"). The Property represents substantially all of Intermed LP's assets.

11.    On or about December 14, 2020, Horseshoe executed a Commercial Contract of Sale ("Contract"), which Horseshoe drafted, for the purchase of the Property. Horseshoe subsequently executed five purported amendments to the Contract. Horseshoe then assigned the Contract to Halter.

12.    Intermed LP's general partner, Intermed Services, Inc., did not execute the Contract or any of the five amendments. Intermed LP did not enter into the Contract or any of the five amendments.

13.    Intermed LP's partnership agreement requires unanimous consent of all partners to sell the Property. At no time did all partners of Intermed LP unanimously consent to the sale of

the Property. To the extent that the Contract was purportedly executed on behalf of Intermed LP, which Intermed LP does not concede, such execution was without authority.

14.     Alternatively, to the extent that the Contract and any amendments were enforceable at any time, which Intermed LP disputes, the Contract terminated pursuant to its own terms. According to Addendum B-1, the Contract was subject to the purchaser obtaining approval of financing from a third-party lender. Addendum B-1 states that unless the purchaser notified the seller in writing that the purchaser had obtained the financing approval by the end of the Financing Contingency Period, the Contract "shall terminate within five (5) days after the end of the Financing Contingency Period." Amendment V to the Contract defines the end of the Financing Contingency Period as 5:00 CDT on January 12, 2022. Neither Horseshoe nor Halter notified Intermed LP in writing that Horseshoe or Halter had obtained financing approval from a third-party lender by 5:00 p.m. CDT on January 12, 2022.

## VI.
### CAUSE OF ACTION: SUIT FOR DECLARATORY RELIEF

15.     Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs.

16.     Pursuant to the Declaratory Judgment Act, Texas Civil Practice and Remedies Code Sections 37.001, et seq., Plaintiff requests that this Court construe a written contract to determine the validity of the contract and to determine Plaintiff's rights, obligations, and liabilities under the contract, if any. Plaintiff requests that the Court declare (1) the Contract and any amendments thereto are not valid or enforceable and (2) if any part or parts of the Contract were valid or enforceable, that the Court declare that Plaintiff has no obligations under the Contract because the Contract terminated.

17.     Pursuant to Intermed LP's partnership agreement, a transfer of all or substantially all of the partnership's assets requires the prior written consent of all partners. No such written consent exists. Therefore, Intermed LP granted no authority to sell the Property.

18.    In Texas, the doctrine of apparent authority does not apply to transactions in real estate. Because Intermed LP did not grant actual authority to sell the Property and did not ratify any exercise of such authority by unanimous written consent, no authority to sell the Property exists.

19.    A limited partnership such as Intermed LP acts only through its general partner. Intermed LP's general partner is Intermed Services, Inc. There is no dispute that Intermed LP's general partner, Intermed Services, Inc., did not execute the Contract. Intermed therefore did not enter into the Contract.

20.    Because Intermed LP did not enter into any written agreement to sell the Property, including the Contract, any purported agreement to sell the Property on behalf of Intermed LP violates the Statue of Frauds. Therefore, no agreement purporting to sell the Property to Horseshoe is valid or enforceable.

21.    Alternatively, if the Court determines that the Contract was enforceable at any time, which Intermed LP categorically denies, the Contract terminated pursuant to Contract Addendum B-1 and Amendment 5. According to Addendum B-1, the Contract was subject to the purchaser obtaining approval of financing from a third-party lender. Addendum B-1 states that unless the purchaser notified the seller in writing that the purchaser had obtained the financing approval by the end of the Financing Contingency Period, the Contract "shall terminate within five (5) days after the end of the Financing Contingency Period." Amendment V to the Contract defines the end of the Financing Contingency Period as 5:00 CDT on January 12, 2022.

22.    Neither Horseshoe nor Halter notified Intermed LP in writing that Horseshoe or Halter had obtained financing approval from a third-party lender by 5:00 p.m. CDT on January 12, 2022. The Contract therefore terminated, and in any event terminated no later than 5:00 p.m. CDT on January 17, 2022. Even if the Contract and subsequent amendments were valid and enforceable, which they were not, the Contract terminated pursuant to its own terms when

Horseshoe and Halter failed to provide Intermed LP the requisite written notice by 5:00 p.m. CDT on January 12, 2022.

23.     For the reasons set forth above, no agreement to sell the Property, including the Contract, is valid or enforceable. Plaintiff seeks a declaration that the Contract is neither valid nor enforceable and that Intermed LP has no obligation under the Contract. By granting the declaratory relief sought by Plaintiff, this Court will clarify an ongoing and continuing dispute as to the parties' rights, obligations, and liabilities—if any—under the Contract.

## VII.
## ATTORNEYS' FEES

24.     Plaintiff incorporates by reference the above paragraphs as if fully incorporated herein. Plaintiff has incurred and will incur significant costs and reasonable and necessary attorneys' fees in seeking this declaratory judgment. Plaintiff is entitled to recover reasonable and necessary attorneys' fees that are equitable and just under Texas Civil Practice and Remedies Code Section 37.009.

## VIII.
## CONCLUSION AND PRAYER

WHEREFORE, Plaintiff demands judgment in its favor and against Defendants as follows:

(i)     declaratory judgment as pleaded and sought herein;

(ii)    pre-judgment and post-judgment interest at the highest rate allowed by law;

(iii)   costs of suit;

(iv)    reasonable attorneys' fees; and

(v)     such other and further relief to which Plaintiff may be entitled.

Respectfully submitted,

LAMBERTH RATCLIFFE COVINGTON PLLC

*/s/ Benjamin L. Weible*
Curt M. Covington
State Bar No. 24053648
curt@lrclegal.com
Benjamin L. Weible
State Bar No. 24068834
ben@lrclegal.com
1010 W. Ralph Hall Parkway, First Floor
Rockwall, Texas 75032
Telephone:  469-698-4300
Facsimile:  469-698-4037

*Attorneys for Plaintiff Intermed Services*
*Management Company, LP*

2

CAUSE NO. 1-22-0060

| | | |
|---|---|---|
| INTERMED SERVICES MANAGEMENT COMPANY, LP, | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| V. | § § | ROCKWALL COUNTY, TEXAS |
| HORSESHOE, LLC AND HALTER COMPANIES, LLC, | § § § | |
| Defendants. | § | 382ND JUDICIAL DISTRICT COURT |

<u>NOTICE OF REMOVAL</u>

Defendants, Horseshoe, LLC and Halter Companies, LLC ("Defendants"), pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, hereby remove this action from the 382nd Judicial District Court of Rockwall County, Texas, Cause No. 1-22-0060, to the United States District Court for the Northern District of Texas. As grounds for removal, Defendants state as follows:

1.      In support of this Notice of Removal Defendants attach and incorporate herein the Affidavit of Benjamin Efraim. Plaintiff Intermed Services Management Company, LP ("Plaintiff" or "Intermed") filed this action in the 382nd Judicial Court of Rockwall County, Texas seeking declaratory relief pertaining to a sale of real property that is located in that county.

2.      Plaintiff Intermed is a limited partnership. The citizenship of a limited partnership is determined by the citizenship of its limited partners. *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008).

3.      The limited partners of Plaintiff are:

a.      Dr. Scott M. Pierce, a citizen of the State of Texas;

b.      Dr. Evan Evans, a citizen of the State of Texas;

c.      Dr. Joseph T. Bleier, a citizen of the State of Texas;

d.      Dr. Asim Usman, a citizen of the State of Texas;

e.      Dr. Steven P. Brancheau, a citizen of the State of Texas;

f.      Dr. Syed Adnan Hamid, a citizen of the State of Texas;

g.      Dr. Mohan Philip, a citizen of the State of Texas; and

h.      Dr. Robert M. Lenington, a citizen of the State of Texas.

4.      The general partner of Plaintiff is Intermed Services, Inc. Intermed Services, Inc. is a Texas corporation with its principal place of business in Greenville, Texas. Intermed Services, Inc. is a citizen of the State of Texas.

5.      None of the Plaintiff's partners is a citizen of the State of California. Plaintiff Intermed Services Management, L.P. is a citizen of the State of Texas

6.      Defendants are limited liability companies organized and existing under the laws of the State of California. The citizenship of a limited liability company is based on the citizenship of its members. *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008). All of Defendants' members are citizens of the State of California, as shown below.

7.      Defendant Halter Companies, LLC has two members: Black Equine Holdings Corp. and Fortune Equities, LLC. Black Equine Holdings Corp. is a corporation organized under the laws of the State of California with its principal place of business located in the State of California. As such, Black Equine Holdings Corp. is a citizen of the State of California.

8.      Fortune Equities, LLC is a limited liability company organized under the laws of the State of California. Its members are all California trusts. The citizenship of these trusts is based on the citizenship of the trusts' trustees. *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 297 n.6 (5th Cir. 2009); *Dillard Family Trust v. Chase Home Fin., LLC*, 2011 U.S. Dist. LEXIS 147869 (N.D. Tex. 2011).

9.      The Fortune Equities, LLC's member trusts are:

a.      The B.E. 2006 Trust, a California Trust. The Trustee of The B.E. 2006 Trust is Kena Chin Efraim, who is a resident of the State of California.

b.      The BEE-BER Trust. The Trustee of the BEE-BER Trust is Kena Chin Efraim, who is a resident of the State of California.

c.      The BEE-MCE Trust 1. The Trustee of the BEE-MCE Trust 1 is Kena Chin Efraim, who is a resident of the State of California.

d.      The BEE-MCE Trust 2. The Trustee of the BEE-MCE Trust 2 is Roy Newman, who is a resident of the State of California.

e.      The MBE-BER Trust.  The Trustee of the MBE-BER Trust is Kena Chin Efraim, who is a resident of the State of California.

f.      The MBE-MCE Trust 1. The Trustee of the MBE-MCE Trust 1 is Kena Chin Efraim, who is a resident of the State of California.

g.      The MBE-MCE Trust 2. The Trustee of the MBE-MCE Trust 2 is Roy Newman, who is a resident of the State of California.

h.      The TCE-BER Trust. The Trustee of the TCE-BER trust is Kena Chin Efraim, who is a resident of the State of California.

i.      The TCE-MCE Trust 1. The Trustee of the TCE-MCE Trust 1 is Kena Chin Efraim, who is a resident of the State of California.

j.      The TCE-MCE Trust 2. The Trustee of the TCE-MCE Trust 2 is Roy Newman, who is a resident of the State of California.

10.     Because all of Fortune Equities, LLC's members are citizens of the State of California, Fortune Equities, LLC is also a citizen of the State of California.

11. Therefore, since both members of Plaintiff Halter Companies, LLC are citizens of the State of California, Halter Companies, LLC is a citizen of the State of California.

12. Defendant Horseshoe, LLC has two members: The B.E. 2006 Trust and Black Equine Holdings Corp. Black Equine Holdings Corp. is a corporation organized under the laws of the State of California with its principal place of business located in the State of California. As such, Black Equine Holdings Corp. is a citizen of the State of California.

13. The B.E. 2006 Trust is a California Trust. The Trustee of the B.E. 2006 Trust is Kena Chin Efraim, who is a resident of the State of California.

14. Because all of Horseshoe, LLC's members are citizens of the State of California, Horseshoe, LLC is a citizen of the State of California.

15. Therefore, since Halter Companies, LLC and Horseshoe, LLC are citizens of the State of California, and Plaintiff is a citizen of the State of Texas, there is complete diversity between the parties. Diversity jurisdiction over Plaintiff's action exists in this Court under 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs (as shown below), and this matter is between citizens of different states.

16. Defendant Horseshoe, LLC contracted to purchase a commercial property in Rockwall County, Texas from Plaintiff for the sum of $6,826,000.00. After many months of negotiations and amendments to the contract for the purchase of that property, Plaintiff repudiated and/or terminated the contract.

17. On January 21, 2022, Defendant Halter Companies, LLC filed an Original Complaint and Demand for Arbitration against Plaintiff Intermed Services Management, L.P., in the United States District Court for the Northern District of Texas, in Cause No. 3:22-cv-00145-N (the "First Federal Case") concerning title to the same real property that is at issue in this case. Defendants intend to move the District Court to consolidate the instant action with the

First Federal Case and to compel arbitration in the consolidated cases, as the parties' contract mandates arbitration.

18.    Because Plaintiff's Original Petition for Declaratory Relief does not state an amount in controversy, Defendants are entitled to do so and show that the amount in controversy is in excess of $75,000. *De Aguilar v. Boeing Co.*, 11 F.3d 55, 58 (5th Cir. 1993). "[T]he amount in controversy, in an action for declaratory or injunctive relief, is the value of the right to be protected or the extent of the injury to be prevented." *Leininger v. Leininger*, 705 F.2d 727, 729 (5th Cir. 1983). Defendants would show the Court that the amount in controversy in this action is in excess of $75,000, exclusive of interest and costs, because the value of the real property, the title to which is at issue herein, is at least $6,150,000, as shown below.

19.    Plaintiff is the owner of that certain building and real property located generally at 810 E. Ralph Hall Parkway, Rockwall, Rockwall County, Texas (the "Property"). The Property consists generally of an office building in which several of Plaintiff's limited partners operate medical practices.

20.    On or about December 16, 2020, Plaintiff and Horseshoe, LLC ("Horseshoe") entered into that certain North Texas Commercial Association of Realtors Commercial Contract of Sale (the "Contract"). Robert Lenington, one of Plaintiff's limited partners, signed the Contract for Plaintiff as its "managing partner". At the time, Dr. Lenington was the President of Plaintiff, as reported by Plaintiff to the Texas Secretary of State.

21.    Under the terms of the Contract, Plaintiff agreed to sell the Property to Horseshoe for the sum of $6,826,000.00. Horseshoe ultimately assigned the Contract to Halter Companies, LLC ("Halter") as allowed in the Contract. References to Defendant herein shall include Horseshoe prior to the assignment.

22.     Defendant performed all of its obligations under the Contract and began its due diligence as provided therein.

23.     Between March 22, 2021, and November 4, 2021, the parties amended the Contract five times. In the Fourth Amendment the parties reduced the purchase price to $6,150,000. Each of the amendments extended the closing date. Plaintiff signed each of the amendments through its purported manager and president, Robert Lenington.

24.     Unbeknownst to Defendant, Plaintiff purportedly had replaced Robert Lenington as the manager of Plaintiff in or about April 2021. Yet, Plaintiff continued to have Dr. Lenington sign the amendments to the Contract through November 2021, without verifying that Dr. Lenington was no longer the general partner, manager or president of Plaintiff.

25.     In or about October of 2021, for reasons that were never explained to Defendant, Plaintiff began to undertake a systematic course of conduct to stall, delay, and obstruct many actions required by the Contract in order to inhibit Defendant's ability to take necessary actions to close the transaction.  Plaintiff's actions were deliberately designed to create a situation in which it would become difficult, if not impossible, for Defendant to close.  The chain of events that were to lead to the closing were like a line of dominoes that needed to fall for Defendant to complete its due diligence and obtain financing in order to comply with the Contract and close the sale.

26.     On information and belief, Plaintiff concocted a scheme to delay, stall, obstruct and prevent the closing of the Contract so that it could attempt to sell the Property to another purchaser at a higher price than that at which it had agreed to sell the Property to Defendant. Plaintiff attempted to rely on the delays and alleged issues Plaintiff itself created to justify an alleged repudiation and/or termination of the Contract. By letter dated January 18, 2022, Plaintiff advised Defendant that it repudiated or terminated the Contract. Defendant had complied with

the Contract and was ready, willing and able to close the sale, but Plaintiff refused to close. Therefore, this action concerns the sale of real property valued under the Contract at $6,150,000.

27.    This action involves a dispute as to the ownership of real property that exceeds $6,000,000 in value. Therefore, because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship, this Court has diversity jurisdiction over this matter.

28.    The United States District Court for the Northern District of Texas, Dallas Division, is the appropriate court for removal of this action from the 382nd Judicial Court of Rockwall County, Texas.

29.    This Notice of Removal is timely filed, pursuant to 28 U.S.C. §1446, within thirty days of Defendants' receipt of the initial pleadings setting forth the claim for relief upon which the action is based.

30.    Pursuant to 28 U.S.C. §1446(d), Defendants have served a copy of the Notice of Removal on Plaintiff and has filed a copy of the Notice of Removal with the Clerk of the District Court of Rockwall, Texas.

WHEREFORE, having fulfilled all statutory requirements, Defendants remove the above-described action pending in the 382nd Judicial Court of Rockwall County, Texas to the United States District Court.

Respectfully submitted,

/s/ Phillip J. Conley
Phillip J. Conley
State Bar No. 04666200
E-mail: pjc@crm-lawfirm.com
Attorney-in-charge
Jay M. Rosenberg
State Bar No. 17269450
E-mail: jmr@crm-lawfirm.com

CONLEY ROSENBERG & MENDEZ PC

14160 Dallas Parkway
Suite 800
Dallas, Texas 75254
(972) 364-9700
(972) 713-6480 (facsimile)


ATTORNEYS FOR DEFENDANTS
HORSESHOE, LLC AND HALTER
COMPANIES, LLC


## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing pleading was served upon Plaintiff's counsel on this 27th day of January, 2022.

/s/ Phillip J. Conley
Phillip J. Conley

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| INTERMED SERVICES MANAGEMENT COMPANY, LP, | § § § | |
| Plaintiff | § § | |
| V. | § | Civil Action No. _____ |
| HORSESHOE, LLC AND HALTER COMPANIES, LLC, | § § § § | |
| Defendants. | § | |

### AFFIDAVIT OF BENJAMIN EFRAIM

| | |
|---|---|
| STATE OF CALIFORNIA | § |
| | § |
| COUNTY OF VENTURA | § |

BEFORE ME, the undersigned Notary Public, on this day personally appeared Benjamin Efraim, who, being by me duly sworn upon his oath, deposed and stated the following:

"My name is Benjamin Efraim. I am over the age of 18, have never been convicted of a felony or a crime involving moral turpitude, and am fully competent to testify in all respects. I have personal knowledge of all facts set forth herein, and they are all true and correct.

I am the Manager of Fortune Realty, LLC, which is the manager of Halter Companies, LLC ("Halter") and Horseshoe, LLC ("Horseshoe").

In these management positions I am familiar with the formation, ownership and operations of Halter and Horseshoe.

I have read the Notice of Removal of Halter and Horseshoe in the referenced matter, and each statement therein is based on my personal knowledge or obtained from the companies' documents that are in my custody, and based thereon each such statement is true and correct.

Affidavit of Benjamin Efraim                                                        Page 1

Attached hereto and incorporated herein is a true and correct copy of the North Texas Commercial Association of Realtors Commercial Contract of Sale between Horseshoe, LLC (later assigned to Halter Companies, LLC) and Intermed Services Management Co., LP, for the purchase of the commercial premises located at 810 e. Ralph Hall Parkway, Rockwall, Rockwall County, Texas."

Further Affiant sayeth not.



Benjamin Efraim

SUBSCRIBED AND SWORN TO ME, the undersigned notary public, on this 26th day of January, 2022.

Notary Public
State of California

NICHOLAS PATRICK AVALLONE
Commission # 2253763
Notary Public - California
Ventura County
My Comm. Expires August 12, 2022

Affidavit of Benjamin Efraim

Page 2



# NORTH TEXAS COMMERCIAL ASSOCIATION OF REALTORS®

## COMMERCIAL CONTRACT OF SALE

*[Check all boxes applicable to this Contract – Boxes not checked do not apply to this Contract]*

In consideration of the agreements contained in this Commercial Contract of Sale (the **"Contract"**), Seller shall sell and convey to Purchaser, and Purchaser shall buy and pay for, the Property (defined below) pursuant to the provisions, and subject to the conditions, of this Contract.

1.    **PARTIES.** The parties to this Contract are:

    **Seller:** Intermed Services Management Co. LP
    Address:

    Phone:                        Fax:
    Email:

    **Purchaser:**    Horseshoe, LLC, a California limited liability company
    Address:

    Phone:                        Fax:
    Email:

2.    **PROPERTY.** The address of the Property is:
    810 E. Ralph Hall Parkway
    Rockwall          , Texas 75032-6878
The Property is located in     Rockwall           County, Texas, the land portion
of which is further described as:

~~or~~ as described in **Exhibit "A", LEGAL DESCRIPTION** ~~and/or shown on~~ **~~Exhibit "B",~~ ~~SITE PLAN~~**.  The Property includes, all and singular, all improvements and fixtures situated thereon, and all rights and appurtenances pertaining thereto, including any right, title and interest of Seller in and to adjacent streets, alleys, or rights-of-way (such land, improvements, fixtures, rights and appurtenances being collectively herein referred to as the **"Property"**).

3.    **PURCHASE PRICE.**

    **A.**    **Amount and Payable.** The purchase price for the Property is $ 6,826,000.00 (the **"Purchase Price"**), payable at the Closing as follows (with the Earnest Money to be applied to the Purchase Price) *[Check only one]:*

Seller's Initials   RL            Purchaser's Initials

©Copyright 2010 NTCAR - Form No. 1 (1/10)

ATTACHMENT – REDACTED AS TO PERSONAL INFORMATION

☑ (1) All in cash (meaning Good Funds, as defined in Section 4F below). If this Contract is subject to approval for Purchaser to obtain financing from a third party, then **Addendum B-1, THIRD PARTY FINANCING** is attached.

☐ (2) Part in cash (Good Funds), in the following amount or percentage *[Check only one]*:

☑ (a) $_____

☐ (b) _____ percent (_____%) of the Purchase Price.

If only part of the Purchase Price is to be paid in cash, then the balance of the Purchase Price will be paid according to the provisions in **Addendum B-2, SELLER FINANCING**. If part of the Purchase Price is to be paid by Purchaser assuming an existing promissory note secured by the Property, or taking the Property subject to an existing promissory note secured by the Property, then **Addendum B-3, EXISTING LOAN**, is attached.

☐ **B. Adjustment.** The Purchase Price will be adjusted up or down based upon the land area of the Property as determined by the Survey. The land area will be multiplied by the following amount per acre or square foot, as applicable, and the product will become the Purchase Price at the Closing *[Check only one]*: ☐ $_____ per acre; or ☐ $_____ per square foot. The land area for purposes of determining the Purchase Price will be the gross land area of the Property unless this box ☐ is checked, in which case the land area for purposes of determining the Purchase Price will be the Net Land Area [as defined in Section 5A (Survey)] of the Property. Notwithstanding the foregoing, the Purchase Price will not be reduced under this Section 3B to less than $_____.

4. **EARNEST MONEY AND TITLE COMPANY ESCROW.**

**A. Title Company.** The Title Company to serve as escrow agent for this Contract is (the **"Title Company"**):
Lawyers Title. _____

**B. Effective Date.** The **"Effective Date"** is the date the Title Company acknowledges receipt of this fully executed Contract as indicated by the signature block for the Title Company.

**C. Earnest Money.** Within two (2) Business Days after the Effective Date, Purchaser shall deliver an earnest money deposit in the amount of $ ____ 65,000.00 ____ (the **"Earnest Money"**) payable to the Title Company, in its capacity as escrow agent, to be held in escrow pursuant to the terms of this Contract. Seller's acceptance of this Contract is expressly conditioned upon Purchaser's timely deposit of the Earnest Money with the Title Company. If Purchaser fails to timely deposit the Earnest Money with the Title Company, then Seller may, at Seller's option, terminate this Contract by delivering a written termination notice to Purchaser at any time until Purchaser deposits the Earnest Money with the Title Company.

The Title Company shall deposit the Earnest Money in one or more fully insured accounts in one or more federally insured banking or savings institutions. Purchaser hereby instructs the Title Company to promptly deposit the check upon receipt (which instruction may not be retracted without Seller's written consent). After receipt of necessary tax forms from Purchaser, the Title Company

Seller's Initials _____    Purchaser's Initials _____

©Copyright 2010 NTCAR - Form No. 1 (1/10)    Page 2

12

will deposit the Earnest Money in an interest bearing account unless this box ☑ is checked, in which case the Title Company will not be required to deposit the Earnest Money in an interest bearing account. Any interest earned on the Earnest Money will become a part of the Earnest Money. At the Closing, the Earnest Money will be applied to the Purchase Price or, at Purchaser's option, will be returned to Purchaser upon full payment of the Purchase Price.

