IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| INTERMED SERVICES MANAGEMENT CO., LP, § § § Plaintiff, § § v. § HORSESHOE, LLC, *et al.*, § § Defendants. § § § § § § § § § § | | Civil Action No. 3:22-CV-0191-N |

## MEMORANDUM OPINION AND ORDER

This order addresses Defendants/Counter-Plaintiffs Horseshoe, LLC ("Horseshoe") and Halter Companies, LLC's ("Halter") motion to compel arbitration [20] and Plaintiff/Counter-Defendant Intermed Services Management Company, L.P.'s ("Intermed LP") motion to dismiss [22]. Upon evidentiary hearing, the Court concludes that the parties entered a valid agreement; thus, the Court grants the motion to compel and denies the motion to dismiss as moot.

### I. THE PURPORTED SALE OF THE PROPERTY

In this case and a related case,[1] the parties dispute whether Intermed LP validly agreed to sell real estate to Horseshoe. In 2005, a group of doctors organized Intermed (collectively) for the exclusive purpose of jointly building and managing a medical office building (the "Property"). Defs.' App. Supp. Br., Ex. B, Usman Dep. 11:5–17 (App. 99)

---

[1] *Halter Cos., LLC v. Intermed Servs. Mgmt. Co., LP*, Case No. 3:22-CV-145 (N.D. Tex. 2022).

[49-1]; *see also* Pl.'s Supp. App. Supp. Resp., Ex. B, Intermed LP Limited Partnership Agreement § 1.03(a) (App. 38) [53]. Intermed consists of two entities: Intermed LP is a Texas limited partnership, and Intermed Services, Inc. ("Intermed Inc.") is its general partner. Limited Partnership Agreement App. 38. The Intermed doctors[2] are simultaneously limited partners in Intermed LP, directors of Intermed Inc., and tenants of the Property, owned by Intermed LP. *See* Pl.'s Supp. App. Supp. Resp., Ex. C, Intermed Inc. Bylaws App. 75; Defs.' App. Supp. Br., Ex. C, Lenington Dep. 12:23–13:20, 14:21–25 (App. 154–56). Importantly, the Property is Intermed LP's sole asset, and the parties do not dispute that unanimous written consent of all partners is a prerequisite to its transfer. Pl.'s Supp. App. Supp. Resp., Ex. L, Lenington Dep. 77:7–25 (App. 173); Limited Partnership Agreement §§ 8.03, 8.05(g) ("The General Partner shall have exclusive control of the Partnership," including "the powers to . . . [s]ell . . . Partnership property," but "except with the prior written consent of all Partners, no Partner may . . . [t]ransfer all or substantially all of the Partnership's assets.").

Dr. Robert Lenington became President of both entities in 2019. Pl.'s Supp. App. Supp. Resp., Ex. D, May 30, 2019 Meeting Minutes (App. 76). Prior to and during his tenure, the Intermed doctors explored the idea of selling the Property. Defs.' Supp. App., Usman Dep. 17:9–17 (App. 102); Lenington Dep. 17:2–9 (App. 157). Like his predecessor, Dr. Scott Pierce, Lenington was understood to be the point person facilitating

---

[2] At the time of the events in question, Intermed's limited partners and shareholder-directors were: Scott Pierce, Asim Usman, Adnan Hamid, Joseph Bleier, Steven Brancheau, Mohan Philip, Evan Evans, David Minchey, and Robert Lenington. Defs.' Supp. Br. 7 [49].

MEMORANDUM OPINION AND ORDER – PAGE 2

a sale. Defs.' Supp. App., Usman Dep. 17:18–25 (App. 102); Lenington Dep. 17:10–18:5, 18:22–19:13 (App. 157–59).