        **D.**    **Independent Consideration.**  Notwithstanding anything in this Contract to the contrary, a portion of the Earnest Money in the amount of $100.00 will be non-refundable and will be distributed to Seller upon any termination of this Contract as independent consideration for Seller's performance under this Contract. If this Contract is properly terminated by Purchaser pursuant to a right of termination granted to Purchaser by any provision of this Contract, the Earnest Money will be promptly returned to Purchaser. Any provision of this Contract that states that the Earnest Money is to be returned to Purchaser means that the Earnest Money, less the non-refundable portion, is to be returned to Purchaser.

        **E.**    **Escrow.**  The Earnest Money is deposited with the Title Company with the understanding that the Title Company is not: (1) responsible for the performance or non-performance of any party to this Contract; or (2) liable for interest on the funds except to the extent interest has been earned after the funds have been deposited in an interest bearing account.

        **F.**    **Definition of Good Funds.**  "Good Funds" means currently available funds, in United States dollars, paid in the form of a certified check, cashier's check, official bank check or wire transfer acceptable to the Title Company, such that the payment may not be stopped by the paying party. Any reference in this Contract to "cash" means Good Funds.

    **5.**    **SURVEY AND TITLE.**

        **A.**    **Survey.**  Within ~~twenty (20)~~ five (5) days after the Effective Date *[Check only one]:*

        ☐  ~~Seller shall deliver to Purchaser a new survey (the "Survey") of the Property prepared at Seller's expense.~~

        ☐  ~~Seller shall deliver to Purchaser a new survey (the "Survey") of the Property prepared at Purchaser's expense.~~

        ☐  ~~Seller shall deliver to Purchaser a new survey (the "Survey") of the Property prepared at Purchaser's expense, and Seller will give a credit to Purchaser against the Purchase Price at the Closing for the cost of the Survey in an amount not to exceed $_____.~~

        ☑  Seller shall deliver to Purchaser a copy of the most recent existing survey (the **"Survey"**) of the Property in Seller's possession. Seller shall also deliver an Affidavit to the Title Company, in form and substance reasonably satisfactory to the Title Company, stating that none of the improvements on the Property and other matters shown by the existing Survey have changed since the existing Survey was prepared. If Purchaser, Purchaser's lender or the Title Company requires a new survey for any reason, then Purchaser shall pay for the cost of the new Survey, and *[check only one]:* ☑ Seller will not be required to pay for any portion of the cost of the new Survey; ~~or ☐ Seller will give a credit to Purchaser against the Purchase Price at the Closing for the cost of the new Survey in an amount not to exceed $_____.~~

Seller's Initials _____          Purchaser's Initials _____

Any new Survey must:

(1) be prepared by a Registered Professional Land Surveyor;

(2) be in a form reasonably acceptable to Purchaser and the Title Company;

(3) set forth a legal description of the Property by metes and bounds or by reference to a platted lot or lots;

(4) show that the Survey was made on the ground with corners marked with monuments either found or placed;

(5) show any discrepancies or conflicts in boundaries, and any visible encroachments;

(6) contain the surveyor's certificate that the Survey is true and correct; and

(7) show the location and size of all of the following on or immediately adjacent to the Property, if any, if recorded or visible and apparent:

    (a) buildings,

    (b) building set back lines (as shown on any recorded plat, but not as may be described in any restrictive covenants or zoning ordinances),

    (c) streets and roads,

    (d) 100-year flood plain (approximate location),

    (e) improvements,

    (f) encroachments,

    (g) easements,

    (h) recording information of recorded easements,

    (i) pavements,

    (j) protrusions,

    (k) fences,

    (l) rights-of-way, and

    (m) any markers or other visible evidence of utilities.

Any area of the Property within the 100-year flood plain will be shown on the Survey as the approximate location of the 100-year flood plain as defined by the Federal Emergency Management Agency or other applicable governmental authority. If the area within any 100-year flood plain is to be deducted for the purpose of determining Net Land Area (defined below), then the Survey must show the area of the Property covered by the 100-year flood plain, and that area, as reasonably determined by the surveyor, will be conclusive for purposes of this Contract, even though the surveyor may qualify that determination as approximate.

After the delivery of the Survey, the legal description of the Property set forth in the Survey will be incorporated in this Contract as the legal description of the Property, and will be used in the deed and any other documents requiring a legal description of the Property.

The Survey must show the gross land area of the Property, and if the Purchase Price is based upon the Net Land Area then the Survey must also show the Net Land Area, expressed in both acres and square feet. The term "Net Land Area" means the gross land area of the Property less the area within any of the following (if recorded or visible and apparent, but excluding those within set back areas) [Check all that apply]:

    ☐ utility easements;

    ☐ drainage easements;

    ☐ access easements;

    ☐ rights-of-way;

    ☐ 100-year flood plain; and

    ☐ any encroachments on the Property.

Seller's Initials __RL__       Purchaser's Initials _____

©Copyright 2010 NTCAR - Form No. 1 (1/10)

**B.** **Title Commitment**. Within ~~twenty (20)~~ ten (10) days after the Effective Date, Seller shall deliver or cause to be delivered to Purchaser:

(1)    A title commitment (the **"Title Commitment"**) covering the Property binding the Title Company to issue a Texas Owner Policy of Title Insurance (the **"Title Policy"**) on the standard form prescribed by the Texas Department of Insurance at the Closing, in the full amount of the Purchase Price, insuring Purchaser's fee simple title to the Property to be good and indefeasible, subject only to the Permitted Exceptions (defined below); and

(2)    the following (collectively, the **"Title Documents"**):

(a) true and legible copies of all recorded instruments affecting the Property and recited as exceptions in the Title Commitment;

(b) a current tax certificate;

(c) any written notices required by applicable statutes, including those referenced in Section 17; and

(d) if the Property includes any personal property, UCC search reports pertaining to the Seller.

6.    **REVIEW OF SURVEY AND TITLE.**

**A.**    **Title Review Period**. Purchaser will have until the expiration of the "Inspection Period" (defined below) to review ~~days (the "Title Review Period")~~ after receipt of the last of the Survey, Title Commitment and Title Documents ~~to review them~~ and to deliver a written notice to Seller stating any objections Purchaser may have to them or any item disclosed by them or to approve them. Purchaser's failure to approve them ~~object~~ within the time provided will be deemed a rejection of them by the Purchaser ~~a waiver of the right to object~~. Any item to which Purchaser does not object will be deemed a **"Permitted Exception."** The items set forth on Schedule C of the Title Commitment, and any other items the Title Company identifies to be released upon the Closing, will be deemed objections by Purchaser. Zoning ordinances and the lien for current taxes are deemed to be Permitted Exceptions.

**B.**    **Cure Period**. If Purchaser delivers any written objections to Seller within the Title Review Period, then Seller shall make a good faith attempt to cure the objections within ~~ten (10)~~ five (5) days (the **"Cure Period"**) after receipt of the objections. ~~However, Seller is not required to incur any cost to do so.~~ If Seller cannot cure the objections within the Cure Period, Seller may deliver a written notice to Purchaser, before expiration of the Cure Period, stating whether Seller is committed to cure the objections at or before the Closing. If Seller does not cure the objections within the Cure Period, or does not timely deliver the notice, or does not commit in the notice to fully cure all of the objections at or before the Closing, then Purchaser may terminate this Contract by delivering a written notice to Seller on or before the earlier to occur of: (1) the date that is ~~seven (7)~~ five (5) days after the expiration of the Cure Period; or (2) the scheduled Closing Date.

**C.**    **New Items.** If any new items are disclosed by any updated Survey, updated Title Commitment, or any new Title Documents, that were not disclosed to Purchaser when the Survey, Title Commitment, and Title Documents were first delivered to Purchaser, then Purchaser will have ~~fifteen (15)~~ ten (10) days to review the new items and to deliver a written acceptance of such new items ~~notice~~ to Seller ~~stating any objections Purchaser may have to the new items~~. Unless Purchaser delivers such written acceptance to Seller, then in accordance with Section 6.A above, Purchaser shall be deemed to have objected to each such new item, and ~~If Purchaser timely delivers any written objections as to the new items to Seller,~~ then Seller shall make a good faith attempt to cure the objections to the new items within ~~ten (10)~~ five (5) days (the **"Additional Cure Period"**) after receipt of the objections as to the new items. ~~However, Seller is not required to incur any cost to do so.~~ If Seller does not cure the objections as to the new items within the Additional Cure Period, or does not deliver a written notice to Purchaser before the expiration of the Additional Cure Period stating whether Seller is committed to cure the

Seller's Initials ____    Purchaser's Initials ____

©Copyright 2010 NTCAR - Form No. 1 (1/10)                Page 5

15

objections as to the new items at or before the Closing, then Purchaser may terminate this Contract by delivering a written notice to Seller on or before the earlier to occur of: (1) that date that is ~~seven (7)~~ five (5) days after the expiration of the Additional Cure Period; or (2) the scheduled Closing Date.

**D.    Return of Earnest Money or Waiver.**  If Purchaser properly and timely terminates this Contract or is deemed to have terminated this Contract due to Purchaser's failure to approve the Survey, Title Commitment, or Title Documents, then, the Earnest Money will be returned to Purchaser.  ~~If Purchaser does not properly and timely terminate this Contract, then Purchaser will be deemed to have waived any uncured objections and must accept title at the Closing subject to the uncured objections and other Permitted Exceptions.~~  Seller's failure to cure Purchaser's objections under this Section 6 does not constitute a default by Seller.

7.    **SELLER'S REPRESENTATIONS.**

**A.    Statements.**  Seller represents to Purchaser, to the best of Seller's knowledge, as follows:

(1)    **Title.**  At the Closing, Seller will convey to Purchaser good and indefeasible fee simple title to the Property free and clear of any and all liens, assessments, easements, security interests and other encumbrances except the Permitted Exceptions.  Delivery of the Title Policy pursuant to Section 15 (the Closing) will be deemed to satisfy the obligation of Seller as to the sufficiency of title required under this Contract.  However, delivery of the Title Policy will not release Seller from the warranties of title set forth in the warranty deed.

(2)    **Leases.**  There are no parties in possession of any portion of the Property as lessees, tenants at sufferance or trespassers except tenants under written leases delivered to Purchaser pursuant to this Contract.

(3)    **Liens and Debts.**  There are no mechanic's liens, Uniform Commercial Code liens or unrecorded liens against the Property, and Seller shall not allow any such liens to attach to the Property before the Closing that will not be satisfied out of the Closing proceeds.  All obligations of Seller arising from the ownership and operation of the Property and any business operated on the Property, including, but not limited to, taxes, leasing commissions, salaries, contracts, and similar agreements, have been paid or will be paid before the Closing. Except for obligations for which provisions are made in this Contract for prorating at the Closing and any indebtedness taken subject to or assumed, there will be no obligations of Seller with respect to the Property outstanding as of the Closing.

(4)    **Litigation.**  There is no pending or threatened litigation, condemnation, or assessment affecting the Property.  Seller shall promptly advise Purchaser of any litigation, condemnation or assessment affecting the Property that is instituted after the Effective Date.

(5)    **Material Defects.**  Seller has disclosed to Purchaser any and all known conditions of a material nature with respect to the Property which may affect the health or safety of any occupant of the Property, as well as deferred maintenance issues and items requiring repair.  Except as disclosed in writing by Seller to Purchaser, the Property has no known latent structural defects or construction defects of a material nature, and none of the improvements have been constructed with materials known to be a potential health hazard to occupants of the Property.

(6)    **Hazardous Materials.**  Except as otherwise disclosed in writing by Seller to Purchaser, the Property (including any improvements) does not contain any Hazardous Materials (defined below) other than lawful quantities properly stored in containers in compliance with applicable laws.

Seller's Initials _____  Purchaser's Initials _____

**B.**    **Remedies.**  If Purchaser discovers, before the Closing, that any of Seller's representations has been misrepresented in a material respect, Purchaser may notify Seller of the misrepresentation in writing, and Seller shall attempt to correct the misrepresentation.  If the misrepresentation is not corrected by Seller before the Closing, Purchaser may: (1) proceed to Closing, without waiving any claim for misrepresentation; or (2) terminate this Contract by delivering a written termination notice to Seller, in which case the Earnest Money will be returned to Purchaser.

8.    **OPERATION OF THE PROPERTY.** After the Effective Date until the Closing Date, Seller shall: (1) operate the Property in the same manner as the Property has been operated by Seller; and (2) maintain the Property in the same condition as existed on the Effective Date, except for ordinary wear and any casualty loss. After the Effective Date, Seller shall not, without Purchaser's prior written approval: (1) further encumber the Property or allow an encumbrance upon the title to the Property, or modify the terms of any existing encumbrance, if the encumbrance would still be in effect after Closing; or (2) enter into any lease or contract affecting the Property, if the lease or contract would still be in effect after Closing. However, Seller may enter into a lease or contract with an independent third party, in the ordinary course of business, without Purchaser's consent, if Purchaser will be entitled to terminate the lease or contract after Closing, without incurring any termination charge, by delivering a termination notice 30 days in advance of the termination date. If Seller enters into any lease or contract affecting the Property after the Effective Date, then Seller shall immediately deliver a photocopy of the signed document to Purchaser.

9.    **NONCONFORMANCE.** Purchaser has or will independently investigate and verify to Purchaser's satisfaction the extent of any limitations of uses of the Property. Purchaser acknowledges that the current use of the Property or the improvements located on the Property (or both) may not conform to applicable Federal, State or municipal laws, ordinances, codes or regulations. Zoning, permitted uses, height limitations, setback requirements, minimum parking requirements, limitations on coverage of improvements to total area of land, Americans with Disabilities Act requirements, wetlands restrictions and other matters may have a significant economic impact upon the intended use of the Property by Purchaser. However, if Seller is aware of pending zoning changes and/or current nonconformance with any Federal, State or local laws, ordinances, codes or regulations, Seller shall disclose same to Purchaser.

10.    **INSPECTION.** *[Check only one]*

☐    **A.**    Inspection Not Necessary.  Purchaser acknowledges that Purchaser has inspected the Property, including all buildings and improvements, and is thoroughly familiar with their condition. Purchaser accepts the Property in its present "AS IS" condition, and any changes caused by normal wear and tear before the Closing, but without waiving Purchaser's rights by virtue of Seller's representations expressed in this Contract.

☑    **B.**    **Inspection Desired.** Purchaser desires to inspect the Property and Seller grants to Purchaser the right to inspect the Property as described below.

(1)    **Inspection Period.** Purchaser will have a period of 45 days after the Effective Date delivery to Purchaser of the last document specified in Section 11.A. (the **"Inspection Period"**) to inspect the Property and conduct studies regarding the Property. Purchaser's studies may include, without limitation: (a) permitted use and zoning of the Property; (b) core borings; (c) environmental and architectural tests and investigations; (d) property measurements, roof inspections, permitting and licensing review, ADA and architectural barriers review, physical inspections of improvements, fixtures, equipment, subsurface soils, structural members, and personal property; and (e) examination of agreements, manuals, plans, specifications and other documents relating to the construction and condition of the Property. Purchaser and Purchaser's agents, employees, consultants and contractors will have the right of reasonable entry onto the

Seller's Initials [ RL ]          Purchaser's Initials _____

Property during normal business hours, and upon reasonable advance notice to Seller and any tenants on the Property, for purposes of inspections, studies, tests and examinations deemed necessary by Purchaser. Purchaser also shall be allowed access to the Property after expiration of the Inspection Period to continue such studies, inspections, and assessments. The inspections, studies, tests and examinations will be at Purchaser's expense and risk. Purchaser may also use the Inspection Period to perform feasibility studies, obtain equity funding, seek financing, and satisfy other conditions unrelated to the condition of the Property. Purchaser shall defend and indemnify Seller against any claims that arise due to any actions by Purchaser or Purchaser's agents, employees, consultants and contractors. Purchaser's obligation to defend and indemnify Seller will survive the Closing or termination of this Contract.

(2)    ~~Extension of Inspection Period. Purchaser may extend the Inspection Period for up to _____ days by delivering an additional earnest money deposit in the amount of $ _____ to the Title Company. The additional deposit will become part of the Earnest Money.~~

(3)    **Termination**. If Purchaser determines, in Purchaser's sole discretion, no matter how arbitrary, that Purchaser chooses not to purchase the Property for any reason, then Purchaser may terminate this Contract by delivering a written notice to Seller on or before the last day of the Inspection Period, or if Purchaser is deemed to have terminated this Contract due to Purchaser's failure to issue the waiver notice provided in section 10.B.(4), in which (either) case the Earnest Money will be returned to Purchaser. Purchaser's reason for choosing to terminate this Contract does not need to be related to the condition of the Property, and Purchaser is not required to justify Purchaser's decision to terminate this Contract.

(4)    **Acceptance**. Unless Purchaser expressly waives its inspection rights under this Section 10 before the expiration of the Inspection Period, then Purchaser will be deemed to have objected to the Property and terminated this Contract. ~~If Purchaser does not properly and timely terminate this Contract before the expiration of the Inspection Period (or if Purchaser accepts the Property in writing) then Purchaser will be deemed to have waived all objections to the Property.~~ Nothing in this Section 10.B(4) shall affect ~~except for~~ any title objections that may be outstanding pursuant to Section 6 (Review of Survey and Title) of this Contract. If Purchase waives its inspection rights as set forth above, then ~~In that event,~~ except as may be expressly stated otherwise in this Contract, Purchaser accepts the Property in its current **"AS IS"** condition, with any changes caused by normal wear and tear before the Closing, and this Contract will continue in full force and effect. This provision does not, however, limit or invalidate any express representations and agreements Seller has made in this Contract.

(5)    **Restoration**. If the transaction described in this Contract does not close through no fault of Seller, and the condition of the Property was altered due to inspections, studies, tests or examinations performed by Purchaser or on Purchaser's behalf, then Purchaser must restore the Property to its original condition at Purchaser's expense. Purchaser's obligation to restore the Property will survive the termination of this Contract.

C.    **Reports.** *[Check all that apply]*

~~☐    (a)    Within ___ days after the Effective Date, Seller shall deliver to Purchaser a written "Phase I" report of an environmental assessment of the Property. The report will be prepared, at Seller's expense, by an environmental consultant reasonably acceptable to Purchaser. The environmental assessment must include an investigation into the existence of Hazardous Materials (as defined in Section 19.A. of this Contract) in, on or around the Property. The environmental assessment must also include a land use history search, engineering inspections, research and studies that may be necessary to discover the existence of Hazardous Materials.~~



Seller's Initials [DS KL]    Purchaser's Initials _____

☑ **(b)** Within ~~10~~ two (2) business days after the Effective Date, Seller shall deliver to Purchaser copies of all reports in Seller's possession or control of engineering investigations, tests and environmental studies that have been made with respect to the Property within the three year period before the Effective Date.

~~□ (c)  If Purchaser terminates this Contract, Purchaser shall return to Seller, at Purchaser's expense and contemporaneously with the termination, the original, hard copies of any documents Seller delivered to Purchaser. Also, Purchaser shall return, destroy, or delete any other copies of such documents, electronic or otherwise, in Purchaser's possession. This provision will survive the termination of this Contract.~~

~~□ (d)  If Purchaser terminates this Contract, Purchaser shall deliver to Seller, at Purchaser's expense and contemporaneously with the termination, copies of all written reports, inspections, plats, drawings and studies that relate to the condition of the Property made by Purchaser's agents, consultants and contractors. This provision will survive the termination of this Contract.~~

## 11. DELIVERY AND REVIEW OF DOCUMENTS.

**A.**    **Delivery**. Seller agrees to deliver to Purchaser, within ~~10~~ two (2) business days after the Effective Date, complete and legible copies of the following pertaining to the Property~~, to the extent in Seller's possession or readily available to Seller~~:

**(1)**    All current leases, including all modifications, amendments, supplements and extensions thereof (including written descriptions of any oral agreements);

**(2)**    A current rent roll certified by Seller to be true, complete and accurate as of the date of delivery, including names of tenants, annual or monthly rents, expenses paid by tenants and by Seller, commencement dates, terms of leases, and renewal options;

**(3)**    A current inventory of all tangible personal property and fixtures owned by Seller and located on, attached to, or used in connection with the Property, to be sold with the Property, certified by Seller to be true and correct as of the date of delivery;

~~**(4)**    Any Notes, Deeds of Trust and other loan documents pertaining to loans assumed or taken subject to;~~

**(5)**    All service, maintenance, management, or other contracts relating to the ownership and operation of the Property;

**(6)**    All warranties and guaranties;

**(7)**    All fire, hazard, liability, and other insurance policies;

**(8)**    The real estate and personal property tax statements for the previous two calendar years;

**(9)**    All leasing and commission agreements;

**(10)**    To the extent in Seller's possession or readily available to Seller, the ~~The~~ "as built" or other plans and specifications;

Seller's Initials  RL          Purchaser's Initials

(11)  A statement of utility charges, repair costs and other expenses incurred by Seller for the operation and maintenance of the Property for each month for the two years preceding the Effective Date;

(12)  A true and correct statement of income and expenses from January 1, 2017 to Year-to-Date 2020.

(13)  Any certificate of mold remediation that has been issued for the Property under Section 1958.154 of the Occupations Code within the preceding five years; and

(14)  Other See Addendum E._____

**B. Review of Documents.** Purchaser will have a period of time (the **"Document Review Period"**) to review the information identified above, ending the later to occur of:

(1)  days after the Effective Date; or

(2)  the end of the Inspection Period (if any).

Unless Purchaser expressly waives its document review under this Section 11 before the expiration of the Inspection Period, then Purchaser. If Purchaser objects to any information disclosed to or discovered by Purchaser, in Purchaser's sole discretion, no matter how arbitrary, will be deemed to have objected to any or all of the information disclosed to or discovered by Purchaser and Purchaser shall be deemed to have may: (i) terminated this Contract by delivery of a written notice to Seller before the expiration of the Document Review Period, in which case the Earnest Money will be returned to Purchaser and Purchaser shall return all documents Seller delivered to Purchaser. If Purchaser delivers written notice to Seller during the Inspection Period waiving any ; or (ii) waive the objections to or approves the information disclosed to or discovered by Purchaser, then Purchaser and Seller shall proceed to and close the transaction, subject to Purchaser's and Seller's other rights, duties and obligations set forth elsewhere in this Contract. If Purchaser does not deliver a written termination notice to Seller before expiration of the Document Review Period, then any objections as to the information provided by Seller pursuant to this Section will be deemed to be waived by Purchaser.

**12. ESTOPPEL CERTIFICATES.** Seller agrees to deliver to Purchaser, at least 10 but not more than 30 days before the Closing Date, estoppel certificates executed by each of the tenants under the leases of the Property stating:

(1)  whether the tenant is an assignee or subtenant;

(2)  the expiration date of the lease;

(3)  the number of renewal options under the lease, if any, and the total period of time covered by the renewal options;

(4)  that none of the terms or provisions of the lease have been changed since the original execution of the lease, except as shown on any attached amendments or modifications;

(5)  that no default exists under the terms of the lease by either landlord or tenant;

(6)  that the tenant has no claim against the landlord under the lease and has no defense or right of offset against collection of rent or other charges accruing under the lease;

(7)  the amount and payment date of the last payment of rent, the period of time covered by that payment, and the amount of any rental payments made in advance;

Seller's Initials _____    Purchaser's Initials _____

©Copyright 2010 NTCAR - Form No. 1 (1/10)                                                                 Page 10

(8)    the amount of any security deposits and other deposits, if any; ~~and~~

(9)    the identity and address of any guarantor of the lease~~.~~; and

(10) any additional information that may be reasonably requested by Purchaser and / or Purchaser's Lender, provided Seller shall request all information provided under each tenant's lease(s).

If any estoppel certificate is not timely delivered, or is unacceptable to Purchaser, then Purchaser may immediately notify Seller in writing of Purchaser's objections. Seller shall promptly attempt to cure the unacceptable matters ~~without any obligation to incur any cost in connection with the attempt~~. If Seller is unable to cure the unacceptable matters before the Closing Date, Purchaser may: (i) terminate this Contract by delivering a written termination notice to Seller, in which case the Earnest Money will be returned to Purchaser; or (ii) close the transaction and retain a claim for damages against Seller for the cost of curing the unacceptable matter~~, in which case Purchaser will be deemed to have waived any objections to the unacceptable matters~~.