In November 2020, Intermed's real estate broker, David English, forwarded Lenington a Letter of Intent ("LOI") from Benjamin Efraim, acting as Principal of Horseshoe. Defs.' Supp. App., Lenington Dep. 21:3–22:11 (retention of broker David English), 23:8–24 (receipt of LOI) (App. 161, 163); Ex. A, Efraim Dec., Ex. 2, LOI (App. 14). The LOI was nonbinding, but proposed general terms of purchase, and provided that upon signing, the parties would "endeavor to negotiate" an agreement "reflect[ing] the terms and conditions contained [t]herein." LOI App. 16–17. Lenington presented the LOI to the other Limited Partners, and they voted 7 to 2 to sign it. Defs.' Supp. App., Usman Dep. 20:24–21:14 (App. 103–04).

From there, the parties recount events differently. Lenington explains the vote as an agreement to "sell the building as long as the contract matched the [LOI]." Defs.' Supp. App., Lenington Dep. 24:21–25:4 (App. 164–65). According to him, "absolutely nobody knew" unanimous consent was required at that time, and the dissenters "were going along with" the sale. *Id.* 26:1–13 (App. 166). Lenington then signed a contract (the "Contract") as the "Managing Partner" of Intermed in December 2020. Efraim Dec., Ex. 3, Contract (App. 41). Subsequently, a severe winter storm in February 2021 caused extensive damaged to the Property, and Lenington signed five amendments to accommodate ongoing repairs. Efraim Dec. ¶¶ 7, 11–13. The final amendments extended the closing date to January 26, 2022, and accepted a significant price reduction. *Id.*; Ex. 12, Fifth Amendment § 3 (App. 74). Lenington says that all partners knew he was signing the initial contract,

that he communicated about the amendments to the extent he could contact each partner, and that no one ever opposed his actions. *See, e.g.*, Defs.' Supp. App., Lenington Dep. 27:12–28:20, 31:19–32:5, 34:22–35:11, 36:23–38:19, 42:10–45:13, 53:8–25, 111:9–112:14. Further, Efraim claims he contacted the Limited Partners regarding their leases, and none cast any aspersions on the validity of the transaction. In contrast, the other Intermed doctors contend that they either expressed disagreement with the proposed price reduction or lacked knowledge of the Contract altogether until a year after its signing. *See, e.g.*, Pl.'s Supp. App., Ex. E, Evans Decl. ¶ 12 (App. 80); Ex. F, Pierce Dep. 24:5–24 (App. 98); Ex. J, Brancheau Decl. ¶ 11 (App. 124); Ex. A, Usman Dep. 27:10–28:16 (App.19–20).

In any event, the sale definitively came to light in November 2021, when Lenington emailed out a copy of the Contract for the first time. Pl.'s Supp. App., Lenington Dep. 108:14–18 (App. 185). Shortly thereafter, Lenington stepped down from his role as President, the partners voted unanimously to repudiate the Contract, and Horseshoe assigned its rights under the Contract and its Amendments to Halter. *Id.*, Pierce Dep. 38:11–15 (App. 100); Ex. O, January 11, 2022 Meeting Minutes (App. 245); Efraim Decl. ¶ 16. Intermed LP then filed an action for declaratory relief in state court; Defendants filed their own action in this district, then removed Intermed LP's state action to this Court. Defs.' Notice Removal ¶ 1 [1]. Defendants demanded arbitration be ordered pursuant to the Contract's dispute resolution provisions. Defs.' Answer, Counterclaims & Demand Arb. ¶¶ 96–98 [16] (citing Contract § 21 (Defs.' Supp. App. 38)).

The Court ordered limited discovery on contract formation and held an evidentiary hearing on May 11, 2023. The Court makes the following findings of fact and conclusions of law.

## II. THE LEGAL STANDARD FOR A MOTION TO COMPEL ARBITRATION

No party disputes the applicability of the Federal Arbitration Act ("FAA"),[3] which requires district courts to compel arbitration if they determine that there is a valid arbitration agreement encompassing the issues in dispute. 9 U.S.C. § 3; *see also Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 530 (5th Cir. 2019). Courts in the Fifth Circuit conduct a two-step inquiry when considering a motion to compel arbitration. First, a court must determine whether the parties agreed to arbitrate the dispute by considering "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003). Second, if the claims are subject to a valid arbitration agreement, the Court must determine "whether any federal statute or policy renders the claims nonarbitrable." *Id.*

Courts apply state contract law to determine whether the arbitration agreement is valid and if the claims are within its scope, and the party seeking to compel arbitration bears the burden of establishing these elements. *Halliburton Energy*, 921 F.3d at 530–31. "The party seeking to compel arbitration need only prove the existence of an agreement to

---

[3] The Texas Arbitration Act, codified at TEX. CIV. PRAC. & REM. CODE § 171.001, *et seq.*, also applies, but there are no substantive differences between the two that pertain to the issues here.