13.    **CASUALTY LOSS AND CONDEMNATION.**

A.    **Damage or Destruction.** All risk of loss to the Property will remain upon Seller before the Closing. If the Property is damaged or destroyed by fire or other casualty to a Material Extent (defined below), then Purchaser may terminate this Contract by delivering a written termination notice to Seller within ten (10) days after ~~the date~~ Purchaser's receipt of written notice that the casualty occurred (and in any event before the Closing), in which case the Earnest Money will be returned to Purchaser. If the Property is damaged by fire or other casualty to less than a Material Extent, the parties shall proceed to the Closing as provided in this Contract. If the transaction is to proceed to the Closing, despite any damage or destruction, there will be no reduction in the Purchase Price and Seller shall either: (1) fully repair the damage before the Closing, at Seller's expense; or (2) give a credit to Purchaser at the Closing for the entire cost of repairing the Property. The term **"Material Extent"** means damage or destruction where the cost of repair exceeds ten percent (10%) of the Purchase Price. If the repairs cannot be completed before the Closing Date, or the cost of repairing the Property cannot be determined before the Closing Date, then either party may postpone the Closing Date by delivering a written notice to the other party specifying an extended Closing Date that is not more than thirty (30) days after the previously scheduled Closing Date, unless such extension will interfere with Purchaser's timely completion of its 1031 exchange.

B.    **Condemnation.** If condemnation proceedings are commenced before the Closing against any portion of the Property, then Seller shall immediately notify Purchaser in writing of the condemnation proceedings, and Purchaser may terminate this Contract by delivering a written notice to Seller within ten (10) days after Purchaser receives the notice (and in any event before the Closing), in which case the Earnest Money will be returned to Purchaser. If this Contract is not terminated, then any condemnation award will ~~(a) if known on the Closing Date, belong to Seller and the Purchase Price will be reduced by the same amount, or (b) if not known on the Closing Date,~~ belong to Purchaser and the Purchase Price will not be reduced.

14.    **ASSIGNMENT.** *[Check only one]*

☐  ~~A.    **Assignment Permitted.** Purchaser may assign this Contract provided the assignee assumes in writing all obligations and liabilities of Purchaser under this Contract, in which event Purchaser will be relieved of any further liability under this Contract.~~

Seller's Initials  _KL_    Purchaser's Initials  _____

☑ **B.    Limited Assignment Permitted.** Purchaser may assign this Contract only to a related party, defined as: (1) an entity in which Purchaser is an owner, partner or corporate officer; (2) an entity which is owned or controlled by the same person or persons that own or control Purchaser; or (3) a member or members of the immediate family of Purchaser, or a trust in which the beneficiary or beneficiaries is or are a member or members of the immediate family of Purchaser.  Purchaser will remain liable under this Contract after any assignment.

☐ ~~**C.    Assignment Prohibited.** Purchaser may not assign this Contract without Seller's prior written consent.~~

15.    **CLOSING.**

    **A.    Closing Date.**  The closing of the transaction described in this Contract (the "Closing") will be held at the offices of the Title Company at its address stated below, on the date (the "Closing Date") that is *[complete only one]:*

      45_____ days after the expiration of the Inspection Period;
      ~~_____ days after the Effective Date; or~~
      _____

However, if any objections that were timely made by Purchaser in writing pursuant to Section 6 (Review of Survey and Title) have not been cured, then either party may postpone the Closing Date by delivering a written notice to the other party specifying an extended Closing Date that is not more than thirty (30) days after the previously scheduled Closing Date, unless such extension will interfere with Purchaser's timely completion of its 1031 exchange.

    **B.    Seller's Closing Obligations.**  At the Closing, Seller shall deliver to Purchaser, at Seller's expense:

    (1)    A duly executed *[check only one]* ☐ ~~General Warranty Deed~~  ☑ Special Warranty Deed  (with vendor's lien retained if financing is given by Seller or obtained from a third party) conveying the Property in fee simple according to the legal description prepared by the surveyor as shown on the Survey, subject only to the Permitted Exceptions;

    (2)    An updated Title Commitment committing the underwriter for the Title Company to issue promptly after the Closing, at Seller's expense, the Title Policy pursuant to the Title Commitment, subject only to the Permitted Exceptions, in the full amount of the Purchase Price, dated as of the date of the Closing, and (at an additional premium cost) *[check only one if applicable]* ☐ ~~with the survey exception modified at Seller's expense to read "any shortages in area,"~~ or ☑ with the survey exception modified at Purchaser's expense to read "any shortages in area;"

    (3)    A Bill of Sale conveying the personal property, described in this Contract, free and clear of liens, security interests and encumbrances, subject only to the Permitted Exceptions (to the extent applicable);

    (4)    Possession of the Property, subject to valid existing leases disclosed by Seller to Purchaser and other applicable Permitted Exceptions;

    (5)    An executed assignment of all leases, if there are any leases affecting the Property;

Seller's Initials  *Kl*_____      Purchaser's Initials _____

(6)    A current rent roll certified by Seller to be complete and accurate, if there are any leases affecting the Property;

(7)    Evidence of Seller's authority and capacity to close this transaction; and

(8)    All other documents reasonably required by the Title Company to close this transaction.

C.    **Purchaser's Closing Obligations**.  At the Closing, Purchaser shall deliver to Seller, at Purchaser's expense:

(1)    The ~~cash portion of the~~ Purchase Price (with the Earnest Money being applied to the Purchase Price);

(2)    ~~The Note and the Deed of Trust, if~~ **Addendum B-2, SELLER FINANCING,** ~~is attached;~~

(3)    ~~An Assumption Agreement in recordable form agreeing to pay all commissions payable under any lease affecting the Property;~~

(4)    Evidence of Purchaser's authority and capacity to close this transaction; and

(5)    All other documents reasonably required by the Title Company to close this transaction.

D.    **Closing Costs.**  Each party shall pay its share of the closing costs which are customarily paid by a seller or purchaser in a transaction of this character in the county where the Property is located, or as otherwise agreed.

E.    **Prorations**.  Rents (including any additional rental or reimbursement amounts to be reconciled), ~~lease commissions, interest on any assumed loan, insurance premiums on any transferred insurance policies, maintenance expenses,~~ operating expenses, ~~standby fees,~~ and ad valorem taxes for the year of the Closing will be prorated at the Closing effective as of the date of the Closing (with the Purchaser being considered the owner of the Property for the entire day of the Closing). Seller shall give a credit to Purchaser at the Closing in the aggregate amount of any security deposits deposited by tenants under leases affecting the Property. If the Closing occurs before the tax rate is fixed for the year of the Closing, the apportionment of the taxes will be upon the basis of the tax rate for the preceding year applied to the latest assessed valuation, ~~but any difference between actual and estimated taxes for the year of the Closing actually paid by Purchaser will be adjusted equitably between the parties upon receipt of a written statement of the actual amount of the taxes~~. This provision will survive the Closing.

F.    **Rollback Taxes**.  If any Rollback Taxes are due before the Closing due to a change in use of the Property by Seller or a denial of any special use valuation of the Property before the Closing, then Seller shall pay those Rollback Taxes (including any interest and penalties) at or before the Closing.  If this sale or a change in use of the Property or denial of any special use valuation of the Property after the Closing would result in the assessment after the Closing of additional taxes and interest applicable to the period of time before the Closing ("**Rollback Taxes**"), then: (1) Purchaser shall pay the Rollback Taxes (including any interest and penalties) if and when they are assessed, without receiving any credit from Seller; unless (2) this box ☑ is checked, in which case Seller shall give a credit to Purchaser at the Closing for the amount of the Rollback Taxes (including interest and penalties) that may be assessed after the Closing as reasonably estimated by the Title Company, and Purchaser shall pay the Rollback Taxes (including any interest and penalties) if and when they are assessed after the Closing. If

Seller's Initials [initials]    Purchaser's Initials [initials]

Seller gives a credit to Purchaser for the estimated amount of Rollback Taxes, and the actual Rollback Taxes assessed after the Closing are different from the estimate used at the Closing, then there will be no subsequent adjustment between Seller and Purchaser.

~~G.~~  ~~Loan Assumption. If Purchaser assumes an existing mortgage loan, or takes the Property subject to an existing lien, at the Closing, Purchaser shall pay: (1) to the lender, any assumption fee charged by the lender; (2) to the lender, reasonable attorney's fees charged by the lenders' attorney; and (3) to Seller, a sum equal to the amount of any reserve accounts held by the lender for the payment of taxes, insurance and any other expenses applicable to the Property for which reserve accounts are held by the lender, and Seller shall transfer the reserve accounts to Purchaser. Purchaser shall execute, at the option and expense of Seller, a Deed of Trust to Secure Assumption with a trustee named by Seller. If consent to the assumption is required by the lender, Seller shall obtain the lender's consent in writing and deliver the consent to Purchaser at the Closing. If Seller does not obtain the lender's written consent (if required) and deliver it to Purchaser at or before the Closing, Purchaser may terminate this Contract by delivering a written termination notice to Seller, and the Earnest Money will be returned to Purchaser.~~

**H.**    **Foreign Person Notification**. If Seller is a Foreign Person, as defined by the Internal Revenue Code, or if Seller fails to deliver to Purchaser a non-foreign affidavit pursuant to §1445 of the Internal Revenue Code, then Purchaser may withhold from the sales proceeds an amount sufficient to comply with applicable tax law and deliver the withheld proceeds to the Internal Revenue Service, together with appropriate tax forms. A non-foreign affidavit from Seller must include: (1) a statement that Seller is not a foreign person; (2) the U. S. taxpayer identification number of Seller; and (3) any other information required by §1445 of the Internal Revenue Code.

16.    **DEFAULT.**

**A.**    **Purchaser's Remedies**. If Seller fails to close this Contract for any reason except Purchaser's default or the termination of this Contract pursuant to a right to terminate set forth in this Contract, Seller will be in default and Purchaser may elect to either: (1) enforce specific performance of this Contract (force Seller to sell the Property to Purchaser pursuant to this Contract); or (2) terminate this Contract by delivering a written notice to Seller. If Purchaser elects to terminate this Contract due to Seller's default, then Purchaser will be deemed to have waived any other remedies available to Purchaser and the Earnest Money will be returned to Purchaser.

The following sentence applies only if this box ☑ is checked If Seller defaults and Purchaser does not elect to enforce specific performance of this Contract, or the remedy of specific performance is not available, then Seller shall reimburse Purchaser for Purchaser's actual expenses paid by Purchaser to independent third parties in connection with this Contract including, but not limited to, reasonable fees and expenses for engineering assessments, environmental assessments, architectural plans, surveys and legal work (but excluding any indirect, punitive or consequential damages, such as a claim for lost profits) in an amount not to exceed $26,000.00.

The foregoing will be Purchaser's sole and exclusive remedies for Seller's default unless this box ☑ is checked, in which case Purchaser may sue Seller for damages. If the box is checked to allow Purchaser to sue Seller for damages, then Purchaser must elect to pursue either specific performance or a claim for damages at the beginning of any legal action initiated by Purchaser.

**B.**    **Seller's Remedies**. If Purchaser fails to close this Contract for any reason except Seller's default or the termination of this Contract pursuant to a right to terminate set forth in this Contract, Purchaser will be in default and Seller may terminate this Contract and receive the Earnest Money as liquidated damages for Purchaser's breach of this Contract, thereby releasing Purchaser from this Contract. If Seller terminates this Contract due to Purchaser's default, then the Earnest Money will be paid to Seller.

Seller's Initials _____    Purchaser's Initials _____

~~The right to receive the Earnest Money will be Seller's sole and exclusive remedy for Purchaser's default unless one of the following remedies is selected, in which case Seller may sue Purchaser: ☐ to enforce specific performance (force Purchaser to purchase the Property pursuant to this Contract); or ☐ for damages. If one or both of the boxes is checked to allow Seller to sue Purchaser to enforce specific performance or for damages, then Seller must elect to either receive the Earnest Money as liquidated damages or pursue one of the other selected remedies at the beginning of any legal action initiated by Seller.~~

17.    **AGENCY DISCLOSURE.**

A.    **Agency Relationships**. The term **"Brokers"** refers to the Principal Broker and the Cooperating Broker, if applicable, as set forth on the signature page. Each Broker has duties only to the party the Broker represents as identified below. If either Broker is acting as an intermediary, then that Broker will have only the duties of an intermediary, and the intermediary disclosure and consent provisions apply as set forth below. *[Each broker check only one]*

(1)    The Principal Broker is:  ☑ agent for Seller only~~; or ☐ agent for Purchaser only; or ☐ an intermediary.~~

(2)    ~~The Cooperating Broker is:  ☐ agent for Seller only; ☐ agent for Purchaser only; or ☐ an intermediary.~~

B.    **Other Brokers**. Seller and Purchaser each represent to the other that they have had no dealings with any person, firm, agent or finder in connection with the negotiation of this Contract or the consummation of the purchase and sale contemplated by this Contract, other than the Brokers named in this Contract, and no real estate broker, agent, attorney, person, firm or entity, other than the Brokers, is entitled to any commission or finder's fee in connection with this transaction as the result of any dealings or acts of the representing party. Each party agrees to indemnify, defend, and hold the other party harmless from and against any costs, expenses or liability for any compensation, commission, fee, or charges that may be claimed by any agent, finder or other similar party, other than the Brokers, by reason of any dealings or acts of the indemnifying party.

C.    **Fee Sharing**. Seller and Purchaser agree that the Brokers may share the Fee (defined below) among themselves, their sales associates, and any other licensed brokers involved in the sale of the Property. The parties authorize the Title Company to pay the Fee directly to the Principal Broker and, if applicable, the Cooperating Broker, in accordance with <u>Section 18</u> (Professional Service Fee) or any other agreement pertaining to the Fee. Payment of the Fee will not alter the fiduciary relationships between the parties and the Brokers.

D.    ~~**Intermediary Relationship**. If either of the Brokers has indicated in Section 17A (Agency Relationships) that the Broker is acting as an intermediary in this transaction, then Purchaser and Seller hereby consent to the intermediary relationship, authorize such Broker or Brokers to act as an intermediary in this transaction, and acknowledge that the source of any expected compensation to the Brokers will be Seller, and the Brokers may also be paid a fee by Purchaser.~~ **~~A broker is required to treat each party honestly and fairly and to comply with the Texas Real Estate License Act. A broker who acts as an intermediary in a transaction:~~**

Seller's Initials ___DS___ *RL* _____    Purchaser's Initials _____

©Copyright 2010 NTCAR - Form No. 1 (1/10)    Page 15

~~(1)    shall treat all parties honestly;~~

~~(2)    may not disclose that the owner will accept a price less than the asking price unless authorized in writing to do so by the owner;~~

~~(3)    may not disclose that the buyer will pay a price greater than the price submitted in a written offer unless authorized in writing to do so by the buyer; and~~

~~(4)    may not disclose any confidential information or any information that a party specifically instructs the broker in writing not to disclose unless authorized in writing to disclose the information or required to do so by the Texas Real Estate License Act or a court order or if the information materially relates to the condition of the property.~~

~~Broker is authorized to appoint, by providing written notice to the parties, one or more licensees associated with Broker to communicate with and carry out instructions of one party, and one or more other licensees associated with Broker to communicate with and carry out instructions of the other party or parties. During negotiations, an appointed licensee may provide opinions and advice to the party to whom the licensee is appointed.~~

## 18.    PROFESSIONAL SERVICE FEE.

**A.    Payment of Fee.** Seller agrees to pay the Brokers a professional service fee (the "**Fee**") for procuring the Purchaser and for assisting in the negotiation of this Contract as follows: At the closing of this sale and through escrow, Seller shall pay the agents a professional service fee of 6% of the Purchase Price split evenly between the parties (50% Buyer and 50% Seller). Buyer's portion of the professional service fee (3% of the Purchase Price) shall be credited to Buyer through escrow, but shall not reduce the Purchase Price.

The Fee will be earned upon the execution of this Contract and will be paid at the Closing of a sale of the Property by Seller pursuant to this Contract (as may be amended or assigned). The Fee will be paid by Seller to the Brokers in the county in which the Property is located. Seller shall pay any applicable sales taxes on the Fee. The Title Company or other escrow agent is authorized and directed to pay the Fee to the Brokers out of the Closing proceeds. A legal description of the Property, as set forth in this Contract and any Survey delivered pursuant to this Contract, is incorporated by reference in the agreement pertaining to the Fee set forth or referenced in this Section.

The Fee is earned notwithstanding: (1) any subsequent termination of this Contract (except a termination by Seller or Purchaser pursuant to a right of termination in this Contract); or (2) any default by Seller. If the Closing does not occur due to Purchaser's default, and Seller does not elect to enforce specific performance, the Fee will not exceed one-half of the Earnest Money. If either party defaults under this Contract, then the Fee will be paid within ten (10) days after the scheduled Closing Date, and the Title Company is authorized to pay the fee out of the Earnest Money or any other escrow deposit made pursuant to this Contract. If Seller defaults, then Seller's obligation to pay the Fee will not be affected if Purchaser chooses the remedy of terminating this Contract, and the amount of the Fee will not be limited to the amount of the Earnest Money or any other escrow deposit made pursuant to this Contract.

**B.    Consent Required.** Purchaser, Seller and Title Company agree that the Brokers are third party beneficiaries of this Contract with respect to the Fee, and that no change may be made by Purchaser, Seller or Title Company as to the time of payment, amount of payment or the conditions for payment of the Fee without the written consent of the Brokers.

Seller's Initials _**K**_    Purchaser's Initials _____

~~C.      Right to Claim a Lien.  Pursuant to Chapter 62 of the Texas Property Code, the Brokers hereby disclose their right to claim a lien based on the commission agreement set forth in this Contract and any other commission agreements applicable to the transaction contemplated by this Contract. This disclosure is hereby incorporated in any such commission agreements.~~

19.    **MISCELLANEOUS PROVISIONS.**

A.      **Definition of Hazardous Materials.**  "Hazardous Materials" means any pollutants, toxic substances, oils, hazardous wastes, hazardous materials or hazardous substances as defined in or pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, as amended, the Clean Water Act, as amended, or any other Federal, State or local environmental law, ordinance, rule, or regulation, whether existing as of the Effective Date or subsequently enacted.

B.      **Notices.**  All notices and other communications required or permitted under this Contract must be in writing and will be deemed delivered on the earlier of:  (1) actual receipt, if delivered in person or by courier, with evidence of delivery; ~~(2) receipt of an electronic facsimile ("Fax") transmission with confirmation of delivery to the Fax numbers specified in this Contract, if any;~~ or (3) upon deposit with the United States Postal Service, certified mail, return receipt requested, postage prepaid, and properly addressed to the intended recipient at the address set forth in this Contract.  Any party may change its address for notice purposes by delivering written notice of its new address to all other parties in the manner set forth above.  Copies of all written notices should also be delivered to the Brokers and to the Title Company, but failure to notify the Brokers or the Title Company will not cause an otherwise properly delivered notice to be ineffective.

☑ **1.**    Seller also consents to receive any notices by email.
☑ **2.**    Purchaser also consents to receive any notices by email.

C.      **Termination.**  If this Contract is terminated for any reason, the parties will have no further rights or obligations under this Contract, except that: (1) Purchaser shall pay the costs to repair any damage to the Property caused by Purchaser or Purchaser's agents; (2) Purchaser shall return to Seller any reports or documents delivered to Purchaser by Seller; and (3) each party shall perform and remain liable for any other obligations that, by the explicit provisions of this Contract, expressly survive the termination of this Contract.  The obligations of this Section 19C will survive the termination of this Contract.  The terms of any mutual termination agreement will supersede and control over the provisions of this Section 19C to the extent of any conflict.

D.      **Forms.**  In case of a dispute as to the form of any document required under this Contract, the most recent form prepared by the State Bar of Texas will be used, modified as necessary to conform to the terms of this Contract.

E.      **Attorneys' Fees.**  The prevailing party in any proceeding brought to enforce this Contract, or brought relating to the transaction contemplated by this Contract, will be entitled to recover, from the non-prevailing party, court costs, reasonable attorneys' fees and all other reasonable related expenses.

F.      **Integration.**  This Contract contains the complete agreement between the parties with respect to the Property and cannot be varied except by written agreement.  The parties agree that there are no oral agreements, understandings, representations or warranties made by the parties that are not expressly set forth in this Contract.  Any prior written agreements, understandings, representations or warranties between the parties will be deemed merged into and superceded by this Contract, unless it is clear from the written document that the intent of the parties is for the previous written agreement, understanding, representation or warranty to survive the execution of this Contract.

Seller's Initials ___ DS ___    Purchaser's Initials _____

©Copyright 2010 NTCAR – Form No. 1 (1/10)                                                                 Page 17

     **G.**    **Survival.** Any representation or covenant contained in this Contract not otherwise discharged at the Closing will survive the Closing.

     **H.**    **Binding Effect.** This Contract will inure to the benefit of, and will be binding upon, the parties to this Contract and their respective heirs, legal representatives, successors and assigns.

     **I.**    **Time for Performance.** Time is of the essence under each provision of this Contract. Strict compliance with the times for performance is required.

     **J.**    **Business Day.** If any date of performance under this Contract falls on a Saturday, Sunday or Texas legal holiday, such date of performance will be deferred to the next day that is not a Saturday, Sunday or Texas legal holiday. References to "business days" mean calendar days, excluding Saturdays, Sundays, and days in which federal banks in Dallas, Texas are closed.

     **K.**    **Right of Entry.** After reasonable advance notice and during normal business hours, Purchaser, Purchaser's representatives and the Brokers have the right to enter upon the Property before the Closing for purposes of viewing, inspecting and conducting studies of the Property, so long as they do not unreasonably interfere with the use of the Property by Seller or any tenants, or cause damage to the Property.

     **L.**    **Governing Law.** This Contract will be construed under and governed by the laws of the State of Texas, and unless otherwise provided in this Contract, all obligations of the parties created under this Contract are to be performed in the county where the Property is located.

     **M.**    **Severability.** If any provision of this Contract is held to be invalid, illegal, or unenforceable by a court of competent jurisdiction, the invalid, illegal, or unenforceable provision will not affect any other provisions, and this Contract will be construed as if the invalid, illegal, or unenforceable provision is severed and deleted from this Contract.

     **N.**    **Broker Disclaimer.** The Brokers will disclose to Purchaser any material factual knowledge the Brokers may possess about the condition of the Property. Purchaser understands that a real estate broker is not an expert in matters of law, tax, financing, surveying, hazardous materials, engineering, construction, safety, zoning, land planning, architecture, or the Americans with Disabilities Act. Purchaser should seek expert assistance on such matters. The Brokers do not investigate a property's compliance with building codes, governmental ordinances, statutes and laws that relate to the use or condition of the Property or its construction, or that relate to its acquisition. Purchaser is not relying upon any representations of the Brokers concerning permitted uses of the Property or with respect to any nonconformance of the Property. If the Brokers provide names of consultants or sources for advice or assistance, the Brokers do not warrant the services of the advisors or their products. The Brokers cannot warrant the suitability of property to be acquired. Purchaser acknowledges that current and future federal, state and local laws and regulations may require any Hazardous Materials to be removed at the expense of those persons who may have had or continue to have any interest in the Property. The expense of such removal may be substantial. Purchaser agrees to look solely to experts and professionals selected or approved by Purchaser to advise Purchaser with respect to the condition of the Property and will not hold the Brokers responsible for any condition relating to the Property. The Brokers do not warrant that Seller will disclose any or all property defects or other matters pertaining to the Property or its condition. Seller and Purchaser agree to hold the Brokers harmless from any damages, claims, costs and expenses including, but not limited to, reasonable attorneys' fees and court costs, resulting from or related to any person furnishing any false, incorrect or inaccurate information with respect to the Property, Seller's concealing any material information with respect to the condition of the Property, or matters that should be analyzed by experts. To the extent permitted by applicable law, the Brokers' liability for errors or omissions, negligence, or otherwise, is limited to the return of the Fee, if any, paid to the responsible Broker pursuant to this Contract. The parties agree that they are not relying upon any oral statements that the Brokers may have made. Purchaser is relying solely upon Purchaser's own investigations and the

Seller's Initials ___ *RL* ___    Purchaser's Initials ___

representations of Seller, if any, and Purchaser acknowledges that the Brokers have not made any warranty or representation with respect to the condition of the Property or otherwise.