MEMORANDUM OPINION AND ORDER – PAGE 5

arbitrate by a preponderance of the evidence." *Grant v. Houser*, 469 F. App'x 310, 315 (5th Cir. 2012) (per curiam) (unpub.). Evidence presented to compel or resist arbitration must be competent summary judgment evidence. *See Gallagher v. Vokey*, 860 F. App'x 354, 358 (5th Cir. 2021) (unpub.). On a motion to compel arbitration "if the material facts necessary to determine the issue are controverted by an opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine the disputed material facts." *ASW Allstate Painting & Const. Co., Inc. v. Lexington Ins. Co.*, 188 F.3d 307, 311 (5th Cir. 1999) (quoting *Howell Crude Oil Co. v. Tana Oil & Gas Corp.*, 860 S.W.2d 634 (Tex. App.—Corpus Christi 1993, no writ)).

### III. LENINGTON HAD APPARENT AUTHORITY TO BIND INTERMED LP TO THE SALE

It is well-established that one individual's actions may bind another if the principal's actions lead a third party to reasonably believe that the agent has authority to act on the principal's behalf. RESTATEMENT (THIRD) OF AGENCY § 2.03 (AM. L. INST. 2006); see also *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007). In assessing apparent authority, the agent's representations are largely immaterial; the relevant considerations are the actions taken by the principal toward the agent, *Gaines*, 235 S.W.3d at 182, and the state of mind of the person who observes or otherwise learns of and relies on the principal's conduct. RESTATEMENT (THIRD) OF AGENCY § 1.03 cmt. b.

A principal may manifest assent to an agent's authority by either (1) knowingly permitting an agent to hold himself out with authority or (2) acting without "such ordinary care as to clothe an agent with the indicia of authority." *Gaines*, 235 S.W.3d at 182

(quoting *Baptist Mem. Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 948 (Tex. 1998)). "Silence may constitute a manifestation when, in light of all the circumstances, a reasonable person would express dissent to the inference that other persons will draw from silence." RESTATEMENT (THIRD) OF AGENCY § 1.03 cmt. b. Voluntary manifestations are effective even if "made negligently or [] otherwise in error." *Id.* § 1.03 cmt. d.

The permissibility of a third party's assumptions about authority turn on whether "a reasonably prudent person" would have concluded the same from the principal's conduct. *Gaines*, 235 S.W. at 183. "A principal's conduct does not occur in a vacuum." RESTATEMENT (THIRD) OF AGENCY § 2.03 cmt. c. "[G]eneral business custom as well as usage that is particular to the principal's industry" inform the reasonableness of the third party's belief. *Id.* And though the standard compares the third party to a reasonable person "using diligence and discretion to ascertain the agent's authority," *Gaines*, 235 S.W. at 182–83, "[a]bsent circumstances that should raise questions in the mind of a reasonable party, as a general matter there is no requirement that the third party inquire into the scope of an agent's authority." *Overseas Carriers, Inc. v. Team Ocean Servs.-Dallas, Inc.*, 2013 WL 76300, at *14 (S.D. Tex. 2013) (quoting RESTATEMENT (THIRD) OF AGENCY § 2.03 cmt. d.) (internal quotations omitted). A third party need only investigate acts of "an unusual or extraordinary nature." *Natarajan v. Alpha Thought Global, Inc.*, 2005 WL 8158160, at *9 (N.D. Tex. 2005) (collecting cases).