**O.    Counterparts.**  This Contract may be executed in a number of identical counterparts. Each counterpart is deemed an original and all counterparts will, collectively, constitute one agreement.

**P.    Patriot Act Representation.**  Seller and Purchaser each represent to the other that: (1) its property interests are not blocked by Executive Order No. 13224, 66 Fed. Reg. 49079; (2) it is not a person listed on the Specially Designated Nationals and Blocked Persons list of the Office of Foreign Assets Control of the United States Department of the Treasury; and (3) it is not acting for or on behalf of any person on that list.

**Q.    Exchange.**  Seller and Purchaser shall cooperate with each other in connection with any tax deferred exchange that either party may be initiating or completing in connection with Section 1031 of the Internal Revenue Code, so long as neither party will be required to pay any expenses related to the other party's exchange and the Closing is not delayed. Notwithstanding any other provision that may prohibit the assignment of this Contract, either party may assign this Contract to a qualified intermediary or exchange accommodation title holder, if the assignment is required in connection with the exchange. The parties agree to cooperate with each other, and sign any reasonable documentation that may be required, to effectuate any such exchange.

## 20.    STATUTORY NOTICES.

**A.    Abstract or Title Policy.**  At the time of the execution of this Contract, Purchaser acknowledges that the Brokers have advised and hereby advise Purchaser, by this writing, that Purchaser should have the abstract covering the Property examined by an attorney of Purchaser's own selection or that Purchaser should be furnished with or obtain a policy of title insurance.

**B.    Notice Regarding Unimproved Property Located in a Certificated Service Area.**  If the Property is unimproved and is located in a certificated service area of a utility service, then Seller shall give to Purchaser a written notice in compliance with §13.257 of the Texas Water Code, and Purchaser agrees to acknowledge receipt of the notice in writing. The notice must set forth the correct name of utility service provider authorized by law to provide water or sewer service to the Property, and must comply with all other applicable requirements of the Texas Water Code.

**C.    Special Assessment Districts.**  If the Property is situated within a utility district or flood control district subject to the provisions of §49.452 of the Texas Water Code, then Seller shall give to Purchaser the required written notice and Purchaser agrees to acknowledge receipt of the notice in writing. The notice must set forth the current tax rate, the current bonded indebtedness and the authorized indebtedness of the district, and must comply with all other applicable requirements of the Texas Water Code.

**D.    Property Owners' Association.**  If the Property is subject to mandatory membership in a property owners' association, Seller shall notify Purchaser of the current annual budget of the property owners' association, and the current authorized fees, dues and/or assessments relating to the Property. In addition, Seller shall give to Purchaser the written notice required under §5.012 of the Texas Property Code, if applicable, and Purchaser agrees to acknowledge receipt of the notice in writing. Also, Seller shall give to Purchaser the resale certificate required under Chapter 207 of the Texas Property Code, if applicable, and Purchaser agrees to acknowledge receipt of the resale certificate in writing.

**E.    Notice Regarding Possible Annexation.**  If the Property that is the subject of this Contract is located outside the limits of a municipality, the Property may now or later be included in the extraterritorial jurisdiction of the municipality, and may now or later be subject to annexation by the

Seller's Initials __RL__ _____    Purchaser's Initials _____ _____

municipality. Each municipality maintains a map that depicts its boundaries and extraterritorial jurisdiction. To determine if the Property is located within a municipality's extraterritorial jurisdiction or is likely to be located within a municipality's extraterritorial jurisdiction, contact all municipalities located in the general proximity of the Property for further information.

     **F.**    **Notice Regarding Coastal Area Property.** If the Property adjoins or shares a common boundary with the tidally influenced submerged lands of the state, then Seller shall give to Purchaser a written notice regarding coastal area property, in compliance with §33.135 of the Texas Natural Resources Code, and Purchaser agrees to acknowledge receipt of the notice in writing.

     **G.**    **Gulf Intracoastal Waterway Notice.** If the Property is located seaward of the Gulf Intracoastal Waterway, then Seller shall give to Purchaser a written notice regarding the seaward location of the Property, in compliance with §61.025 of the Texas Natural Resources Code, and Purchaser agrees to acknowledge receipt of the notice in writing.

     **H.**    **Notice for Property Located in an Agricultural Development District.** If the Property is located in an agricultural development district, then in accordance with §60.063 of the Texas Agricultural Code: (1) Seller shall give to Purchaser a written notice that the Property is located in such a district; (2) Purchaser agrees to acknowledge receipt of the notice in writing; and (3) at the Closing, a separate copy of the notice with current information about the district will be executed by Seller and Purchaser and recorded in the deed records of the county in which the Property is located.

     **I.**    **Certificate of Mold Remediation.** If a certificate of mold remediation has been issued for the Property under Section 1958.154 of the Occupations Code within the preceding five years, Seller is required to provide a copy of the certificate to Purchaser.

     **J.**    **Notice of Water Level Fluctuations.** If the Property adjoins a lake, reservoir, or other impoundment of water that has storage capacity of at least 5,000 acre-feet at the impoundment's normal operating level, then the following notice applies.

     NOTICE OF WATER LEVEL FLUCTUATIONS: The water level of the impoundment of water adjoining the Property fluctuates for various reasons, including as a result of: (1) an entity lawfully exercising its right to use the water stored in the impoundment; or (2) drought or flood conditions.

     **L.**    **Disclosure of Dual Capacity as Broker and Principal.**    **[Complete if applicable].**

Benjamin B. Efraim   is a licensed ~~Texas~~ California real estate broker and is acting in a dual capacity as broker for the Purchaser and as a principal in this transaction, as he or she may be the Purchaser <u>or affiliated with the Purchaser</u> (or one of the owners of the Purchaser after any assignment of this Contract).

_____ ~~is a licensed Texas real estate broker and is acting in a dual capacity as broker for the Seller and as a principal in this transaction, as he or she may be the Seller (or one of the owners of the Seller).~~

**21.**    **DISPUTE RESOLUTION.**

     **A.**    **Mediation.** If any dispute (the **"Dispute"**) arises between any of the parties to this Contract including, but not limited to, payment of the Fee, then any party (including any Broker) may give written notice to the other parties requiring all involved parties to attempt to resolve the Dispute by mediation. Except in those circumstances where a party reasonably believes that an applicable statute of limitations period is about to expire, or a party requires injunctive or equitable relief, the parties are

Seller's Initials ___*RL*___      Purchaser's Initials _____

©Copyright 2010 NTCAR - Form No. 1 (1/10)                         Page 20

obligated to use this mediation procedure before initiating arbitration or any other action. Within seven (7) days after receipt of the mediation notice, each party must deliver a written designation to all other parties stating the names of one or more individuals with authority to resolve the Dispute on such party's behalf. Within fourteen (14) days after receipt of the mediation notice, the parties shall make a good faith effort to select a qualified mediator to mediate the Dispute. If the parties are unable to timely agree upon a mutually acceptable mediator, any party may request any state or federal judge to appoint a mediator. In consultation with the mediator, the parties shall promptly designate a mutually convenient time and place for the mediation that is no later than thirty (30) days after the date the mediator is selected. In the mediation, each party must be represented by persons with authority and discretion to negotiate a resolution of the Dispute, and may be represented by counsel. The mediation will be governed by applicable provisions of Chapter 154 of the Texas Civil Practice and Remedies Code, and such other rules as the mediator may prescribe. The fees and expenses of the mediator will be shared equally by all parties included in the Dispute.

        **B.**    **Arbitration.** If the parties are unable to resolve any Dispute by mediation, then the parties (including the Brokers) shall submit the Dispute to binding arbitration before a single arbitrator. The Dispute will be decided by arbitration in accordance with the applicable arbitration statute and any rules selected by the arbitrator. After an unsuccessful mediation, any party may initiate the arbitration procedure by delivering a written notice of demand for arbitration to the other parties. Within fourteen (14) days after the receipt of the written notice of demand for arbitration, the parties shall make a good faith effort to select a qualified arbitrator acceptable to all parties. If the parties are unable to agree upon the selection of an arbitrator, then any party may request any state or federal judge to appoint an arbitrator. This agreement to arbitrate will be specifically enforceable under the prevailing arbitration law.

    **22.**    **CONSULT AN ATTORNEY.** This Contract is a legally binding agreement. The Brokers cannot give legal advice. The parties to this Contract acknowledge that they have been advised to have this Contract reviewed by legal counsel before signing this Contract.

| Purchaser's attorney: | Seller's attorney: |
|---|---|
| **Name:** Stuart A. Lautin, Esq. | **Name:** _____ |
| **Address:** | **Address:** _____ |
| | _____ |
| **Phone:** | **Phone:** _____ |
| **Email:** | **Email:** _____ |

    **23.**    **EXHIBITS AND ADDENDA.** All Exhibits and Addenda attached to this Contract are incorporated herein by reference and made a part of this Contract for all purposes *[check all that apply]*:

| | | |
|---|---|---|
| ☑ | Exhibit "A" | Legal Description |
| ☐ | Exhibit "B" | Site Plan |
| ☑ | Exhibit "C" | Information About Brokerage Services |
| ☐ | Exhibit "D" | _____ |
| | | |
| ☐ | Addendum A | Schedule of Personal Property |
| ☑ | Addendum B-1 | Third Party Financing |
| ☐ | Addendum B-2 | Seller Financing |
| ☐ | Addendum B-3 | Existing Loan |
| ☑ | Addendum C | Disclosure Notice |
| ☐ | Addendum D | Lead Based Paint |
| ☑ | Addendum E | Additional Provisions |

Seller's Initials ___*RL*___    Purchaser's Initials _____

~~24.    CONTRACT AS OFFER. The execution of this Contract by the first party to do so constitutes an offer to purchase or sell the Property. If the other party does not accept that offer by signing this Contract and delivering a fully executed copy to the first party within _____ _____ days after the date this Contract is executed by the first party, then the first party may withdraw that offer by delivering a written notice to the other party at any time before the other party accepts that offer, in which case the Earnest Money, if any, will be returned to Purchaser.~~

25.    **ADDITIONAL PROVISIONS.** *[Additional provisions may be set forth below or on any attached Addendum].*

See Addendum E. attached hereto.    _____

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Seller's Initials    RL    _____        Purchaser's Initials _____

This Contract is executed to be effective as of the date the Title Company acknowledges receipt of this fully executed Contract as indicated by the signature block for the Title Company (the Effective Date).

**SELLER:**

**Intermed Services Management Co, LP,**
a Texas limited partnership

By: (Signature____  *robert lenington*
Name: Robert Lenington 51B7F7B1D09549C...
Title: _____  managing partner

By: (Signature)_____
Name: _____
Title: _____

Tax I.D. No: _____
Date of Execution: _____ 12/16/2020

**PURCHASER:**

**Horseshoe, LLC,**
a California limited liability company

By:  **Fortune Realty, LLC,**
    its Manager

By: (Signature)_____
Name: Benjamin B. Efraim, Esq.
Title: Manager

By: (Signature)_____
Name: _____
Title: _____

Tax I.D. No: _____
Date of Execution: _____ 12/14/2020

**PRINCIPAL BROKER:**

Ridge Pointe Commercial Real Estate, LTD

By: (Signature)____  *robert lenington*
Name: _____
Title: _____

Address: _____
_____
Telephone: _____
Email: deng
TREC License No.. _____

**COOPERATING BROKER:**

By: (Signature)_____
Name: _____
Title: _____

Address: _____
_____
Telephone: _____
Email: _____
TREC License No.: _____

**TITLE COMPANY RECEIPT:** The Title Company acknowledges receipt of this Contract on _____
___December 16, 2020___ (the **Effective Date**).  Upon receipt of the Earnest Money, the Title
Company accepts the Earnest Money subject to the terms and conditions set forth in this Contract.

## TITLE COMPANY:

By: (Signature) _____

Name: __Lindsey Busbee_____

Title: __Commercial Escrow Officer_____

Address: _____

Telephone: _____
Email: _____

*PERMISSION TO USE:  This form is provided for use by members of the North Texas Commercial Association of
Realtors*, Inc. ("NTCAR") and members of the North Texas Commercial Association of Real Estate Professionals,
Inc.  Permission is given to make limited copies of the current version of this form for use in a particular Texas real
estate transaction.  Please contact the NTCAR office to confirm you are using the current version of this form.  Mass
production, or reproduction for resale, is not allowed without express permission.  Any changes to this form must be
made in a manner that is obvious.  If any words are deleted, they must be left in the form with a line drawn through
them.  If changes are made that are not obvious, they are not enforceable.*

Seller's Initials __RL__          Purchaser's Initials _____

## EXHIBIT "A"

## Legal Description

[To be provided by Title]

---

©Copyright 2010 NTCAR - Form No. 1 (1/10)

## EXHIBIT "C"

### Information About Brokerage Services

©Copyright 2010 NTCAR – Form No. 1 (1/10)

# Information About Brokerage Services

*Texas law requires all real estate license holders to give the following information about brokerage services to prospective buyers, tenants, sellers and landlords.*



**TYPES OF REAL ESTATE LICENSE HOLDERS:**
- **A BROKER** is responsible for all brokerage activities, including acts performed by sales agents sponsored by the broker.
- **A SALES AGENT** must be sponsored by a broker and works with clients on behalf of the broker.

**A BROKER'S MINIMUM DUTIES REQUIRED BY LAW (A client is the person or party that the broker represents):**
- Put the interests of the client above all others, including the broker's own interests;
- Inform the client of any material information about the property or transaction received by the broker;
- Answer the client's questions and present any offer to or counter-offer from the client; and
- Treat all parties to a real estate transaction honestly and fairly.

**A LICENSE HOLDER CAN REPRESENT A PARTY IN A REAL ESTATE TRANSACTION:**

**AS AGENT FOR OWNER (SELLER/LANDLORD):** The broker becomes the property owner's agent through an agreement with the owner, usually in a written listing to sell or property management agreement. An owner's agent must perform the broker's minimum duties above and must inform the owner of any material information about the property or transaction known by the agent, including information disclosed to the agent or subagent by the buyer or buyer's agent.

**AS AGENT FOR BUYER/TENANT:** The broker becomes the buyer/tenant's agent by agreeing to represent the buyer, usually through a written representation agreement. A buyer's agent must perform the broker's minimum duties above and must inform the buyer of any material information about the property or transaction known by the agent, including information disclosed to the agent by the seller or seller's agent.

**AS AGENT FOR BOTH – INTERMEDIARY**: To act as an intermediary between the parties the broker must first obtain the written agreement of *each party* to the transaction. The written agreement must state who will pay the broker and, in conspicuous bold or underlined print, set forth the broker's obligations as an intermediary. A broker who acts as an intermediary:
- Must treat all parties to the transaction impartially and fairly;
- May, with the parties' written consent, appoint a different license holder associated with the broker to each party (owner and buyer) to communicate with, provide opinions and advice to, and carry out the instructions of each party to the transaction.
- Must not, unless specifically authorized in writing to do so by the party, disclose:
  - that the owner will accept a price less than the written asking price;
  - that the buyer/tenant will pay a price greater than the price submitted in a written offer; and
  - any confidential information or any other information that a party specifically instructs the broker in writing not to disclose, unless required to do so by law.

**AS SUBAGENT:** A license holder acts as a subagent when aiding a buyer in a transaction without an agreement to represent the buyer. A subagent can assist the buyer but does not represent the buyer and must place the interests of the owner first.

**TO AVOID DISPUTES, ALL AGREEMENTS BETWEEN YOU AND A BROKER SHOULD BE IN WRITING AND CLEARLY ESTABLISH:**
- The broker's duties and responsibilities to you, and your obligations under the representation agreement.
- Who will pay the broker for services provided to you, when payment will be made and how the payment will be calculated.

**LICENSE HOLDER CONTACT INFORMATION:** This notice is being provided for information purposes. It does not create an obligation for you to use the broker's services. Please acknowledge receipt of this notice below and retain a copy for your records.

David English/Ridge Pointe
Commercial Real Estate, LTD

| Licensed Broker /Broker Firm Name or Primary Assumed Business Name | License No. | Email | Phone |
|---|---|---|---|
| Designated Broker of Firm | License No. | Email | Phone |
| Licensed Supervisor of Sales Agent/ Associate | License No. | Email | Phone |
| Sales Agent/Associate's Name | License No. | Email | Phone |

DS

KL

12/16/2020

Buyer/Tenant/Seller/Landlord Initials            Date

**Regulated by the Texas Real Estate Commission**          Information available at www.trec.texas.gov

IABS 1-0

37

# NORTH TEXAS COMMERCIAL ASSOCIATION OF REALTORS®

## ADDENDUM B-1 TO COMMERCIAL CONTRACT OF SALE

## THIRD PARTY FINANCING

**Property address or description:** 810 E. Ralph Hall Parkway, Rockwall, TX 75032-6878, Rockwall County, Texas

1.    **THIRD PARTY FINANCING.** *[Chose one]:*

☐    This Contract is subject to Purchaser obtaining approval from a third party lender of financing in the amount of $_____, payable at _____ _____ intervals based on an amortization of not less than _____ years, with a payment term of not less than _____ years, and with the initial interest rate not to exceed _____ % per annum for the first _____ years of the loan.

☑    This Contract is subject to Purchaser obtaining approval from a third party lender of financing upon terms acceptable to Purchaser.

~~2.    APPLICATION. Purchaser shall apply for the desired third party financing approval within seven (7) days after the Effective Date and shall use reasonable efforts to obtain the financing approval.~~

3.    **FINANCING CONTINGENCY.** ~~If~~ Unless Purchaser notifies Seller in writing that it has obtained ~~does not obtain~~ the financing approval by the date that is thirty (30) days (the **"Financing Contingency Period"**) after the Effective Date, then ~~Purchaser may terminate~~ this Contract shall terminate ~~by delivering a written notice to Seller~~ within five (5) days after the end of the Financing Contingency Period (but in any event before the Closing). ~~Purchaser shall deliver a written notice to Seller confirming Purchaser has obtained the financing approval promptly after Purchaser receives the approval. If Seller does not receive that notice on or before the date that is two (2) business days after the end of the Financing Contingency Period, then Seller may terminate this Contract by delivering a written notice to Purchaser at any time thereafter until Seller receives that notice (but in any event before the Closing).~~ If ~~either party terminates~~ this Contract is terminated pursuant to this Section, the Earnest Money will be returned to Purchaser.

Seller's Initials  KL

Purchaser's Initials  [signature]

@Copyright 2010 NTCAR - Form No. 1 (1/10)

ADDENDUM B-1

38

# NORTH TEXAS COMMERCIAL ASSOCIATION OF REALTORS®

## ADDENDUM C TO COMMERCIAL CONTRACT OF SALE

### DISCLOSURE NOTICE

**Property address or description**: 810 E. Ralph Hall Parkway, Rockwall, TX 75032-6878, Rockwall County, Texas

This Disclosure Notice (this **"Notice"**) is a statement by Seller of the condition of the Property made as of the date of this Contract. This is not a substitute for any inspections Purchaser may make or for warranties that may be made by others. **To best of Seller's knowledge**, other than disclosed by Seller in this Notice: (1) the Property does not have any material latent, structural, or construction defects; (2) the Property is not contaminated with Hazardous Materials in violation of applicable laws and regulations; (3) none of the improvements on the Property has been constructed of materials known to be a potential health hazard to occupants of the Property; and (4) the following information is true and correct in all material respects, and Seller has included any material fact concerning the Property of which Seller is aware. **These representations are not warranties or guarantees by Seller.** Seller hereby authorizes the Brokers to disclose to Purchaser all information about the condition of the Property whether disclosed to the Brokers by Seller orally or in writing (by this Notice or otherwise), or otherwise discovered. Seller shall advise Purchaser and the Brokers of any other material fact or condition, not reported here, that may arise or become known to Seller before the Closing. These representations are made by Seller only and are not representations of the Brokers. Seller acknowledges that Purchaser and the Brokers will be relying upon the accuracy and completeness of this information.

*Please answer all questions.* If the answer to any question is "Yes," explain on a separate sheet.

| | N/A | YES | NO | UNKNOWN |
|---|---|---|---|---|
| **1. Buildings and Improvements.** Are there any defects or repairs needed to the following? | | | | |
| a. Roof, parapets, flashing, penetrations, chimneys, skylights | | | | |
| b. Air conditioning, refrigeration, heating, ventilating systems, air ducting, fans | | | | |
| c. Foundation piers, slabs, grade beams, footings, retaining walls | | | | |
| d. Floors, interiors, floor coverings, ceilings, millwork, partitions | | | | |
| e. Exterior walls, curtain walls, weather proofing, caulking | | | | |
| f. Structural components, columns, trusses, beams, bracing | | | | |
| g. Electrical systems, wiring, lighting, fixtures and equipment | | | | |
| h. Plumbing systems, piping, drains, valves, fixtures and equipment | | | | |
| i. Elevators, escalators, overhead doors, other built-in mechanical equipment | | | | |
| j. Windows, doors, plate glass, canopies, other architectural features | | | | |
| k. Parking areas, driveways, steps, walks, curbs and other pavements | | | | |
| l. Landscaping, irrigation systems, embankments, fences, signs | | | | |
| **2. Hazardous Materials.** Have there been any Hazardous Materials: | | | | |
| a. Released or deposited on or under or about the Property, or leaking on or from the Property? | | | | |
| b. Used in the construction of the improvements or in finishing materials? | | | | |
| c. Released or deposited on or leaking from other properties contiguous to the Property? | | | | |

Seller's Initials ___RL___   Purchaser's Initials _____  o

|  | N/A | YES | NO | UNKNOWN |
|---|---|---|---|---|

**3. Subsurface Conditions.**

a. Are there any material soil, geological, groundwater, or foundation problems?

b. Are there underground storage tanks or leaking pipes on the Property?

c. Is the Property situated in a wetland or over a garbage dump or waste landfill?

**4. Special Conditions.**

a. Are there any public or private easements or agreements for utilities or access?

b. Is the Property flood prone or located in a 100-year flood plain?

c. Are there any violations of building codes, zoning ordinances, EPA regulations, OSHA regulations, or Texas Commission on Environmental Quality rules?

d. Are there any violations of Deed Restrictions covering the Property?

e. Are there any threatened condemnations by public authorities or utility companies, including planned streets, highways, railroads, utilities, or development projects?

f. Is the Property located in a historical district or planned development district?

g. Is the Property in any special zoning district or under a specific use permit?

h. Are there any pending changes in zoning or in the physical condition of the Property?

i. Is the Property subject to membership in a property owners' association or dues?

**5. Utilities Present.** *(Strike those not on the Property):* City Water; Sanitary Sewer; Storm Drainage; Natural Gas; Electricity

Seller's Initials _____   Purchaser's Initials _____

©Copyright 2010 NTCAR - Form No. 1 (1/10)

ADDENDUM C

## ADDENDUM E TO
## COMMERCIAL CONTRACT OF SALE

This Addendum E to Commercial Contract of Sale ("Addendum") modifies the provisions of the Commercial Contract of Sale ("Contract") executed between **Intermed Services Management Co, LP**, as Seller, and **Horseshoe, LLC**, as Purchaser. Terms commencing with a capital letter that are undefined in this Addendum share the same definition as provided in the Contract. References to section numbers refer to their counterparts in the Contract. In the event of conflicts, the provisions of this Addendum govern such conflicts.

1. Loan Balance. The amount of the Purchase Price to be financed can only be approximated at this time; Purchaser shall not incur an event of default if Purchaser seeks a loan for an amount different than that disclosed to Seller at the time of contracting.

2. Additional Earnest Money. Section 4.C. of the Contract is amended to provide that Purchaser shall cause the additional sum of $130,000 to be paid to Title Company within two business days following expiration of the Inspection Period. Such additional sum shall be considered as Earnest Money and applied or disbursed in accordance with the Contract.