Texas case law is mixed on the extent to which apparent authority applies in real estate transactions. In *Goode v. Westside Developers, Inc.*, a Texas appellate court held that "the doctrine of apparent authority of an agent to bind his principal ordinarily has no

MEMORANDUM OPINION AND ORDER – PAGE 7

application to transactions involving the sale or conveyance of land." 258 S.W.2d 844, 848 (Tex. Civ. App. — Waco 1953, writ ref'd n.r.e.). Key to the court's rationale was that real estate agents and brokers are special agents of limited authority and lack the power to consummate a sale. *Id.* (citing *Loma Vista Dev. Co. v. Johnson*, 180 S.W.2d 922, 924 (Tex. 1944)). The court in *Bugh v. Word* followed *Goode*, held that "the creation of an ostensible or apparent agent should not be permitted in real estate transactions," but again emphasizing the rationale that "one dealing with a real estate broker has a duty to inquire into his authority." 424 S.W.2d 274, 279 (Tex. Civ. App. — Austin 1968, writ ref'd n.r.e.). The court in *Huginnie v. Loyd* then read *Goode* and *Bugh* to extend beyond real estate agents and brokers due to the lack of any explicit limitation. 483 S.W.2d 696, 702 (Tex. Civ. App. — Tyler 1972, writ ref'd n.r.e.). The court in *Cherokee Water Co. v. Forderhause* followed *Huginnie*, 727 S.W.2d 605, 613 (Tex. App. — Texarkana 1987, *rev'd on other grounds*, 741 S.W.2d 377 (Tex. 1987)), but the court in *Matthews v. AmWest Savings Association* declined to apply it, citing the distinction between special and general agents. 825 S.W.2d 552, 554 (Tex. App. — Beaumont 1992, pet. denied).

Importantly, all but *Matthews* involved a human agent acting on behalf of human principals.[4] Corporations and partnerships are not natural persons, and they inherently must act through their officers or others authorized as agents. *Kanida v. Gulf Coast Med. Personnel LP*, 363 F.3d 568, 579 n.9 (5th Cir. 2004) (noting that jury instruction stating so

---

[4] In *Goode*, where the seller was a corporation, Thornton signed on behalf of Norman, who was the President (and thus human agent) of Westside Developers. 258 S.W.2d at 846. In *Cherokee Water Co.*, the sellers signed a deed with Sharp conveying property to Hall, who acted as Cherokee's trustee. 727 S.W.2d at 608.

was correct as a matter of law). Furthermore, "apparent authority is an essential adjunct to actual authority in enabling third parties to deal effectively with organizations," as "creat[ing] actual authority to act on behalf of an organization" tends to be "cumbersome." RESTATEMENT (THIRD) OF AGENCY § 3.03 cmt. c.

None of the aforementioned Texas appellate court decisions is binding over the others, and neither the Texas Supreme Court nor the Fifth Circuit have spoken on the matter. Thus, this Court is free to follow *Matthews*, at least on these facts. Where the question is whether an individual acted as a general agent of an organizational principal, apparent authority is not foreclosed.

### A. Lenington Had Apparent Authority to Sign the Contract

To determine whether Lenington had apparent authority to sign the Contract, the Court first examines Intermed LP's conduct for external manifestations of assent. Then, the Court turns to whether Efraim's assumption of Lenington's authority based on that conduct was reasonable. Again, neither Lenington's actions nor Intermed LP's interactions with Lenington affect the apparent authority analysis.

***1. Intermed LP's Manifestations of Assent.*** – First, corporate titles may create apparent authority in some contexts, *Natarajan*, 2005 WL 8158160, at *10 (collecting cases), as "situating people within a hierarchy of positions with defined responsibilities" conveys information to third parties. RESTATEMENT (THIRD) OF AGENCY § 1.03 cmt. c. "If an individual occupies a position that customarily carries specific authority," it is proper for a third party "who knows of the individual's position" to "infer that the principal consents to the individual's exercise of such authority." *Id.* Principals cannot

MEMORANDUM OPINION AND ORDER – PAGE 9

automatically escape liability by "carv[ing] out elements of the customary authority," as third parties may justifiably be unaware of the limitation. *Id.* Here, Intermed's partners elected Lenington as President, and the organization's explicit purpose is the buying and selling of real estate. Pl.'s Supp. App. Supp. Resp., Ex. D, May 30, 2019 Meeting Minutes (App. 76); Limited Partnership Agreement § 1.03(a) (App. 38). Though under Texas law a "president has no inherent authority by virtue of his office," several decisions suggest that presidents typically have "at least the authority to make routine decisions" in the ordinary course of business. 20A TEX. PRAC., BUS. ORGS. § 35:9(2), n.25 Authority from position (3d ed.) (collecting cases).