3. Due Diligence Documents. In addition to the documents to be delivered to Purchaser identified in Sections 10.C.(b) and 11.A. of the Contract, Seller shall also cause the following documents to be delivered to Purchaser within two business days after the Effective Date:

   (15)    Schedule and reconciliation of all operating expenses from Jan 2017 to year-to-date 2020.
   (16)    Schedule and reconciliation of all "triple net" expenses from Jan 2017 to year-to-date 2020.
   (17)    Schedule and reconciliation of all common area expenses from Jan 2017 to year-to-date 2020.
   (18)    Seller's current owner policy of title insurance, and all endorsements.
   (19)    Copies of all title exceptions described in Seller's current owner title policy.
   (20)    All financial statements, gross sales reports, and income statements furnished by Seller's tenants and such tenants' guarantors.
   (21)    2020 Property budget.
   (22)    2021 Property budget, if it has been developed by Seller or Seller's property manager.
   (23)    All warranties and guaranties pertaining to Seller's equipment, furnishings, and fixtures.
   (24)    Full copies of all pleadings and relevant correspondence for pending litigation, mediation, and arbitration against or in any manner involving Seller, Seller's affiliates or owners, Seller's tenants, and such tenants' guarantors; full copies of all claims asserted by or against any of the foregoing.

(25)    All certificates of occupancy, licenses, and permits issued to Seller and Seller's tenants.

(26)    All brokerage and leasing contracts and agreements, and all amendments.

(27)    All insurance loss run schedules, casualty reports, and liability claims from Jan 2017 to year-to-date 2020.

(28)    All prior notices of municipal code and environmental violations.

(29)    All communications with tenants and tenants' guarantors regarding allegations of default or breach asserted against any of Seller, any affiliate or owner of Seller, Seller's property manager, tenants, tenants' assignees, tenants' sublessees, and tenants' guarantors.

(30)    All ADA, Texas Architectural Barriers, and Texas Accessibility Standards reports, assessments, repairs, demands, claims, invoices, bills, and statements.

(31)    All other information material to the Property.

4.    Estoppels. All Estoppel Certificates described in Section 12 of the Contract must be in form and content reasonably acceptable to Purchaser and /or Purchaser's lender.

5.    Closing Docs. Each of the Deed, Bill of Sale, Assignment of Leases, and Certified Rent Roll described in Section 15.B of the Contract must be in form and content reasonably acceptable to Purchaser and /or Purchaser's lender.

6.    Obligation Discharge. Section 15.D of the Contract is modified to provide that Seller shall cause all service contracts, leasing agreements, brokerage contracts, commission agreements, and similar to be paid and fully discharged at Closing, at Seller's expense, and furnish Purchaser with evidence thereof reasonably satisfactory to Purchaser. Further, Seller shall also cause to be fully paid to Purchaser at Closing all unpaid tenant improvement allowances, future rent abatements and credits, all lease option extension credits, and all future tenant-inducements.

[SIGNATURES ON NEXT PAGE]

3

CAUSE NO. 1-22-0060

| | | |
|---|---|---|
| INTERMED SERVICES MANAGEMENT COMPANY, LP, | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| V. | § § | ROCKWALL COUNTY, TEXAS |
| HORSESHOE, LLC AND HALTER COMPANIES, LLC, | § § § | |
| Defendants. | § | 382ND JUDICIAL DISTRICT COURT |

## AMENDED NOTICE OF REMOVAL

Defendants, Horseshoe, LLC and Halter Companies, LLC ("Defendants"), pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, hereby files their Amended Notice of Removal to remove this action from the 382nd Judicial District Court of Rockwall County, Texas, Cause No. 1-22-0060, to the United States District Court for the Northern District of Texas. As grounds for removal, Defendants state as follows:

1.      In support of this Amended Notice of Removal Defendants attach and incorporate herein the Affidavit of Benjamin Efraim that was filed in connection with the Notice of Removal. Plaintiff Intermed Services Management Company, LP ("Plaintiff" or "Intermed") filed this action in the 382nd Judicial Court of Rockwall County, Texas seeking declaratory relief pertaining to a sale of real property that is located in that county.

2.      Plaintiff Intermed is a limited partnership. The citizenship of a limited partnership is determined by the citizenship of its limited partners. *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008).

3.      The limited partners of Plaintiff are:

a.      Dr. Scott M. Pierce, a citizen of the State of Texas;

b.      Dr. Evan Evans, a citizen of the State of Texas;

c.      Dr. Joseph T. Bleier, a citizen of the State of Texas;

d.      Dr. Asim Usman, a citizen of the State of Texas;

e.      Dr. Steven P. Brancheau, a citizen of the State of Texas;

f.      Dr. Syed Adnan Hamid, a citizen of the State of Texas;

g.      Dr. Mohan Philip, a citizen of the State of Texas;

h.      Dr. Robert M. Lenington, a citizen of the State of Texas; and

i.      Dr. David Minchey, a citizen of the State of Alabama.

4.      The general partner of Plaintiff is Intermed Services, Inc. Intermed Services, Inc. is a Texas corporation with its principal place of business in Greenville, Texas. Intermed Services, Inc. is a citizen of the State of Texas.

5.      None of the Plaintiff's partners is a citizen of the State of California. Plaintiff Intermed Services Management, L.P. is a citizen of the State of Texas

6.      Defendants are limited liability companies organized and existing under the laws of the State of California. The citizenship of a limited liability company is based on the citizenship of its members. *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008). All of Defendants' members are citizens of the State of California, as shown below.

7.      Defendant Halter Companies, LLC has two members: Black Equine Holdings Corp. and Fortune Equities, LLC. Black Equine Holdings Corp. is a corporation organized under the laws of the State of California with its principal place of business located in the State of California. As such, Black Equine Holdings Corp. is a citizen of the State of California.

8.      Fortune Equities, LLC is a limited liability company organized under the laws of the State of California. Its members are all California trusts. The citizenship of these trusts is based on the citizenship of the trusts' trustees. *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 297 n.6

(5th Cir. 2009); *Dillard Family Trust v. Chase Home Fin., LLC*, 2011 U.S. Dist. LEXIS 147869 (N.D. Tex. 2011).

9.    The Fortune Equities, LLC's member trusts are:

a.    The B.E. 2006 Trust, a California Trust. The Trustee of The B.E. 2006 Trust is Kena Chin Efraim, who is a resident of the State of California.

b.    The BEE-BER Trust. The Trustee of the BEE-BER Trust is Kena Chin Efraim, who is a resident of the State of California.

c.    The BEE-MCE Trust 1. The Trustee of the BEE-MCE Trust 1 is Kena Chin Efraim, who is a resident of the State of California.

d.    The BEE-MCE Trust 2. The Trustee of the BEE-MCE Trust 2 is Roy Newman, who is a resident of the State of California.

e.    The MBE-BER Trust.  The Trustee of the MBE-BER Trust is Kena Chin Efraim, who is a resident of the State of California.

f.    The MBE-MCE Trust 1. The Trustee of the MBE-MCE Trust 1 is Kena Chin Efraim, who is a resident of the State of California.

g.    The MBE-MCE Trust 2. The Trustee of the MBE-MCE Trust 2 is Roy Newman, who is a resident of the State of California.

h.    The TCE-BER Trust. The Trustee of the TCE-BER trust is Kena Chin Efraim, who is a resident of the State of California.

i.    The TCE-MCE Trust 1. The Trustee of the TCE-MCE Trust 1 is Kena Chin Efraim, who is a resident of the State of California.

j.    The TCE-MCE Trust 2. The Trustee of the TCE-MCE Trust 2 is Roy Newman, who is a resident of the State of California.

10.      Because all of Fortune Equities, LLC's members are citizens of the State of California, Fortune Equities, LLC is also a citizen of the State of California.

11.      Therefore, since both members of Plaintiff Halter Companies, LLC are citizens of the State of California, Halter Companies, LLC is a citizen of the State of California.

12.      Defendant Horseshoe, LLC has two members: The B.E. 2006 Trust and Black Equine Holdings Corp. Black Equine Holdings Corp. is a corporation organized under the laws of the State of California with its principal place of business located in the State of California. As such, Black Equine Holdings Corp. is a citizen of the State of California.

13.      The B.E. 2006 Trust is a California Trust. The Trustee of the B.E. 2006 Trust is Kena Chin Efraim, who is a resident of the State of California.

14.      Because all of Horseshoe, LLC's members are citizens of the State of California, Horseshoe, LLC is a citizen of the State of California.

15.      Therefore, since Halter Companies, LLC and Horseshoe, LLC are citizens of the State of California, and Plaintiff is a citizen of the State of Texas, there is complete diversity between the parties. Diversity jurisdiction over Plaintiff's action exists in this Court under 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs (as shown below), and this matter is between citizens of different states.

16.      Defendant Horseshoe, LLC contracted to purchase a commercial property in Rockwall County, Texas from Plaintiff for the sum of $6,826,000.00. After many months of negotiations and amendments to the contract for the purchase of that property, Plaintiff repudiated and/or terminated the contract.

17.      On January 21, 2022, Defendant Halter Companies, LLC filed an Original Complaint and Demand for Arbitration against Plaintiff Intermed Services Management, L.P., in the United States District Court for the Northern District of Texas, in Cause No. 3:22-cv-00145-

N (the "First Federal Case") concerning title to the same real property that is at issue in this case. Defendants intend to move the District Court to consolidate the instant action with the First Federal Case and to compel arbitration in the consolidated cases, as the parties' contract mandates arbitration.

18.    Because Plaintiff's Original Petition for Declaratory Relief does not state an amount in controversy, Defendants are entitled to do so and show that the amount in controversy is in excess of $75,000. *De Aguilar v. Boeing Co.*, 11 F.3d 55, 58 (5th Cir. 1993). "[T]he amount in controversy, in an action for declaratory or injunctive relief, is the value of the right to be protected or the extent of the injury to be prevented." *Leininger v. Leininger*, 705 F.2d 727, 729 (5th Cir. 1983). Defendants would show the Court that the amount in controversy in this action is in excess of $75,000, exclusive of interest and costs, because the value of the real property, the title to which is at issue herein, is at least $6,150,000, as shown below.

19.    Plaintiff is the owner of that certain building and real property located generally at 810 E. Ralph Hall Parkway, Rockwall, Rockwall County, Texas (the "Property"). The Property consists generally of an office building in which several of Plaintiff's limited partners operate medical practices.

20.    On or about December 16, 2020, Plaintiff and Horseshoe, LLC ("Horseshoe") entered into that certain North Texas Commercial Association of Realtors Commercial Contract of Sale (the "Contract"). Robert Lenington, one of Plaintiff's limited partners, signed the Contract for Plaintiff as its "managing partner". At the time, Dr. Lenington was the President of Plaintiff, as reported by Plaintiff to the Texas Secretary of State.

21.    Under the terms of the Contract, Plaintiff agreed to sell the Property to Horseshoe for the sum of $6,826,000.00. Horseshoe ultimately assigned the Contract to Halter

Companies, LLC ("Halter") as allowed in the Contract. References to Defendant herein shall include Horseshoe prior to the assignment.

22.     Defendant performed all of its obligations under the Contract and began its due diligence as provided therein.

23.     Between March 22, 2021, and November 4, 2021, the parties amended the Contract five times. In the Fourth Amendment the parties reduced the purchase price to $6,150,000. Each of the amendments extended the closing date. Plaintiff signed each of the amendments through its purported manager and president, Robert Lenington.

24.     Unbeknownst to Defendant, Plaintiff purportedly had replaced Robert Lenington as the manager of Plaintiff in or about April 2021. Yet, Plaintiff continued to have Dr. Lenington sign the amendments to the Contract through November 2021, without verifying that Dr. Lenington was no longer the general partner, manager or president of Plaintiff.

25.     In or about October of 2021, for reasons that were never explained to Defendant, Plaintiff began to undertake a systematic course of conduct to stall, delay, and obstruct many actions required by the Contract in order to inhibit Defendant's ability to take necessary actions to close the transaction.  Plaintiff's actions were deliberately designed to create a situation in which it would become difficult, if not impossible, for Defendant to close.  The chain of events that were to lead to the closing were like a line of dominoes that needed to fall for Defendant to complete its due diligence and obtain financing in order to comply with the Contract and close the sale.

26.     On information and belief, Plaintiff concocted a scheme to delay, stall, obstruct and prevent the closing of the Contract so that it could attempt to sell the Property to another purchaser at a higher price than that at which it had agreed to sell the Property to Defendant. Plaintiff attempted to rely on the delays and alleged issues Plaintiff itself created to justify an

AMENDED NOTICE OF REMOVAL                                                           PAGE 6

alleged repudiation and/or termination of the Contract. By letter dated January 18, 2022, Plaintiff advised Defendant that it repudiated or terminated the Contract. Defendant had complied with the Contract and was ready, willing and able to close the sale, but Plaintiff refused to close. Therefore, this action concerns the sale of real property valued under the Contract at $6,150,000.

27.    This action involves a dispute as to the ownership of real property that exceeds $6,000,000 in value. Therefore, because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship, this Court has diversity jurisdiction over this matter.

28.    The United States District Court for the Northern District of Texas, Dallas Division, is the appropriate court for removal of this action from the 382nd Judicial Court of Rockwall County, Texas.

29.    This Amended Notice of Removal is allowed pursuant to 28 U.S.C. §1653.

30.    Pursuant to 28 U.S.C. §1446(d), Defendants have served a copy of the Amended Notice of Removal on Plaintiff and has filed a copy of the Amended Notice of Removal with the Clerk of the District Court of Rockwall, Texas.

WHEREFORE, having fulfilled all statutory requirements, Defendants remove the above-described action pending in the 382nd Judicial Court of Rockwall County, Texas to the United States District Court.

Respectfully submitted,

/s/ Phillip J. Conley
Phillip J. Conley
State Bar No. 04666200
E-mail:  pjc@crm-lawfirm.com
Attorney-in-charge
Jay M. Rosenberg
State Bar No. 17269450
E-mail:  jmr@crm-lawfirm.com

CONLEY ROSENBERG & MENDEZ PC

14160 Dallas Parkway
Suite 800
Dallas, Texas 75254
(972) 364-9700
(972) 713-6480 (facsimile)

ATTORNEYS FOR DEFENDANTS
HORSESHOE, LLC AND HALTER
COMPANIES, LLC

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing pleading was served upon Plaintiff's counsel on this 15th day of February, 2022.

/s/  Phillip J. Conley
Phillip J. Conley

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| INTERMED SERVICES MANAGEMENT COMPANY, LP, | § § § | |
| Plaintiff | § § | |
| V. | § § | Civil Action No. _____ |
| HORSESHOE, LLC AND HALTER COMPANIES, LLC, | § § § | |
| Defendants. | § § | |

## AFFIDAVIT OF BENJAMIN EFRAIM

| | |
|---|---|
| STATE OF CALIFORNIA | § |
| | § |
| COUNTY OF VENTURA | § |

BEFORE ME, the undersigned Notary Public, on this day personally appeared Benjamin Efraim, who, being by me duly sworn upon his oath, deposed and stated the following:

"My name is Benjamin Efraim. I am over the age of 18, have never been convicted of a felony or a crime involving moral turpitude, and am fully competent to testify in all respects. I have personal knowledge of all facts set forth herein, and they are all true and correct.

I am the Manager of Fortune Realty, LLC, which is the manager of Halter Companies, LLC ("Halter") and Horseshoe, LLC ("Horseshoe").

In these management positions I am familiar with the formation, ownership and operations of Halter and Horseshoe.

I have read the Notice of Removal of Halter and Horseshoe in the referenced matter, and each statement therein is based on my personal knowledge or obtained from the companies' documents that are in my custody, and based thereon each such statement is true and correct.

Affidavit of Benjamin Efraim                                                  Page 1

Attached hereto and incorporated herein is a true and correct copy of the North Texas Commercial Association of Realtors Commercial Contract of Sale between Horseshoe, LLC (later assigned to Halter Companies, LLC) and Intermed Services Management Co., LP, for the purchase of the commercial premises located at 810 e. Ralph Hall Parkway, Rockwall, Rockwall County, Texas."

Further Affiant sayeth not.



_____
Benjamin Efraim

SUBSCRIBED AND SWORN TO ME, the undersigned notary public, on this 26th day of January, 2022.

[Notary Seal: NICHOLAS PATRICK AVALLONE, Commission # 2253763, Notary Public - California, Ventura County, My Comm. Expires August 12, 2022]

_____
Notary Public
State of California

Affidavit of Benjamin Efraim

Page 2

10



NORTH TEXAS COMMERCIAL ASSOCIATION OF REALTORS®

COMMERCIAL CONTRACT OF SALE

*[Check all boxes applicable to this Contract – Boxes not checked do not apply to this Contract]*

In consideration of the agreements contained in this Commercial Contract of Sale (the **"Contract"**), Seller shall sell and convey to Purchaser, and Purchaser shall buy and pay for, the Property (defined below) pursuant to the provisions, and subject to the conditions, of this Contract.

1.    **PARTIES.** The parties to this Contract are:

**Seller:** Intermed Services Management Co. LP
Address:

Phone:                                   Fax:
Email:

**Purchaser:** Horseshoe, LLC, a California limited liability company
Address:

Phone:                                   Fax:
Email:

2.    **PROPERTY.** The address of the Property is:
810 E. Ralph Hall Parkway
Rockwall                , Texas 75032-6878                          .
The Property is located in      Rockwall              County, Texas, the land portion of which is further described as:

~~or~~ as described in **Exhibit "A"**, **LEGAL DESCRIPTION** ~~and/or shown on~~ **Exhibit "B"**, **SITE PLAN**. The Property includes, all and singular, all improvements and fixtures situated thereon, and all rights and appurtenances pertaining thereto, including any right, title and interest of Seller in and to adjacent streets, alleys, or rights-of-way (such land, improvements, fixtures, rights and appurtenances being collectively herein referred to as the **"Property"**).

3.    **PURCHASE PRICE.**

A.    **Amount and Payable.** The purchase price for the Property is $ 6,826,000.00 (the **"Purchase Price"**), payable at the Closing as follows (with the Earnest Money to be applied to the Purchase Price) *[Check only one]*:

Seller's Initials  RL              Purchaser's Initials

©Copyright 2010 NTCAR - Form No. 1 (1/10)                                        Page 1

ATTACHMENT – REDACTED AS TO PERSONAL INFORMATION

☑ (1)  All in cash (meaning Good Funds, as defined in Section 4F below). If this Contract is subject to approval for Purchaser to obtain financing from a third party, then **Addendum B-1, THIRD PARTY FINANCING** is attached.

~~☐ (2)  Part in cash (Good Funds), in the following amount or percentage *[Check only one]*:~~

☑ ~~(a)  $_____~~

☐ ~~(b) _____ percent (_____%) of the Purchase Price.~~

~~If only part of the Purchase Price is to be paid in cash, then the balance of the Purchase Price will be paid according to the provisions in **Addendum B-2, SELLER FINANCING**. If part of the Purchase Price is to be paid by Purchaser assuming an existing promissory note secured by the Property, or taking the Property subject to an existing promissory note secured by the Property, then **Addendum B-3, EXISTING LOAN**, is attached.~~

~~☐  **B.  Adjustment.** The Purchase Price will be adjusted up or down based upon the land area of the Property as determined by the Survey. The land area will be multiplied by the following amount per acre or square foot, as applicable, and the product will become the Purchase Price at the Closing *[Check only one]*: ☐ $_____ per acre; or ☐ $_____ per square foot. The land area for purposes of determining the Purchase Price will be the gross land area of the Property unless this box ☐ is checked, in which case the land area for purposes of determining the Purchase Price will be the Net Land Area [as defined in Section 5A (Survey)] of the Property. Notwithstanding the foregoing, the Purchase Price will not be reduced under this Section 3B to less than $_____.~~

4.  **EARNEST MONEY AND TITLE COMPANY ESCROW.**

**A.  Title Company.** The Title Company to serve as escrow agent for this Contract is (the **"Title Company"**):
Lawyers Title. <

**B.  Effective Date.** The **"Effective Date"** is the date the Title Company acknowledges receipt of this fully executed Contract as indicated by the signature block for the Title Company.

**C.  Earnest Money.** Within two (2) Business Days after the Effective Date, Purchaser shall deliver an earnest money deposit in the amount of $ _____ 65,000.00 _____ (the **"Earnest Money"**) payable to the Title Company, in its capacity as escrow agent, to be held in escrow pursuant to the terms of this Contract. Seller's acceptance of this Contract is expressly conditioned upon Purchaser's timely deposit of the Earnest Money with the Title Company. If Purchaser fails to timely deposit the Earnest Money with the Title Company, then Seller may, at Seller's option, terminate this Contract by delivering a written termination notice to Purchaser at any time until Purchaser deposits the Earnest Money with the Title Company.

The Title Company shall deposit the Earnest Money in one or more fully insured accounts in one or more federally insured banking or savings institutions. Purchaser hereby instructs the Title Company to promptly deposit the check upon receipt (which instruction may not be retracted without Seller's written consent). After receipt of necessary tax forms from Purchaser, the Title Company

Seller's Initials ___ KL ___          Purchaser's Initials ___ 2m °

©Copyright 2010 NTCAR - Form No. 1 (1/10)          Page 2

will deposit the Earnest Money in an interest bearing account unless this box ☑ is checked, in which case the Title Company will not be required to deposit the Earnest Money in an interest bearing account. Any interest earned on the Earnest Money will become a part of the Earnest Money. At the Closing, the Earnest Money will be applied to the Purchase Price or, at Purchaser's option, will be returned to Purchaser upon full payment of the Purchase Price.

        **D.**    **Independent Consideration.**  Notwithstanding anything in this Contract to the contrary, a portion of the Earnest Money in the amount of $100.00 will be non-refundable and will be distributed to Seller upon any termination of this Contract as independent consideration for Seller's performance under this Contract. If this Contract is properly terminated by Purchaser pursuant to a right of termination granted to Purchaser by any provision of this Contract, the Earnest Money will be promptly returned to Purchaser. Any provision of this Contract that states that the Earnest Money is to be returned to Purchaser means that the Earnest Money, less the non-refundable portion, is to be returned to Purchaser.

        **E.**    **Escrow.**  The Earnest Money is deposited with the Title Company with the understanding that the Title Company is not: (1) responsible for the performance or non-performance of any party to this Contract; or (2) liable for interest on the funds except to the extent interest has been earned after the funds have been deposited in an interest bearing account.

        **F.**    **Definition of Good Funds.**  "Good Funds" means currently available funds, in United States dollars, paid in the form of a certified check, cashier's check, official bank check or wire transfer acceptable to the Title Company, such that the payment may not be stopped by the paying party. Any reference in this Contract to "cash" means Good Funds.

    **5.**    **SURVEY AND TITLE.**

        **A.**    **Survey.**  Within ~~twenty (20)~~ five (5) days after the Effective Date *[Check only one]*:

        ☐  ~~Seller shall deliver to Purchaser a new survey (the "Survey") of the Property prepared at Seller's expense.~~

        ☐  ~~Seller shall deliver to Purchaser a new survey (the "Survey") of the Property prepared at Purchaser's expense.~~

        ☐  ~~Seller shall deliver to Purchaser a new survey (the "Survey") of the Property prepared at Purchaser's expense, and Seller will give a credit to Purchaser against the Purchase Price at the Closing for the cost of the Survey in an amount not to exceed $_____.~~

        ☑  Seller shall deliver to Purchaser a copy of the most recent existing survey (the **"Survey"**) of the Property in Seller's possession. Seller shall also deliver an Affidavit to the Title Company, in form and substance reasonably satisfactory to the Title Company, stating that none of the improvements on the Property and other matters shown by the existing Survey have changed since the existing Survey was prepared. If Purchaser, Purchaser's lender or the Title Company requires a new survey for any reason, then Purchaser shall pay for the cost of the new Survey, and *[check only one]*: ☑ Seller will not be required to pay for any portion of the cost of the new Survey; ~~or ☐ Seller will give a credit to Purchaser against the Purchase Price at the Closing for the cost of the new Survey in an amount not to exceed $_____.~~

Seller's Initials   **ᴅꜱ** **RJ**      Purchaser's Initials   _____

©Copyright 2010 NTCAR - Form No. 1 (1/10)                                 Page 3

Any new Survey must:

(1) be prepared by a Registered Professional Land Surveyor;
(2) be in a form reasonably acceptable to Purchaser and the Title Company;
(3) set forth a legal description of the Property by metes and bounds or by reference to a platted lot or lots;
(4) show that the Survey was made on the ground with corners marked with monuments either found or placed;
(5) show any discrepancies or conflicts in boundaries, and any visible encroachments;
(6) contain the surveyor's certificate that the Survey is true and correct; and
(7) show the location and size of all of the following on or immediately adjacent to the Property, if any, if recorded or visible and apparent:
    (a) buildings,
    (b) building set back lines (as shown on any recorded plat, but not as may be described in any restrictive covenants or zoning ordinances),
    (c) streets and roads,
    (d) 100-year flood plain (approximate location),
    (e) improvements,
    (f) encroachments,
    (g) easements,
    (h) recording information of recorded easements,
    (i) pavements,
    (j) protrusions,
    (k) fences,
    (l) rights-of-way, and
    (m) any markers or other visible evidence of utilities.