Additionally, Efraim spoke with at least some of the Intermed doctors directly, Efraim Decl. ¶ 6 (App. 2), who may be charged with knowing of him via Lenington's circulation of the LOI and the subsequent vote. At no point did any limited partner dissuade Efraim of Lenington's authority to facilitate a sale, even when Efraim introduced himself explicitly as the buyer of the building and initiated discussions about the future of their leases. *See, e.g.*, Pl.'s Supp. App., Usman Dep. 27:10–28:10, 35:10–17 (App. 19–20, 23).

**2. *Efraim's Reliance on Intermed LP's Conduct.*** – Reliance must be considered in light of industry customs, and Efraim asserts that, in his experience with over 100 sales, evidence of corporate resolution or partner consent is not typically obtained prior to closing. Efraim Decl. ¶ 18. Instead, he contends that certification of authority is a matter handled by the seller and the title insurance company, without the involvement of the buyer. *Id*. By Efraim's account, the circumstances of the transaction in comparison to his nearly-40 years of experience gave him no reason to doubt Lenington's authority;

according to Efraim, it is typical to rely on a "reputable commercial real estate agent office" where a property is located, Efraim Dep. 35:19–36:16 (App. 238–39), and English did not express any limitations on Lenington's authority as the "seller" other than that Lenington had partners. *Id.* 10:22–11:1 (App. 232–33).

Sales of real property can be outside the scope of ordinary business, which puts a buyer on inquiry as to whether they are interacting with an authorized person. However, according to Efraim, it has never been the case that owners of selling company claimed the president did not have authority. Evidentiary Hr'g. Tr. 29:21-24 [62]. And Intermed LP's explicit purpose, outlined in its governing documents, was to buy and sell real estate. Pl.'s Supp. App. Supp. Resp., Ex. A-1, Intermed LP's Limited Partnership Agreement § 1.03(a) (App. 8) [27]. Further, while Efraim could not rely on Lenington's title alone, other limited partners knew of the transaction in some form, yet failed to clarify the situation in their interactions with Efraim. Evidentiary Hr'g Tr. 16:1-21:25, 24:16-28:3 [62].

The Court finds that Intermed LP manifested Lenington's authority to sell the Property on its behalf, and Efraim reasonably relied on Intermed LP's manifestations. At minimum, the amendments signed following Efraim's initial phone calls to the Intermed doctors created a valid agreement.

## Conclusion

The parties entered a valid agreement containing an arbitration provision. Whether conditions precedent to its enforcement have been satisfied is a question to be resolved by an arbitrator. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002). Accordingly, the Court grants the motion to compel arbitration and denies the motion to dismiss as moot.

Although the FAA provides for a stay pending arbitration, 9 U.S.C. §3, a court may instead dismiss the action without prejudice when all claims are subject to arbitration. *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) ("The weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration.") (citations omitted); *see also Vican, Inc. v. Incipio Techs., Inc.*, 2016 WL 687155, at *1 (N.D. Tex. Feb. 19, 2016) (dismissing action *sua sponte* under the FAA upon request to compel arbitration and stay litigation). This is so because "[a]ny post-arbitration remedies sought by the parties will not entail renewed consideration and adjudication of the merits of the controversy but would be circumscribed to a judicial review of the arbitrator's award in the limited manner prescribed by law." *Alford*, 975 F.2d at 1164 (citation omitted). Here all claims Intermed LP has asserted are subject to arbitration. Based on this determination, the Court dismisses the case, without prejudice, in favor of arbitration.

Signed September 6, 2023.

David C. Godbey
Chief United States District Judge

MEMORANDUM OPINION AND ORDER – PAGE 12