Any area of the Property within the 100-year flood plain will be shown on the Survey as the approximate location of the 100-year flood plain as defined by the Federal Emergency Management Agency or other applicable governmental authority. If the area within any 100-year flood plain is to be deducted for the purpose of determining Net Land Area (defined below), then the Survey must show the area of the Property covered by the 100-year flood plain, and that area, as reasonably determined by the surveyor, will be conclusive for purposes of this Contract, even though the surveyor may qualify that determination as approximate.

After the delivery of the Survey, the legal description of the Property set forth in the Survey will be incorporated in this Contract as the legal description of the Property, and will be used in the deed and any other documents requiring a legal description of the Property.

The Survey must show the gross land area of the Property, and if the Purchase Price is based upon the Net Land Area then the Survey must also show the Net Land Area, expressed in both acres and square feet. The term "Net Land Area" means the gross land area of the Property less the area within any of the following (if recorded or visible and apparent, but excluding those within set back areas) [Check all that apply]:

    ☐ utility easements;
    ☐ drainage easements;
    ☐ access easements;
    ☐ rights-of-way;
    ☐ 100-year flood plain; and
    ☐ any encroachments on the Property.

Seller's Initials _____    Purchaser's Initials _____

©Copyright 2010 NTCAR - Form No. 1 (1/10)    Page 4

14

**B.** **Title Commitment**. Within ~~twenty (20)~~ ten (10) days after the Effective Date, Seller shall deliver or cause to be delivered to Purchaser:

(1) A title commitment (the **"Title Commitment"**) covering the Property binding the Title Company to issue a Texas Owner Policy of Title Insurance (the **"Title Policy"**) on the standard form prescribed by the Texas Department of Insurance at the Closing, in the full amount of the Purchase Price, insuring Purchaser's fee simple title to the Property to be good and indefeasible, subject only to the Permitted Exceptions (defined below); and

(2) the following (collectively, the **"Title Documents"**):

(a) true and legible copies of all recorded instruments affecting the Property and recited as exceptions in the Title Commitment;

(b) a current tax certificate;

(c) any written notices required by applicable statutes, including those referenced in Section 17; and

(d) if the Property includes any personal property, UCC search reports pertaining to the Seller.

**6.** **REVIEW OF SURVEY AND TITLE.**

**A.** **Title Review Period**. Purchaser will have until the expiration of the "Inspection Period" (defined below) to review ~~days (the "Title Review Period")~~ ~~after receipt of the last of~~ the Survey, Title Commitment and Title Documents ~~to review them~~ and to deliver a written notice to Seller stating any objections Purchaser may have to them or any item disclosed by them or to approve them. Purchaser's failure to approve them ~~object~~ within the time provided will be deemed a rejection of them by the Purchaser ~~a waiver of the right to object~~. Any item to which Purchaser does not object will be deemed a **"Permitted Exception."** The items set forth on Schedule C of the Title Commitment, and any other items the Title Company identifies to be released upon the Closing, will be deemed objections by Purchaser. Zoning ordinances and the lien for current taxes are deemed to be Permitted Exceptions.

**B.** **Cure Period**. If Purchaser delivers any written objections to Seller within the Title Review Period, then Seller shall make a good faith attempt to cure the objections within ~~ten (10)~~ five (5) days (the **"Cure Period"**) after receipt of the objections. ~~However, Seller is not required to incur any cost to do so.~~ If Seller cannot cure the objections within the Cure Period, Seller may deliver a written notice to Purchaser, before expiration of the Cure Period, stating whether Seller is committed to cure the objections at or before the Closing. If Seller does not cure the objections within the Cure Period, or does not timely deliver the notice, or does not commit in the notice to fully cure all of the objections at or before the Closing, then Purchaser may terminate this Contract by delivering a written notice to Seller on or before the earlier to occur of: (1) the date that is ~~seven (7)~~ five (5) days after the expiration of the Cure Period; or (2) the scheduled Closing Date.

**C.** **New Items.** If any new items are disclosed by any updated Survey, updated Title Commitment, or any new Title Documents, that were not disclosed to Purchaser when the Survey, Title Commitment, and Title Documents were first delivered to Purchaser, then Purchaser will have ~~fifteen (15)~~ ten (10) days to review the new items and to deliver a written acceptance of such new items ~~notice~~ to Seller ~~stating any objections Purchaser may have to the new items~~. Unless Purchaser delivers such written acceptance to Seller, then in accordance with Section 6.A above, Purchaser shall be deemed to have objected to each such new item, and ~~If Purchaser timely delivers any written objections as to the new items to Seller,~~ then Seller shall make a good faith attempt to cure the objections to the new items within ~~ten (10)~~ five (5) days (the **"Additional Cure Period"**) after receipt of the objections as to the new items. ~~However, Seller is not required to incur any cost to do so.~~ If Seller does not cure the objections as to the new items within the Additional Cure Period, or does not deliver a written notice to Purchaser before the expiration of the Additional Cure Period stating whether Seller is committed to cure the

Seller's Initials _RL_     Purchaser's Initials _____

objections as to the new items at or before the Closing, then Purchaser may terminate this Contract by delivering a written notice to Seller on or before the earlier to occur of: (1) that date that is ~~seven (7)~~ five (5) days after the expiration of the Additional Cure Period; or (2) the scheduled Closing Date.

      **D.**    **Return of Earnest Money or Waiver.**  If Purchaser properly and timely terminates this Contract or is deemed to have terminated this Contract due to Purchaser's failure to approve the Survey, Title Commitment, or Title Documents, then, the Earnest Money will be returned to Purchaser. ~~If Purchaser does not properly and timely terminate this Contract, then Purchaser will be deemed to have waived any uncured objections and must accept title at the Closing subject to the uncured objections and other Permitted Exceptions.~~  Seller's failure to cure Purchaser's objections under this Section 6 does not constitute a default by Seller.

7.    **SELLER'S REPRESENTATIONS.**

      **A.**    **Statements.** Seller represents to Purchaser, to the best of Seller's knowledge, as follows:

      **(1)**    **Title.** At the Closing, Seller will convey to Purchaser good and indefeasible fee simple title to the Property free and clear of any and all liens, assessments, easements, security interests and other encumbrances except the Permitted Exceptions. Delivery of the Title Policy pursuant to Section 15 (the Closing) will be deemed to satisfy the obligation of Seller as to the sufficiency of title required under this Contract. However, delivery of the Title Policy will not release Seller from the warranties of title set forth in the warranty deed.

      **(2)**    **Leases.** There are no parties in possession of any portion of the Property as lessees, tenants at sufferance or trespassers except tenants under written leases delivered to Purchaser pursuant to this Contract.

      **(3)**    **Liens and Debts.** There are no mechanic's liens, Uniform Commercial Code liens or unrecorded liens against the Property, and Seller shall not allow any such liens to attach to the Property before the Closing that will not be satisfied out of the Closing proceeds. All obligations of Seller arising from the ownership and operation of the Property and any business operated on the Property, including, but not limited to, taxes, leasing commissions, salaries, contracts, and similar agreements, have been paid or will be paid before the Closing. Except for obligations for which provisions are made in this Contract for prorating at the Closing and any indebtedness taken subject to or assumed, there will be no obligations of Seller with respect to the Property outstanding as of the Closing.

      **(4)**    **Litigation.** There is no pending or threatened litigation, condemnation, or assessment affecting the Property. Seller shall promptly advise Purchaser of any litigation, condemnation or assessment affecting the Property that is instituted after the Effective Date.

      **(5)**    **Material Defects.** Seller has disclosed to Purchaser any and all known conditions of a material nature with respect to the Property which may affect the health or safety of any occupant of the Property, as well as deferred maintenance issues and items requiring repair. Except as disclosed in writing by Seller to Purchaser, the Property has no known latent structural defects or construction defects of a material nature, and none of the improvements have been constructed with materials known to be a potential health hazard to occupants of the Property.

      **(6)**    **Hazardous Materials.** Except as otherwise disclosed in writing by Seller to Purchaser, the Property (including any improvements) does not contain any Hazardous Materials (defined below) other than lawful quantities properly stored in containers in compliance with applicable laws.

Seller's Initials   RL        Purchaser's Initials       

©Copyright 2010 NTCAR - Form No. 1 (1/10)                            Page 6

**B.**    **Remedies.** If Purchaser discovers, before the Closing, that any of Seller's representations has been misrepresented in a material respect, Purchaser may notify Seller of the misrepresentation in writing, and Seller shall attempt to correct the misrepresentation.    If the misrepresentation is not corrected by Seller before the Closing, Purchaser may: (1) proceed to Closing, without waiving any claim for misrepresentation; or (2) terminate this Contract by delivering a written termination notice to Seller, in which case the Earnest Money will be returned to Purchaser.

**8.**    **OPERATION OF THE PROPERTY.** After the Effective Date until the Closing Date, Seller shall: (1) operate the Property in the same manner as the Property has been operated by Seller; and (2) maintain the Property in the same condition as existed on the Effective Date, except for ordinary wear and any casualty loss. After the Effective Date, Seller shall not, without Purchaser's prior written approval: (1) further encumber the Property or allow an encumbrance upon the title to the Property, or modify the terms of any existing encumbrance, if the encumbrance would still be in effect after Closing; or (2) enter into any lease or contract affecting the Property, if the lease or contract would still be in effect after Closing. However, Seller may enter into a lease or contract with an independent third party, in the ordinary course of business, without Purchaser's consent, if Purchaser will be entitled to terminate the lease or contract after Closing, without incurring any termination charge, by delivering a termination notice 30 days in advance of the termination date. If Seller enters into any lease or contract affecting the Property after the Effective Date, then Seller shall immediately deliver a photocopy of the signed document to Purchaser.

**9.**    **NONCONFORMANCE.** Purchaser has or will independently investigate and verify to Purchaser's satisfaction the extent of any limitations of uses of the Property. Purchaser acknowledges that the current use of the Property or the improvements located on the Property (or both) may not conform to applicable Federal, State or municipal laws, ordinances, codes or regulations. Zoning, permitted uses, height limitations, setback requirements, minimum parking requirements, limitations on coverage of improvements to total area of land, Americans with Disabilities Act requirements, wetlands restrictions and other matters may have a significant economic impact upon the intended use of the Property by Purchaser. However, if Seller is aware of pending zoning changes and/or current nonconformance with any Federal, State or local laws, ordinances, codes or regulations, Seller shall disclose same to Purchaser.

**10.**    **INSPECTION.** *[Check only one]*

☐    **A.**    Inspection Not Necessary. Purchaser acknowledges that Purchaser has inspected the Property, including all buildings and improvements, and is thoroughly familiar with their condition. Purchaser accepts the Property in its present "AS IS" condition, and any changes caused by normal wear and tear before the Closing, but without waiving Purchaser's rights by virtue of Seller's representations expressed in this Contract.

☑    **B.**    **Inspection Desired.** Purchaser desires to inspect the Property and Seller grants to Purchaser the right to inspect the Property as described below.

(1)    **Inspection Period.** Purchaser will have a period of 45 days after the Effective Date delivery to Purchaser of the last document specified in Section 11.A. (the **"Inspection Period"**) to inspect the Property and conduct studies regarding the Property. Purchaser's studies may include, without limitation: (a) permitted use and zoning of the Property; (b) core borings; (c) environmental and architectural tests and investigations; (d) property measurements, roof inspections, permitting and licensing review, ADA and architectural barriers review, physical inspections of improvements, fixtures, equipment, subsurface soils, structural members, and personal property; and (e) examination of agreements, manuals, plans, specifications and other documents relating to the construction and condition of the Property. Purchaser and Purchaser's agents, employees, consultants and contractors will have the right of reasonable entry onto the

Seller's Initials   RL          Purchaser's Initials   _____

Property during normal business hours, and upon reasonable advance notice to Seller and any tenants on the Property, for purposes of inspections, studies, tests and examinations deemed necessary by Purchaser. Purchaser also shall be allowed access to the Property after expiration of the Inspection Period to continue such studies, inspections, and assessments. The inspections, studies, tests and examinations will be at Purchaser's expense and risk. Purchaser may also use the Inspection Period to perform feasibility studies, obtain equity funding, seek financing, and satisfy other conditions unrelated to the condition of the Property. Purchaser shall defend and indemnify Seller against any claims that arise due to any actions by Purchaser or Purchaser's agents, employees, consultants and contractors. Purchaser's obligation to defend and indemnify Seller will survive the Closing or termination of this Contract.

(2)    ~~Extension of Inspection Period. Purchaser may extend the Inspection Period for~~ ~~up to~~_____ ~~days by delivering an additional earnest money deposit in the amount of~~ ~~$~~_____ ~~to the Title Company. The additional deposit will become part of the Earnest~~ ~~Money.~~

(3)    **Termination**. If Purchaser determines, in Purchaser's sole discretion, no matter how arbitrary, that Purchaser chooses not to purchase the Property for any reason, then Purchaser may terminate this Contract by delivering a written notice to Seller on or before the last day of the Inspection Period, or if Purchaser is deemed to have terminated this Contract due to Purchaser's failure to issue the waiver notice provided in section 10.B.(4), in which (either) case the Earnest Money will be returned to Purchaser. Purchaser's reason for choosing to terminate this Contract does not need to be related to the condition of the Property, and Purchaser is not required to justify Purchaser's decision to terminate this Contract.

(4)    **Acceptance**. Unless Purchaser expressly waives its inspection rights under this Section 10 before the expiration of the Inspection Period, then Purchaser will be deemed to have objected to the Property and terminated this Contract. ~~If Purchaser does not properly and timely~~ ~~terminate this Contract before the expiration of the Inspection Period (or if Purchaser accepts the~~ ~~Property in writing) then Purchaser will be deemed to have waived all objections to the Property.~~ Nothing in this Section 10.B(4) shall affect ~~except for~~ any title objections that may be outstanding pursuant to Section 6 (Review of Survey and Title) of this Contract. If Purchase waives its inspection rights as set forth above, then ~~In that event~~, except as may be expressly stated otherwise in this Contract, Purchaser accepts the Property in its current **"AS IS"** condition, with any changes caused by normal wear and tear before the Closing, and this Contract will continue in full force and effect. This provision does not, however, limit or invalidate any express representations and agreements Seller has made in this Contract.

(5)    **Restoration**. If the transaction described in this Contract does not close through no fault of Seller, and the condition of the Property was altered due to inspections, studies, tests or examinations performed by Purchaser or on Purchaser's behalf, then Purchaser must restore the Property to its original condition at Purchaser's expense. Purchaser's obligation to restore the Property will survive the termination of this Contract.

C.    **Reports**. *[Check all that apply]*

☐    ~~(a)    Within ___ days after the Effective Date, Seller shall deliver to Purchaser a written~~ ~~"Phase I" report of an environmental assessment of the Property. The report will be prepared, at~~ ~~Seller's expense, by an environmental consultant reasonably acceptable to Purchaser. The~~ ~~environmental assessment must include an investigation into the existence of Hazardous Materials~~ ~~(as defined in Section 19.A. of this Contract) in, on or around the Property. The environmental~~ ~~assessment must also include a land use history search, engineering inspections, research and~~ ~~studies that may be necessary to discover the existence of Hazardous Materials.~~

Seller's Initials [DS] _KL_ _____    Purchaser's Initials _____

☑ **(b)** Within ~~10~~ two (2) business days after the Effective Date, Seller shall deliver to Purchaser copies of all reports in Seller's possession or control of engineering investigations, tests and environmental studies that have been made with respect to the Property within the three year period before the Effective Date.

~~◻ **(c)** If Purchaser terminates this Contract, Purchaser shall return to Seller, at Purchaser's expense and contemporaneously with the termination, the original, hard copies of any documents Seller delivered to Purchaser. Also, Purchaser shall return, destroy, or delete any other copies of such documents, electronic or otherwise, in Purchaser's possession. This provision will survive the termination of this Contract.~~

~~◻ **(d)** If Purchaser terminates this Contract, Purchaser shall deliver to Seller, at Purchaser's expense and contemporaneously with the termination, copies of all written reports, inspections, plats, drawings and studies that relate to the condition of the Property made by Purchaser's agents, consultants and contractors. This provision will survive the termination of this Contract.~~

## 11. DELIVERY AND REVIEW OF DOCUMENTS.

**A.** **Delivery.** Seller agrees to deliver to Purchaser, within ~~10~~ two (2) business days after the Effective Date, complete and legible copies of the following pertaining to the Property~~, to the extent in Seller's possession or readily available to Seller~~:

**(1)** All current leases, including all modifications, amendments, supplements and extensions thereof (including written descriptions of any oral agreements);

**(2)** A current rent roll certified by Seller to be true, complete and accurate as of the date of delivery, including names of tenants, annual or monthly rents, expenses paid by tenants and by Seller, commencement dates, terms of leases, and renewal options;

**(3)** A current inventory of all tangible personal property and fixtures owned by Seller and located on, attached to, or used in connection with the Property, to be sold with the Property, certified by Seller to be true and correct as of the date of delivery;

~~**(4)** Any Notes, Deeds of Trust and other loan documents pertaining to loans assumed or taken subject to;~~

**(5)** All service, maintenance, management, or other contracts relating to the ownership and operation of the Property;

**(6)** All warranties and guaranties;

**(7)** All fire, hazard, liability, and other insurance policies;

**(8)** The real estate and personal property tax statements for the previous two calendar years;

**(9)** All leasing and commission agreements;

**(10)** To the extent in Seller's possession or readily available to Seller, the ~~The~~ "as built" or other plans and specifications;



Seller's Initials [DS] _RL_ _____    Purchaser's Initials _____ _____

©Copyright 2010 NTCAR - Form No. 1 (1/10)    Page 9

(11)  A statement of utility charges, repair costs and other expenses incurred by Seller for the operation and maintenance of the Property for each month for the two years preceding the Effective Date;

(12)  A true and correct statement of income and expenses from January 1, 2017 to Year-to-Date 2020.

(13)  Any certificate of mold remediation that has been issued for the Property under Section 1958.154 of the Occupations Code within the preceding five years; and

(14)  Other See Addendum E. _____

**B. Review of Documents.** Purchaser will have a period of time (the **"Document Review Period"**) to review the information identified above, ending the later to occur of:

(1)  days after the Effective Date; or
(2)  the end of the Inspection Period (if any).

Unless Purchaser expressly waives its document review under this Section 11 before the expiration of the Inspection Period, then Purchaser. If Purchaser objects to any information disclosed to or discovered by Purchaser, in Purchaser's sole discretion, no matter how arbitrary, will be deemed to have objected to any or all of the information disclosed to or discovered by Purchaser and Purchaser shall be deemed to have may: (i) terminated this Contract by delivery of a written notice to Seller before the expiration of the Document Review Period, in which case the Earnest Money will be returned to Purchaser and Purchaser shall return all documents Seller delivered to Purchaser. If Purchaser delivers written notice to Seller during the Inspection Period waiving any ; or (ii) waive the objections to or approves the information disclosed to or discovered by Purchaser, then Purchaser and Seller shall proceed to and close the transaction, subject to Purchaser's and Seller's other rights, duties and obligations set forth elsewhere in this Contract. If Purchaser does not deliver a written termination notice to Seller before expiration of the Document Review Period, then any objections as to the information provided by Seller pursuant to this Section will be deemed to be waived by Purchaser.

**12. ESTOPPEL CERTIFICATES.** Seller agrees to deliver to Purchaser, at least 10 but not more than 30 days before the Closing Date, estoppel certificates executed by each of the tenants under the leases of the Property stating:

(1)  whether the tenant is an assignee or subtenant;

(2)  the expiration date of the lease;

(3)  the number of renewal options under the lease, if any, and the total period of time covered by the renewal options;

(4)  that none of the terms or provisions of the lease have been changed since the original execution of the lease, except as shown on any attached amendments or modifications;

(5)  that no default exists under the terms of the lease by either landlord or tenant;

(6)  that the tenant has no claim against the landlord under the lease and has no defense or right of offset against collection of rent or other charges accruing under the lease;

(7)  the amount and payment date of the last payment of rent, the period of time covered by that payment, and the amount of any rental payments made in advance;

Seller's Initials _____    Purchaser's Initials _____

©Copyright 2010 NTCAR - Form No. 1 (1/10)                                    Page 10

(8)   the amount of any security deposits and other deposits, if any; ~~and~~

(9)   the identity and address of any guarantor of the lease~~.~~; and

(10) any additional information that may be reasonably requested by Purchaser and / or Purchaser's Lender, provided Seller shall request all information provided under each tenant's lease(s).

If any estoppel certificate is not timely delivered, or is unacceptable to Purchaser, then Purchaser may immediately notify Seller in writing of Purchaser's objections. Seller shall promptly attempt to cure the unacceptable matters ~~without any obligation to incur any cost in connection with the attempt~~. If Seller is unable to cure the unacceptable matters before the Closing Date, Purchaser may: (i) terminate this Contract by delivering a written termination notice to Seller, in which case the Earnest Money will be returned to Purchaser; or (ii) close the transaction and retain a claim for damages against Seller for the cost of curing the unacceptable matter~~, in which case Purchaser will be deemed to have waived any objections to the unacceptable matters~~.

13.    **CASUALTY LOSS AND CONDEMNATION.**

A.    **Damage or Destruction.** All risk of loss to the Property will remain upon Seller before the Closing. If the Property is damaged or destroyed by fire or other casualty to a Material Extent (defined below), then Purchaser may terminate this Contract by delivering a written termination notice to Seller within ten (10) days after ~~the date~~ Purchaser's receipt of written notice that the casualty occurred (and in any event before the Closing), in which case the Earnest Money will be returned to Purchaser. If the Property is damaged by fire or other casualty to less than a Material Extent, the parties shall proceed to the Closing as provided in this Contract. If the transaction is to proceed to the Closing, despite any damage or destruction, there will be no reduction in the Purchase Price and Seller shall either: (1) fully repair the damage before the Closing, at Seller's expense; or (2) give a credit to Purchaser at the Closing for the entire cost of repairing the Property. The term **"Material Extent"** means damage or destruction where the cost of repair exceeds ten percent (10%) of the Purchase Price. If the repairs cannot be completed before the Closing Date, or the cost of repairing the Property cannot be determined before the Closing Date, then either party may postpone the Closing Date by delivering a written notice to the other party specifying an extended Closing Date that is not more than thirty (30) days after the previously scheduled Closing Date, unless such extension will interfere with Purchaser's timely completion of its 1031 exchange.

B.    **Condemnation.** If condemnation proceedings are commenced before the Closing against any portion of the Property, then Seller shall immediately notify Purchaser in writing of the condemnation proceedings, and Purchaser may terminate this Contract by delivering a written notice to Seller within ten (10) days after Purchaser receives the notice (and in any event before the Closing), in which case the Earnest Money will be returned to Purchaser. If this Contract is not terminated, then any condemnation award will ~~(a) if known on the Closing Date, belong to Seller and the Purchase Price will be reduced by the same amount, or (b) if not known on the Closing Date,~~ belong to Purchaser and the Purchase Price will not be reduced.

14.    **ASSIGNMENT.** *[Check only one]*

☐    ~~A.    **Assignment Permitted.**    Purchaser may assign this Contract provided the assignee assumes in writing all obligations and liabilities of Purchaser under this Contract, in which event Purchaser will be relieved of any further liability under this Contract.~~

Seller's Initials ___*KL*___        Purchaser's Initials _____

©Copyright 2010 NTCAR - Form No. 1 (1/10)                                                    Page 11

☑ **B.**   **Limited Assignment Permitted.**  Purchaser may assign this Contract only to a related party, defined as:  (1) an entity in which Purchaser is an owner, partner or corporate officer; (2) an entity which is owned or controlled by the same person or persons that own or control Purchaser; or (3) a member or members of the immediate family of Purchaser, or a trust in which the beneficiary or beneficiaries is or are a member or members of the immediate family of Purchaser.  Purchaser will remain liable under this Contract after any assignment.

☐ **C.**   ~~Assignment Prohibited.  Purchaser may not assign this Contract without Seller's prior written consent.~~

**15.   CLOSING.**

**A.**   **Closing Date.**  The closing of the transaction described in this Contract (the "Closing") will be held at the offices of the Title Company at its address stated below, on the date (the "**Closing Date**") that is *[complete only one]:*

45_____ days after the expiration of the Inspection Period;

~~_____ days after the Effective Date; or~~

_____

However, if any objections that were timely made by Purchaser in writing pursuant to Section 6 (Review of Survey and Title) have not been cured, then either party may postpone the Closing Date by delivering a written notice to the other party specifying an extended Closing Date that is not more than thirty (30) days after the previously scheduled Closing Date, unless such extension will interfere with Purchaser's timely completion of its 1031 exchange.

**B.**   **Seller's Closing Obligations.**  At the Closing, Seller shall deliver to Purchaser, at Seller's expense:

**(1)**   A duly executed *[check only one]* ☐ ~~General Warranty Deed~~ ☑ Special Warranty Deed  (with vendor's lien retained if financing is given by Seller or obtained from a third party) conveying the Property in fee simple according to the legal description prepared by the surveyor as shown on the Survey, subject only to the Permitted Exceptions;

**(2)**   An updated Title Commitment committing the underwriter for the Title Company to issue promptly after the Closing, at Seller's expense, the Title Policy pursuant to the Title Commitment, subject only to the Permitted Exceptions, in the full amount of the Purchase Price, dated as of the date of the Closing, and (at an additional premium cost) *[check only one if applicable]* ☐ ~~with the survey exception modified at Seller's expense to read "any shortages in area,"~~ or ☑ with the survey exception modified at Purchaser's expense to read "any shortages in area;"

**(3)**   A Bill of Sale conveying the personal property, described in this Contract, free and clear of liens, security interests and encumbrances, subject only to the Permitted Exceptions (to the extent applicable);

**(4)**   Possession of the Property, subject to valid existing leases disclosed by Seller to Purchaser and other applicable Permitted Exceptions;

**(5)**   An executed assignment of all leases, if there are any leases affecting the Property;

Seller's Initials _____   Purchaser's Initials _____

(6)    A current rent roll certified by Seller to be complete and accurate, if there are any leases affecting the Property;

(7)    Evidence of Seller's authority and capacity to close this transaction; and

(8)    All other documents reasonably required by the Title Company to close this transaction.

C.    **Purchaser's Closing Obligations**.  At the Closing, Purchaser shall deliver to Seller, at Purchaser's expense:

(1)    The ~~cash portion of the~~ Purchase Price (with the Earnest Money being applied to the Purchase Price);

(2)    ~~The Note and the Deed of Trust, if~~ **Addendum B-2, SELLER FINANCING,** ~~is attached;~~

(3)    ~~An Assumption Agreement in recordable form agreeing to pay all commissions payable under any lease affecting the Property;~~

(4)    Evidence of Purchaser's authority and capacity to close this transaction; and

(5)    All other documents reasonably required by the Title Company to close this transaction.

D.    **Closing Costs**.  Each party shall pay its share of the closing costs which are customarily paid by a seller or purchaser in a transaction of this character in the county where the Property is located, or as otherwise agreed.

E.    **Prorations**.  Rents (including any additional rental or reimbursement amounts to be reconciled), ~~lease commissions, interest on any assumed loan, insurance premiums on any transferred insurance policies, maintenance expenses,~~ operating expenses, ~~standby fees,~~ and ad valorem taxes for the year of the Closing will be prorated at the Closing effective as of the date of the Closing (with the Purchaser being considered the owner of the Property for the entire day of the Closing). Seller shall give a credit to Purchaser at the Closing in the aggregate amount of any security deposits deposited by tenants under leases affecting the Property. If the Closing occurs before the tax rate is fixed for the year of the Closing, the apportionment of the taxes will be upon the basis of the tax rate for the preceding year applied to the latest assessed valuation, ~~but any difference between actual and estimated taxes for the year of the Closing actually paid by Purchaser will be adjusted equitably between the parties upon receipt of a written statement of the actual amount of the taxes~~. This provision will survive the Closing.

F.    **Rollback Taxes**.  If any Rollback Taxes are due before the Closing due to a change in use of the Property by Seller or a denial of any special use valuation of the Property before the Closing, then Seller shall pay those Rollback Taxes (including any interest and penalties) at or before the Closing.  If this sale or a change in use of the Property or denial of any special use valuation of the Property after the Closing would result in the assessment after the Closing of additional taxes and interest applicable to the period of time before the Closing ("**Rollback Taxes**"), then: (1) Purchaser shall pay the Rollback Taxes (including any interest and penalties) if and when they are assessed, without receiving any credit from Seller; unless (2) this box ☑ is checked, in which case Seller shall give a credit to Purchaser at the Closing for the amount of the Rollback Taxes (including interest and penalties) that may be assessed after the Closing as reasonably estimated by the Title Company, and Purchaser shall pay the Rollback Taxes (including any interest and penalties) if and when they are assessed after the Closing. If

Seller's Initials _____  Purchaser's Initials _____

Seller gives a credit to Purchaser for the estimated amount of Rollback Taxes, and the actual Rollback Taxes assessed after the Closing are different from the estimate used at the Closing, then there will be no subsequent adjustment between Seller and Purchaser.

~~G.     Loan Assumption. If Purchaser assumes an existing mortgage loan, or takes the Property subject to an existing lien, at the Closing, Purchaser shall pay: (1) to the lender, any assumption fee charged by the lender; (2) to the lender, reasonable attorney's fees charged by the lenders' attorney; and (3) to Seller, a sum equal to the amount of any reserve accounts held by the lender for the payment of taxes, insurance and any other expenses applicable to the Property for which reserve accounts are held by the lender, and Seller shall transfer the reserve accounts to Purchaser. Purchaser shall execute, at the option and expense of Seller, a Deed of Trust to Secure Assumption with a trustee named by Seller. If consent to the assumption is required by the lender, Seller shall obtain the lender's consent in writing and deliver the consent to Purchaser at the Closing. If Seller does not obtain the lender's written consent (if required) and deliver it to Purchaser at or before the Closing, Purchaser may terminate this Contract by delivering a written termination notice to Seller, and the Earnest Money will be returned to Purchaser.~~

**H.     Foreign Person Notification**. If Seller is a Foreign Person, as defined by the Internal Revenue Code, or if Seller fails to deliver to Purchaser a non-foreign affidavit pursuant to §1445 of the Internal Revenue Code, then Purchaser may withhold from the sales proceeds an amount sufficient to comply with applicable tax law and deliver the withheld proceeds to the Internal Revenue Service, together with appropriate tax forms. A non-foreign affidavit from Seller must include: (1) a statement that Seller is not a foreign person; (2) the U. S. taxpayer identification number of Seller; and (3) any other information required by §1445 of the Internal Revenue Code.

16.    **DEFAULT.**

**A.     Purchaser's Remedies**. If Seller fails to close this Contract for any reason except Purchaser's default or the termination of this Contract pursuant to a right to terminate set forth in this Contract, Seller will be in default and Purchaser may elect to either: (1) enforce specific performance of this Contract (force Seller to sell the Property to Purchaser pursuant to this Contract); or (2) terminate this Contract by delivering a written notice to Seller. If Purchaser elects to terminate this Contract due to Seller's default, then Purchaser will be deemed to have waived any other remedies available to Purchaser and the Earnest Money will be returned to Purchaser.

The following sentence applies only if this box ☑ is checked If Seller defaults and Purchaser does not elect to enforce specific performance of this Contract, or the remedy of specific performance is not available, then Seller shall reimburse Purchaser for Purchaser's actual expenses paid by Purchaser to independent third parties in connection with this Contract including, but not limited to, reasonable fees and expenses for engineering assessments, environmental assessments, architectural plans, surveys and legal work (but excluding any indirect, punitive or consequential damages, such as a claim for lost profits) in an amount not to exceed $26,000.00.

The foregoing will be Purchaser's sole and exclusive remedies for Seller's default unless this box ☑ is checked, in which case Purchaser may sue Seller for damages. If the box is checked to allow Purchaser to sue Seller for damages, then Purchaser must elect to pursue either specific performance or a claim for damages at the beginning of any legal action initiated by Purchaser.

**B.     Seller's Remedies**. If Purchaser fails to close this Contract for any reason except Seller's default or the termination of this Contract pursuant to a right to terminate set forth in this Contract, Purchaser will be in default and Seller may terminate this Contract and receive the Earnest Money as liquidated damages for Purchaser's breach of this Contract, thereby releasing Purchaser from this Contract. If Seller terminates this Contract due to Purchaser's default, then the Earnest Money will be paid to Seller.

Seller's Initials ___    Purchaser's Initials ___

©Copyright 2010 NTCAR - Form No. 1 (1/10)

The right to receive the Earnest Money will be Seller's sole and exclusive remedy ~~for Purchaser's default unless one of the following remedies is selected, in which case Seller may sue Purchaser: ☐ to enforce specific performance (force Purchaser to purchase the Property pursuant to this Contract); or ☐ for damages. If one or both of the boxes is checked to allow Seller to sue Purchaser to enforce specific performance or for damages, then Seller must elect to either receive the Earnest Money as liquidated damages or pursue one of the other selected remedies at the beginning of any legal action initiated by Seller.~~

### 17.   AGENCY DISCLOSURE.

**A.   Agency Relationships**. The term **"Brokers"** refers to the Principal Broker and the Cooperating Broker, if applicable, as set forth on the signature page. Each Broker has duties only to the party the Broker represents as identified below. If either Broker is acting as an intermediary, then that Broker will have only the duties of an intermediary, and the intermediary disclosure and consent provisions apply as set forth below. *[Each broker check only one]*

**(1)**   The Principal Broker is:   ☑ agent for Seller only~~; or ☐ agent for Purchaser only; or ☐ an intermediary.~~

**(2)**   ~~The Cooperating Broker is:   ☐ agent for Seller only; ☐ agent for Purchaser only; or ☐ an intermediary.~~

**B.   Other Brokers**. Seller and Purchaser each represent to the other that they have had no dealings with any person, firm, agent or finder in connection with the negotiation of this Contract or the consummation of the purchase and sale contemplated by this Contract, other than the Brokers named in this Contract, and no real estate broker, agent, attorney, person, firm or entity, other than the Brokers, is entitled to any commission or finder's fee in connection with this transaction as the result of any dealings or acts of the representing party. Each party agrees to indemnify, defend, and hold the other party harmless from and against any costs, expenses or liability for any compensation, commission, fee, or charges that may be claimed by any agent, finder or other similar party, other than the Brokers, by reason of any dealings or acts of the indemnifying party.

**C.   Fee Sharing**. Seller and Purchaser agree that the Brokers may share the Fee (defined below) among themselves, their sales associates, and any other licensed brokers involved in the sale of the Property. The parties authorize the Title Company to pay the Fee directly to the Principal Broker and, if applicable, the Cooperating Broker, in accordance with <u>Section 18</u> (Professional Service Fee) or any other agreement pertaining to the Fee. Payment of the Fee will not alter the fiduciary relationships between the parties and the Brokers.

**D.   ~~Intermediary Relationship. If either of the Brokers has indicated in Section 17A (Agency Relationships) that the Broker is acting as an intermediary in this transaction, then Purchaser and Seller hereby consent to the intermediary relationship, authorize such Broker or Brokers to act as an intermediary in this transaction, and acknowledge that the source of any expected compensation to the Brokers will be Seller, and the Brokers may also be paid a fee by Purchaser. A broker is required to treat each party honestly and fairly and to comply with the Texas Real Estate License Act. A broker who acts as an intermediary in a transaction:~~**

Seller's Initials [RL]        Purchaser's Initials _____

~~(1)      shall treat all parties honestly;~~

~~(2)      may not disclose that the owner will accept a price less than the asking price unless authorized in writing to do so by the owner;~~

~~(3)      may not disclose that the buyer will pay a price greater than the price submitted in a written offer unless authorized in writing to do so by the buyer; and~~

~~(4)      may not disclose any confidential information or any information that a party specifically instructs the broker in writing not to disclose unless authorized in writing to disclose the information or required to do so by the Texas Real Estate License Act or a court order or if the information materially relates to the condition of the property.~~

~~Broker is authorized to appoint, by providing written notice to the parties, one or more licensees associated with Broker to communicate with and carry out instructions of one party, and one or more other licensees associated with Broker to communicate with and carry out instructions of the other party or parties. During negotiations, an appointed licensee may provide opinions and advice to the party to whom the licensee is appointed.~~

18.     **PROFESSIONAL SERVICE FEE.**

A.     **Payment of Fee**. Seller agrees to pay the Brokers a professional service fee (the "**Fee**") for procuring the Purchaser and for assisting in the negotiation of this Contract as follows: At the closing of this sale and through escrow, Seller shall pay the agents a professional service fee of 6% of the Purchase Price split evenly between the parties (50% Buyer and 50% Seller). Buyer's portion of the professional service fee (3% of the Purchase Price) shall be credited to Buyer through escrow, but shall not reduce the Purchase Price.

The Fee will be earned upon the execution of this Contract and will be paid at the Closing of a sale of the Property by Seller pursuant to this Contract (as may be amended or assigned). The Fee will be paid by Seller to the Brokers in the county in which the Property is located. Seller shall pay any applicable sales taxes on the Fee. The Title Company or other escrow agent is authorized and directed to pay the Fee to the Brokers out of the Closing proceeds. A legal description of the Property, as set forth in this Contract and any Survey delivered pursuant to this Contract, is incorporated by reference in the agreement pertaining to the Fee set forth or referenced in this Section.

The Fee is earned notwithstanding: (1) any subsequent termination of this Contract (except a termination by Seller or Purchaser pursuant to a right of termination in this Contract); or (2) any default by Seller. If the Closing does not occur due to Purchaser's default, and Seller does not elect to enforce specific performance, the Fee will not exceed one-half of the Earnest Money. If either party defaults under this Contract, then the Fee will be paid within ten (10) days after the scheduled Closing Date, and the Title Company is authorized to pay the fee out of the Earnest Money or any other escrow deposit made pursuant to this Contract. If Seller defaults, then Seller's obligation to pay the Fee will not be affected if Purchaser chooses the remedy of terminating this Contract, and the amount of the Fee will not be limited to the amount of the Earnest Money or any other escrow deposit made pursuant to this Contract.

B.     **Consent Required**. Purchaser, Seller and Title Company agree that the Brokers are third party beneficiaries of this Contract with respect to the Fee, and that no change may be made by Purchaser, Seller or Title Company as to the time of payment, amount of payment or the conditions for payment of the Fee without the written consent of the Brokers.

Seller's Initials __DS__ R/ _____     Purchaser's Initials _____

~~C.   **Right to Claim a Lien.**  Pursuant to Chapter 62 of the Texas Property Code, the Brokers hereby disclose their right to claim a lien based on the commission agreement set forth in this Contract and any other commission agreements applicable to the transaction contemplated by this Contract. This disclosure is hereby incorporated in any such commission agreements.~~

### 19.   MISCELLANEOUS PROVISIONS.

**A.   Definition of Hazardous Materials.**  "Hazardous Materials" means any pollutants, toxic substances, oils, hazardous wastes, hazardous materials or hazardous substances as defined in or pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, as amended, the Clean Water Act, as amended, or any other Federal, State or local environmental law, ordinance, rule, or regulation, whether existing as of the Effective Date or subsequently enacted.

**B.   Notices.**  All notices and other communications required or permitted under this Contract must be in writing and will be deemed delivered on the earlier of: (1) actual receipt, if delivered in person or by courier, with evidence of delivery; ~~(2) receipt of an electronic facsimile ("Fax") transmission with confirmation of delivery to the Fax numbers specified in this Contract, if any;~~ or (3) upon deposit with the United States Postal Service, certified mail, return receipt requested, postage prepaid, and properly addressed to the intended recipient at the address set forth in this Contract.  Any party may change its address for notice purposes by delivering written notice of its new address to all other parties in the manner set forth above.  Copies of all written notices should also be delivered to the Brokers and to the Title Company, but failure to notify the Brokers or the Title Company will not cause an otherwise properly delivered notice to be ineffective.

☑ **1.**   Seller also consents to receive any notices by email.

☑ **2.**   Purchaser also consents to receive any notices by email.

**C.   Termination.**  If this Contract is terminated for any reason, the parties will have no further rights or obligations under this Contract, except that: (1) Purchaser shall pay the costs to repair any damage to the Property caused by Purchaser or Purchaser's agents; (2) Purchaser shall return to Seller any reports or documents delivered to Purchaser by Seller; and (3) each party shall perform and remain liable for any other obligations that, by the explicit provisions of this Contract, expressly survive the termination of this Contract.  The obligations of this Section 19C will survive the termination of this Contract.  The terms of any mutual termination agreement will supersede and control over the provisions of this Section 19C to the extent of any conflict.

**D.   Forms.**  In case of a dispute as to the form of any document required under this Contract, the most recent form prepared by the State Bar of Texas will be used, modified as necessary to conform to the terms of this Contract.

**E.   Attorneys' Fees.**  The prevailing party in any proceeding brought to enforce this Contract, or brought relating to the transaction contemplated by this Contract, will be entitled to recover, from the non-prevailing party, court costs, reasonable attorneys' fees and all other reasonable related expenses.

**F.   Integration.**  This Contract contains the complete agreement between the parties with respect to the Property and cannot be varied except by written agreement.  The parties agree that there are no oral agreements, understandings, representations or warranties made by the parties that are not expressly set forth in this Contract.  Any prior written agreements, understandings, representations or warranties between the parties will be deemed merged into and superceded by this Contract, unless it is clear from the written document that the intent of the parties is for the previous written agreement, understanding, representation or warranty to survive the execution of this Contract.

Seller's Initials ____   Purchaser's Initials ____

27

G. **Survival**. Any representation or covenant contained in this Contract not otherwise discharged at the Closing will survive the Closing.

H. **Binding Effect**. This Contract will inure to the benefit of, and will be binding upon, the parties to this Contract and their respective heirs, legal representatives, successors and assigns.

I. **Time for Performance**. Time is of the essence under each provision of this Contract. Strict compliance with the times for performance is required.

J. **Business Day**. If any date of performance under this Contract falls on a Saturday, Sunday or Texas legal holiday, such date of performance will be deferred to the next day that is not a Saturday, Sunday or Texas legal holiday. References to "business days" mean calendar days, excluding Saturdays, Sundays, and days in which federal banks in Dallas, Texas are closed.

K. **Right of Entry**. After reasonable advance notice and during normal business hours, Purchaser, Purchaser's representatives and the Brokers have the right to enter upon the Property before the Closing for purposes of viewing, inspecting and conducting studies of the Property, so long as they do not unreasonably interfere with the use of the Property by Seller or any tenants, or cause damage to the Property.

L. **Governing Law**. This Contract will be construed under and governed by the laws of the State of Texas, and unless otherwise provided in this Contract, all obligations of the parties created under this Contract are to be performed in the county where the Property is located.

M. **Severability**. If any provision of this Contract is held to be invalid, illegal, or unenforceable by a court of competent jurisdiction, the invalid, illegal, or unenforceable provision will not affect any other provisions, and this Contract will be construed as if the invalid, illegal, or unenforceable provision is severed and deleted from this Contract.

N. **Broker Disclaimer**. The Brokers will disclose to Purchaser any material factual knowledge the Brokers may possess about the condition of the Property. Purchaser understands that a real estate broker is not an expert in matters of law, tax, financing, surveying, hazardous materials, engineering, construction, safety, zoning, land planning, architecture, or the Americans with Disabilities Act. Purchaser should seek expert assistance on such matters. The Brokers do not investigate a property's compliance with building codes, governmental ordinances, statutes and laws that relate to the use or condition of the Property or its construction, or that relate to its acquisition. Purchaser is not relying upon any representations of the Brokers concerning permitted uses of the Property or with respect to any nonconformance of the Property. If the Brokers provide names of consultants or sources for advice or assistance, the Brokers do not warrant the services of the advisors or their products. The Brokers cannot warrant the suitability of property to be acquired. Purchaser acknowledges that current and future federal, state and local laws and regulations may require any Hazardous Materials to be removed at the expense of those persons who may have had or continue to have any interest in the Property. The expense of such removal may be substantial. Purchaser agrees to look solely to experts and professionals selected or approved by Purchaser to advise Purchaser with respect to the condition of the Property and will not hold the Brokers responsible for any condition relating to the Property. The Brokers do not warrant that Seller will disclose any or all property defects or other matters pertaining to the Property or its condition. Seller and Purchaser agree to hold the Brokers harmless from any damages, claims, costs and expenses including, but not limited to, reasonable attorneys' fees and court costs, resulting from or related to any person furnishing any false, incorrect or inaccurate information with respect to the Property, Seller's concealing any material information with respect to the condition of the Property, or matters that should be analyzed by experts. To the extent permitted by applicable law, the Brokers' liability for errors or omissions, negligence, or otherwise, is limited to the return of the Fee, if any, paid to the responsible Broker pursuant to this Contract. The parties agree that they are not relying upon any oral statements that the Brokers may have made. Purchaser is relying solely upon Purchaser's own investigations and the

Seller's Initials _____ RL _____    Purchaser's Initials _____

©Copyright 2010 NTCAR - Form No. 1 (1/10)                                                                Page 18

28

representations of Seller, if any, and Purchaser acknowledges that the Brokers have not made any warranty or representation with respect to the condition of the Property or otherwise.

        **O.**    **Counterparts**.  This Contract may be executed in a number of identical counterparts. Each counterpart is deemed an original and all counterparts will, collectively, constitute one agreement.

        **P.**    **Patriot Act Representation**.  Seller and Purchaser each represent to the other that: (1) its property interests are not blocked by Executive Order No. 13224, 66 Fed. Reg. 49079; (2) it is not a person listed on the Specially Designated Nationals and Blocked Persons list of the Office of Foreign Assets Control of the United States Department of the Treasury; and (3) it is not acting for or on behalf of any person on that list.

        **Q.**    **Exchange.**  Seller and Purchaser shall cooperate with each other in connection with any tax deferred exchange that either party may be initiating or completing in connection with Section 1031 of the Internal Revenue Code, so long as neither party will be required to pay any expenses related to the other party's exchange and the Closing is not delayed. Notwithstanding any other provision that may prohibit the assignment of this Contract, either party may assign this Contract to a qualified intermediary or exchange accommodation title holder, if the assignment is required in connection with the exchange. The parties agree to cooperate with each other, and sign any reasonable documentation that may be required, to effectuate any such exchange.

    **20.**    **STATUTORY NOTICES.**

        **A.**    **Abstract or Title Policy**.  At the time of the execution of this Contract, Purchaser acknowledges that the Brokers have advised and hereby advise Purchaser, by this writing, that Purchaser should have the abstract covering the Property examined by an attorney of Purchaser's own selection or that Purchaser should be furnished with or obtain a policy of title insurance.

        **B.**    **Notice Regarding Unimproved Property Located in a Certificated Service Area**.  If the Property is unimproved and is located in a certificated service area of a utility service, then Seller shall give to Purchaser a written notice in compliance with §13.257 of the Texas Water Code, and Purchaser agrees to acknowledge receipt of the notice in writing.  The notice must set forth the correct name of utility service provider authorized by law to provide water or sewer service to the Property, and must comply with all other applicable requirements of the Texas Water Code.

        **C.**    **Special Assessment Districts**.  If the Property is situated within a utility district or flood control district subject to the provisions of §49.452 of the Texas Water Code, then Seller shall give to Purchaser the required written notice and Purchaser agrees to acknowledge receipt of the notice in writing.  The notice must set forth the current tax rate, the current bonded indebtedness and the authorized indebtedness of the district, and must comply with all other applicable requirements of the Texas Water Code.

        **D.**    **Property Owners' Association**.  If the Property is subject to mandatory membership in a property owners' association, Seller shall notify Purchaser of the current annual budget of the property owners' association, and the current authorized fees, dues and/or assessments relating to the Property.  In addition, Seller shall give to Purchaser the written notice required under §5.012 of the Texas Property Code, if applicable, and Purchaser agrees to acknowledge receipt of the notice in writing. Also, Seller shall give to Purchaser the resale certificate required under Chapter 207 of the Texas Property Code, if applicable, and Purchaser agrees to acknowledge receipt of the resale certificate in writing.

        **E.**    **Notice Regarding Possible Annexation**.  If the Property that is the subject of this Contract is located outside the limits of a municipality, the Property may now or later be included in the extraterritorial jurisdiction of the municipality and may now or later be subject to annexation by the

Seller's Initials   **Rl**            Purchaser's Initials

municipality. Each municipality maintains a map that depicts its boundaries and extraterritorial jurisdiction. To determine if the Property is located within a municipality's extraterritorial jurisdiction or is likely to be located within a municipality's extraterritorial jurisdiction, contact all municipalities located in the general proximity of the Property for further information.

F.    **Notice Regarding Coastal Area Property.** If the Property adjoins or shares a common boundary with the tidally influenced submerged lands of the state, then Seller shall give to Purchaser a written notice regarding coastal area property, in compliance with §33.135 of the Texas Natural Resources Code, and Purchaser agrees to acknowledge receipt of the notice in writing.

G.    **Gulf Intracoastal Waterway Notice.** If the Property is located seaward of the Gulf Intracoastal Waterway, then Seller shall give to Purchaser a written notice regarding the seaward location of the Property, in compliance with §61.025 of the Texas Natural Resources Code, and Purchaser agrees to acknowledge receipt of the notice in writing.

H.    **Notice for Property Located in an Agricultural Development District.** If the Property is located in an agricultural development district, then in accordance with §60.063 of the Texas Agricultural Code: (1) Seller shall give to Purchaser a written notice that the Property is located in such a district; (2) Purchaser agrees to acknowledge receipt of the notice in writing; and (3) at the Closing, a separate copy of the notice with current information about the district will be executed by Seller and Purchaser and recorded in the deed records of the county in which the Property is located.

I.    **Certificate of Mold Remediation**. If a certificate of mold remediation has been issued for the Property under Section 1958.154 of the Occupations Code within the preceding five years, Seller is required to provide a copy of the certificate to Purchaser.

J.    **Notice of Water Level Fluctuations**. If the Property adjoins a lake, reservoir, or other impoundment of water that has storage capacity of at least 5,000 acre-feet at the impoundment's normal operating level, then the following notice applies.

NOTICE OF WATER LEVEL FLUCTUATIONS: The water level of the impoundment of water adjoining the Property fluctuates for various reasons, including as a result of: (1) an entity lawfully exercising its right to use the water stored in the impoundment; or (2) drought or flood conditions.

I.    **Disclosure of Dual Capacity as Broker and Principal.    [Complete if applicable].**

Benjamin B. Efraim    is a licensed ~~Texas~~ California real estate broker and is acting in a dual capacity as broker for the Purchaser and as a principal in this transaction, as he or she may be the Purchaser or affiliated with the Purchaser (or one of the owners of the Purchaser after any assignment of this Contract).

~~_____ is a licensed Texas real estate broker and is acting in a dual capacity as broker for the Seller and as a principal in this transaction, as he or she may be the Seller (or one of the owners of the Seller).~~

21.    **DISPUTE RESOLUTION.**

A.    **Mediation.** If any dispute (the **"Dispute"**) arises between any of the parties to this Contract including, but not limited to, payment of the Fee, then any party (including any Broker) may give written notice to the other parties requiring all involved parties to attempt to resolve the Dispute by mediation. Except in those circumstances where a party reasonably believes that an applicable statute of limitations period is about to expire, or a party requires injunctive or equitable relief, the parties are

Seller's Initials ____RL____    Purchaser's Initials _____

obligated to use this mediation procedure before initiating arbitration or any other action. Within seven (7) days after receipt of the mediation notice, each party must deliver a written designation to all other parties stating the names of one or more individuals with authority to resolve the Dispute on such party's behalf. Within fourteen (14) days after receipt of the mediation notice, the parties shall make a good faith effort to select a qualified mediator to mediate the Dispute. If the parties are unable to timely agree upon a mutually acceptable mediator, any party may request any state or federal judge to appoint a mediator. In consultation with the mediator, the parties shall promptly designate a mutually convenient time and place for the mediation that is no later than thirty (30) days after the date the mediator is selected. In the mediation, each party must be represented by persons with authority and discretion to negotiate a resolution of the Dispute, and may be represented by counsel. The mediation will be governed by applicable provisions of Chapter 154 of the Texas Civil Practice and Remedies Code, and such other rules as the mediator may prescribe. The fees and expenses of the mediator will be shared equally by all parties included in the Dispute.

      **B.**    **Arbitration.** If the parties are unable to resolve any Dispute by mediation, then the parties (including the Brokers) shall submit the Dispute to binding arbitration before a single arbitrator. The Dispute will be decided by arbitration in accordance with the applicable arbitration statute and any rules selected by the arbitrator. After an unsuccessful mediation, any party may initiate the arbitration procedure by delivering a written notice of demand for arbitration to the other parties. Within fourteen (14) days after the receipt of the written notice of demand for arbitration, the parties shall make a good faith effort to select a qualified arbitrator acceptable to all parties. If the parties are unable to agree upon the selection of an arbitrator, then any party may request any state or federal judge to appoint an arbitrator. This agreement to arbitrate will be specifically enforceable under the prevailing arbitration law.

    **22.**    **CONSULT AN ATTORNEY**. This Contract is a legally binding agreement. The Brokers cannot give legal advice. The parties to this Contract acknowledge that they have been advised to have this Contract reviewed by legal counsel before signing this Contract.

| Purchaser's attorney: | Seller's attorney: |
|---|---|
| Name: Stuart A. Lautin, Esq. | Name: _____ |
| Address: | Address: _____ |
| | _____ |
| Phone: | Phone: _____ |
| Email: | Email: _____ |

    **23.**    **EXHIBITS AND ADDENDA.** All Exhibits and Addenda attached to this Contract are incorporated herein by reference and made a part of this Contract for all purposes *[check all that apply]*:

| | | |
|---|---|---|
| ☑ | Exhibit "A" | Legal Description |
| ☐ | Exhibit "B" | Site Plan |
| ☑ | Exhibit "C" | Information About Brokerage Services |
| ☐ | Exhibit "D" | _____ |
| | | |
| ☐ | Addendum A | Schedule of Personal Property |
| ☑ | Addendum B-1 | Third Party Financing |
| ☐ | Addendum B-2 | Seller Financing |
| ☐ | Addendum B-3 | Existing Loan |
| ☑ | Addendum C | Disclosure Notice |
| ☐ | Addendum D | Lead Based Paint |
| ☑ | Addendum E | Additional Provisions |

Seller's Initials   _RL_   ____    Purchaser's Initials _____

24.    ~~CONTRACT AS OFFER.~~ ~~The execution of this Contract by the first party to do so constitutes an offer to purchase or sell the Property. If the other party does not accept that offer by signing this Contract and delivering a fully executed copy to the first party within_____ _____days after the date this Contract is executed by the first party, then the first party may withdraw that offer by delivering a written notice to the other party at any time before the other party accepts that offer, in which case the Earnest Money, if any, will be returned to Purchaser.~~

25.    **ADDITIONAL PROVISIONS.** *[Additional provisions may be set forth below or on any attached Addendum].*

See Addendum E. attached hereto._____

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

This Contract is executed to be effective as of the date the Title Company acknowledges receipt of this fully executed Contract as indicated by the signature block for the Title Company (the **Effective Date**).

**SELLER:**

**Intermed Services Management Co, LP,**
a Texas limited partnership

By: (Signature _____ *robert lenington*
Name: Robert Lenington 51B7F7B1D09549C...
Title: _____ managing partner

By: (Signature) _____
Name: _____
Title: _____

Tax I.D. No: _____
Date of Execution: ____ 12/16/2020

**PRINCIPAL BROKER:**

Ridge Pointe Commercial Real Estate, LTD

By: (Signature) _____ *robert lenington*
Name: _____
Title: _____

Address: _____

Telephone: _____
Email: deng
TREC License No.. _____

**PURCHASER:**

**Horseshoe, LLC,**
a California limited liability company

By:      **Fortune Realty, LLC,**
         its Manager

By: (Signature) _____
Name: Benjamin B. Efraim, Esq.
Title: Manager

By: (Signature) _____
Name: _____
Title: _____

Tax I.D. No: _____
Date of Execution: ____ 12/14/2020

~~COOPERATING BROKER:~~

~~By: (Signature)~~
~~Name:~~
~~Title:~~

~~Address:~~

~~Telephone:~~
~~Email:~~
~~TREC License No.:~~

**TITLE COMPANY RECEIPT:** The Title Company acknowledges receipt of this Contract on _____ _December 16, 2020_ (the **Effective Date**). Upon receipt of the Earnest Money, the Title Company accepts the Earnest Money subject to the terms and conditions set forth in this Contract.

## TITLE COMPANY:

By: (Signature) _____

Name: _Lindsey Busbee_____

Title: _Commercial Escrow Officer_____

Address: _____

Telephone: _____

Email: _____

*PERMISSION TO USE: This form is provided for use by members of the North Texas Commercial Association of Realtors*, Inc. ("NTCAR") and members of the North Texas Commercial Association of Real Estate Professionals, Inc. Permission is given to make limited copies of the current version of this form for use in a particular Texas real estate transaction. Please contact the NTCAR office to confirm you are using the current version of this form. Mass production, or reproduction for resale, is not allowed without express permission. Any changes to this form must be made in a manner that is obvious. If any words are deleted, they must be left in the form with a line drawn through them. If changes are made that are not obvious, they are not enforceable.*

Seller's Initials _____   Purchaser's Initials _____

34

## EXHIBIT "A"

### Legal Description

[To be provided by Title]

---

©Copyright 2010 NTCAR - Form No. 1 (1/10)

## EXHIBIT "C"

### Information About Brokerage Services

©Copyright 2010 NTCAR – Form No. 1 (1/10)

# Information About Brokerage Services

*Texas law requires all real estate license holders to give the following information about brokerage services to prospective buyers, tenants, sellers and landlords.*



**TYPES OF REAL ESTATE LICENSE HOLDERS:**
- **A BROKER** is responsible for all brokerage activities, including acts performed by sales agents sponsored by the broker.
- **A SALES AGENT** must be sponsored by a broker and works with clients on behalf of the broker.

**A BROKER'S MINIMUM DUTIES REQUIRED BY LAW (A client is the person or party that the broker represents):**
- Put the interests of the client above all others, including the broker's own interests;
- Inform the client of any material information about the property or transaction received by the broker;
- Answer the client's questions and present any offer to or counter-offer from the client; and
- Treat all parties to a real estate transaction honestly and fairly.

**A LICENSE HOLDER CAN REPRESENT A PARTY IN A REAL ESTATE TRANSACTION:**

**AS AGENT FOR OWNER (SELLER/LANDLORD):** The broker becomes the property owner's agent through an agreement with the owner, usually in a written listing to sell or property management agreement. An owner's agent must perform the broker's minimum duties above and must inform the owner of any material information about the property or transaction known by the agent, including information disclosed to the agent or subagent by the buyer or buyer's agent.

**AS AGENT FOR BUYER/TENANT:** The broker becomes the buyer/tenant's agent by agreeing to represent the buyer, usually through a written representation agreement. A buyer's agent must perform the broker's minimum duties above and must inform the buyer of any material information about the property or transaction known by the agent, including information disclosed to the agent by the seller or seller's agent.

**AS AGENT FOR BOTH - INTERMEDIARY**: To act as an intermediary between the parties the broker must first obtain the written agreement of *each party* to the transaction. The written agreement must state who will pay the broker and, in conspicuous bold or underlined print, set forth the broker's obligations as an intermediary. A broker who acts as an intermediary:
- Must treat all parties to the transaction impartially and fairly;
- May, with the parties' written consent, appoint a different license holder associated with the broker to each party (owner and buyer) to communicate with, provide opinions and advice to, and carry out the instructions of each party to the transaction.
- Must not, unless specifically authorized in writing to do so by the party, disclose:
  - that the owner will accept a price less than the written asking price;
  - that the buyer/tenant will pay a price greater than the price submitted in a written offer; and
  - any confidential information or any other information that a party specifically instructs the broker in writing not to disclose, unless required to do so by law.

**AS SUBAGENT:** A license holder acts as a subagent when aiding a buyer in a transaction without an agreement to represent the buyer. A subagent can assist the buyer but does not represent the buyer and must place the interests of the owner first.

**TO AVOID DISPUTES, ALL AGREEMENTS BETWEEN YOU AND A BROKER SHOULD BE IN WRITING AND CLEARLY ESTABLISH:**
- The broker's duties and responsibilities to you, and your obligations under the representation agreement.
- Who will pay the broker for services provided to you, when payment will be made and how the payment will be calculated.

**LICENSE HOLDER CONTACT INFORMATION:** This notice is being provided for information purposes. It does not create an obligation for you to use the broker's services. Please acknowledge receipt of this notice below and retain a copy for your records.

David English/Ridge Pointe
Commercial Real Estate, LTD

| Licensed Broker /Broker Firm Name or Primary Assumed Business Name | License No. | Email | Phone |
|---|---|---|---|
| Designated Broker of Firm | License No. | Email | Phone |
| Licensed Supervisor of Sales Agent/ Associate | License No. | Email | Phone |
| Sales Agent/Associate's Name | License No. | Email | Phone |

Buyer/Tenant/Seller/Landlord Initials        12/16/2020

Date

**Regulated by the Texas Real Estate Commission**        Information available at www.trec.texas.gov

IABS 1-0

37

# NORTH TEXAS COMMERCIAL ASSOCIATION OF REALTORS®

## ADDENDUM B-1 TO COMMERCIAL CONTRACT OF SALE

### THIRD PARTY FINANCING

**Property address or description:**  810 E. Ralph Hall Parkway, Rockwall, TX 75032-6878, Rockwall County, Texas

---

1.    **THIRD PARTY FINANCING.** *[Chose one]:*

☐    This Contract is subject to Purchaser obtaining approval from a third party lender of financing in the amount of $_____, payable at _____ _____ intervals based on an amortization of not less than _____ years, with a payment term of not less than _____ years, and with the initial interest rate not to exceed _____ % per annum for the first _____ years of the loan.

☑    This Contract is subject to Purchaser obtaining approval from a third party lender of financing upon terms acceptable to Purchaser.

2.    **APPLICATION.** Purchaser shall apply for the desired third party financing approval within seven (7) days after the Effective Date and shall use reasonable efforts to obtain the financing approval.

3.    **FINANCING CONTINGENCY.** ~~If~~ Unless Purchaser notifies Seller in writing that it has obtained ~~does not obtain~~ the financing approval by the date that is thirty (30)  days  (the  **"Financing Contingency Period"**) after the Effective Date, then ~~Purchaser may terminate~~ this Contract shall terminate ~~by delivering a written notice to Seller~~ within five (5) days after the end of the Financing Contingency Period (but in any event before the Closing). ~~Purchaser shall deliver a written notice to Seller confirming Purchaser has obtained the financing approval promptly after Purchaser receives the approval. If Seller does not receive that notice on or before the date that is two (2) business days after the end of the Financing Contingency Period, then Seller may terminate this Contract by delivering a written notice to Purchaser at any time thereafter until Seller receives that notice (but in any event before the Closing).~~ If ~~either party terminates~~ this Contract is terminated pursuant to this Section, the Earnest Money will be returned to Purchaser.

Seller's Initials _____    Purchaser's Initials _____

@Copyright 2010 NTCAR - Form No. 1 (1/10)

ADDENDUM B-1

38

# NORTH TEXAS COMMERCIAL ASSOCIATION OF REALTORS®

## ADDENDUM C TO COMMERCIAL CONTRACT OF SALE

### DISCLOSURE NOTICE

**Property address or description**: 810 E. Ralph Hall Parkway, Rockwall, TX 75032-6878, Rockwall County, Texas

This Disclosure Notice (this **"Notice"**) is a statement by Seller of the condition of the Property made as of the date of this Contract. This is not a substitute for any inspections Purchaser may make or for warranties that may be made by others. **To best of Seller's knowledge**, other than disclosed by Seller in this Notice: (1) the Property does not have any material latent, structural, or construction defects; (2) the Property is not contaminated with Hazardous Materials in violation of applicable laws and regulations; (3) none of the improvements on the Property has been constructed of materials known to be a potential health hazard to occupants of the Property; and (4) the following information is true and correct in all material respects, and Seller has included any material fact concerning the Property of which Seller is aware. **These representations are not warranties or guarantees by Seller.** Seller hereby authorizes the Brokers to disclose to Purchaser all information about the condition of the Property whether disclosed to the Brokers by Seller orally or in writing (by this Notice or otherwise), or otherwise discovered. Seller shall advise Purchaser and the Brokers of any other material fact or condition, not reported here, that may arise or become known to Seller before the Closing. These representations are made by Seller only and are not representations of the Brokers. Seller acknowledges that Purchaser and the Brokers will be relying upon the accuracy and completeness of this information.

*Please answer all questions.* If the answer to any question is "Yes," explain on a separate sheet.

**1. Buildings and Improvements.** Are there any defects or repairs needed to the following?

| | N/A | YES | NO | UNKNOWN |
|---|---|---|---|---|
| a. Roof, parapets, flashing, penetrations, chimneys, skylights | | | | |
| b. Air conditioning, refrigeration, heating, ventilating systems, air ducting, fans | | | | |
| c. Foundation piers, slabs, grade beams, footings, retaining walls | | | | |
| d. Floors, interiors, floor coverings, ceilings, millwork, partitions | | | | |
| e. Exterior walls, curtain walls, weather proofing, caulking | | | | |
| f. Structural components, columns, trusses, beams, bracing | | | | |
| g. Electrical systems, wiring, lighting, fixtures and equipment | | | | |
| h. Plumbing systems, piping, drains, valves, fixtures and equipment | | | | |
| i. Elevators, escalators, overhead doors, other built-in mechanical equipment | | | | |
| j. Windows, doors, plate glass, canopies, other architectural features | | | | |
| k. Parking areas, driveways, steps, walks, curbs and other pavements | | | | |
| l. Landscaping, irrigation systems, embankments, fences, signs | | | | |

**2. Hazardous Materials.** Have there been any Hazardous Materials:

| | N/A | YES | NO | UNKNOWN |
|---|---|---|---|---|
| a. Released or deposited on or under or about the Property, or leaking on or from the Property? | | | | |
| b. Used in the construction of the improvements or in finishing materials? | | | | |
| c. Released or deposited on or leaking from other properties contiguous to the Property? | | | | |

Seller's Initials _RL_      Purchaser's Initials _____ ○

©Copyright 2010 NTCAR - Form No. 1 (1/10)                     **ADDENDUM C**

JoudSign Envelope ID: F54/ IAAS-3243-4F82-8010-F5S182050B71

|  | N/A | YES | NO | UNKNOWN |
|---|---|---|---|---|

**3. Subsurface Conditions.**

a. Are there any material soil, geological, groundwater, or foundation problems?

b. Are there underground storage tanks or leaking pipes on the Property?

c. Is the Property situated in a wetland or over a garbage dump or waste landfill?

**4. Special Conditions.**

a. Are there any public or private easements or agreements for utilities or access?

b. Is the Property flood prone or located in a 100-year flood plain?

c. Are there any violations of building codes, zoning ordinances, EPA regulations, OSHA regulations, or Texas Commission on Environmental Quality rules?

d. Are there any violations of Deed Restrictions covering the Property?

e. Are there any threatened condemnations by public authorities or utility companies, including planned streets, highways, railroads, utilities, or development projects?

f. Is the Property located in a historical district or planned development district?

g. Is the Property in any special zoning district or under a specific use permit?

h. Are there any pending changes in zoning or in the physical condition of the Property?

i. Is the Property subject to membership in a property owners' association or dues?

**5. Utilities Present.** *(Strike those not on the Property)*: City Water; Sanitary Sewer; Storm Drainage; Natural Gas; Electricity

Seller's Initials ___DS___ _KL_ _____    Purchaser's Initials _____

©Copyright 2010 NTCAR - Form No. 1 (1/10)

ADDENDUM C

40

## ADDENDUM E TO
## COMMERCIAL CONTRACT OF SALE

This Addendum E to Commercial Contract of Sale ("Addendum") modifies the provisions of the Commercial Contract of Sale ("Contract") executed between **Intermed Services Management Co, LP,** as Seller, and **Horseshoe, LLC,** as Purchaser. Terms commencing with a capital letter that are undefined in this Addendum share the same definition as provided in the Contract. References to section numbers refer to their counterparts in the Contract. In the event of conflicts, the provisions of this Addendum govern such conflicts.

1. Loan Balance. The amount of the Purchase Price to be financed can only be approximated at this time; Purchaser shall not incur an event of default if Purchaser seeks a loan for an amount different than that disclosed to Seller at the time of contracting.

2. Additional Earnest Money. Section 4.C. of the Contract is amended to provide that Purchaser shall cause the additional sum of $130,000 to be paid to Title Company within two business days following expiration of the Inspection Period. Such additional sum shall be considered as Earnest Money and applied or disbursed in accordance with the Contract.

3. Due Diligence Documents. In addition to the documents to be delivered to Purchaser identified in Sections 10.C.(b) and 11.A. of the Contract, Seller shall also cause the following documents to be delivered to Purchaser within two business days after the Effective Date:

    (15)    Schedule and reconciliation of all operating expenses from Jan 2017 to year-to-date 2020.
    (16)    Schedule and reconciliation of all "triple net" expenses from Jan 2017 to year-to-date 2020.
    (17)    Schedule and reconciliation of all common area expenses from Jan 2017 to year-to-date 2020.
    (18)    Seller's current owner policy of title insurance, and all endorsements.
    (19)    Copies of all title exceptions described in Seller's current owner title policy.
    (20)    All financial statements, gross sales reports, and income statements furnished by Seller's tenants and such tenants' guarantors.
    (21)    2020 Property budget.
    (22)    2021 Property budget, if it has been developed by Seller or Seller's property manager.
    (23)    All warranties and guaranties pertaining to Seller's equipment, furnishings, and fixtures.
    (24)    Full copies of all pleadings and relevant correspondence for pending litigation, mediation, and arbitration against or in any manner involving Seller, Seller's affiliates or owners, Seller's tenants, and such tenants' guarantors; full copies of all claims asserted by or against any of the foregoing.

41

(25)  All certificates of occupancy, licenses, and permits issued to Seller and Seller's tenants.

(26)  All brokerage and leasing contracts and agreements, and all amendments.

(27)  All insurance loss run schedules, casualty reports, and liability claims from Jan 2017 to year-to-date 2020.

(28)  All prior notices of municipal code and environmental violations.

(29)  All communications with tenants and tenants' guarantors regarding allegations of default or breach asserted against any of Seller, any affiliate or owner of Seller, Seller's property manager, tenants, tenants' assignees, tenants' sublessees, and tenants' guarantors.

(30)  All ADA, Texas Architectural Barriers, and Texas Accessibility Standards reports, assessments, repairs, demands, claims, invoices, bills, and statements.

(31)  All other information material to the Property.

4. Estoppels. All Estoppel Certificates described in Section 12 of the Contract must be in form and content reasonably acceptable to Purchaser and /or Purchaser's lender.

5. Closing Docs. Each of the Deed, Bill of Sale, Assignment of Leases, and Certified Rent Roll described in Section 15.B of the Contract must be in form and content reasonably acceptable to Purchaser and /or Purchaser's lender.

6. Obligation Discharge. Section 15.D of the Contract is modified to provide that Seller shall cause all service contracts, leasing agreements, brokerage contracts, commission agreements, and similar to be paid and fully discharged at Closing, at Seller's expense, and furnish Purchaser with evidence thereof reasonably satisfactory to Purchaser. Further, Seller shall also cause to be fully paid to Purchaser at Closing all unpaid tenant improvement allowances, future rent abatements and credits, all lease option extension credits, and all future tenant-inducements.

[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, this Addendum has been executed as of the Effective Date.

**Intermed Services Management Co, LP** ("Seller")

By: _____
Name: Robert Lemington
Title:    managing partner


**Horseshoe, LLC** ("Buyer")

By: Fortune Realty, LLC, its Manager


By: _____
Name: Benjamin B. Efraim
Title: Manager of Fortune Realty, LLC

12|14|2020.

Page 3